**REDACTED PUBLIC VERSION**

**NOT YET SCHEDULED FOR ORAL ARGUMENT**

No. 22-1073 (and consolidated cases)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING COMPANY LLC, ET AL.

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

———————————————

ON PETITIONS FOR REVIEW OF FINAL ACTIONS OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————————————

**FINAL BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

———————————————

TODD KIM
*Assistant Attorney General*

BRYAN J. HARRISON
JEFFREY HUGHES
U.S. Department of Justice
Of Counsel:                          Environment and Natural Resources Division
                                     Environmental Defense Section
SUSAN STAHLE                         P.O. Box 7611
U.S. Environmental Protection Agency Washington, DC  20044-7611
Office of General Counsel            Tel:  (202) 307-0930 (Harrison)
Washington, DC                       Tel:  (202) 305-4598 (Hughes)
                                     bryan.harrison@usdoj.gov
January 10, 2024                     jeffrey.hughes@usdoj.gov

**REDACTED PUBLIC VERSION**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.    Parties and Amici**

All parties, intervenors, and amici appearing in this Court are listed in the Petitioners' Initial Joint Opening Brief.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Petitioners' Initial Joint Opening Brief.

**C.    Related Cases**

The following are related cases within the meaning of Circuit Rule 28(a)(1)(C):

-   *Calumet Shreveport Refin., LLC v. EPA*, No. 22-60266 – consolidated with Nos. 22-60425, 22-60433, 22-60434 (5th Cir.)

-   *Hunt Refin. Company v. EPA*, No. 22-11617 – consolidated with No. 22-12535 (11th Cir.)

-   *Par Hawaii Refining, LLC, et al. v. EPA*, No. 23-1255 (D.C. Cir.) – consolidated with No. 23-1194 (D.C. Cir.)

-   *Placid Refin. Company LLC v. EPA*, No. 23-1256 (D.C. Cir.) – consolidated with No. 23-1194 (D.C. Cir.)

-   *San Joaquin Refin. Co., Inc. v. EPA*, No. 23-1257 (D.C. Cir.) – consolidated with No. 23-1194 (D.C. Cir.)

- *The San Antonio Refinery LLC v. EPA*, No. 23-1258 (D.C. Cir.) –

consolidated with No. 23-1194 (D.C. Cir.)

- *Cross Oil Refin. & Mktg. Inc. v. EPA*, No. 23-1266 (D.C. Cir.) –

consolidated with No. 23-1194 (D.C. Cir.)

- *American Refin. Group, Inc. v. EPA*, No. 23-2664 (3d Cir.)

- *Calumet Shreveport Refin., et al. v. EPA*, No. 23-60399 (5th Cir.)

- *Wynnewood Refin. Co., LLC v. EPA*, No. 23-60427 (5th Cir.)

- *Ergon Refin., Inc., et al. v. EPA*, No. 23-60492 (5th Cir.)

- *Countrymark Refin. and Logistics, LLC v. EPA*, No. 23-2766 (7th Cir.)

- *Cross Oil Refin. & Mktg. Inc. v. EPA*, No. 23-3101 (8th Cir.)

- *Calumet Montana Refin., LLC v. EPA*, No. 23-2183 (9th Cir.)

- *Par Hawaii Refin., LLC v. EPA*, No. 23-2185 (9th Cir.)

- *San Joaquin Refin. Co, Inc. v. EPA*, No. 23-2186 (9th Cir.)

- *Wyoming Refin. Company v. EPA*, No. 23-9582 (10th Cir.)

- *Hunt Refin. Company v. EPA*, No. 23-12347 (11th Cir.)

/s/ *Bryan J. Harrison*
Bryan J. Harrison

*Counsel for Respondent EPA*

**REDACTED PUBLIC VERSION**

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ........................................................................................ i

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES .............................................................. viii

GLOSSARY ....................................................................................... xvi

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES .............................................................3

PERTINENT STATUTES AND REGULATIONS .................................4

STATEMENT OF THE CASE ................................................................4

I.      STATUTORY AND REGULATORY BACKGROUND ............................4

    A.    The Renewable Fuel Standard Program ..............................4

    B.    Renewable Identification Numbers ("RINs") ......................5

    C.    The Temporary Exemption for "Small Refineries" as
        Defined Under the CAA .....................................................6

    D.    Historical Approaches to "Disproportionate Economic
        Hardship".............................................................................8

    E.    EPA's Assessments of RIN Market Dynamics...................10

II.    FACTUAL AND PROCEDURAL BACKGROUND................................11

    A.    Events Prompting Remand of EPA's Initial 2018
        Decision and Proposed Denial ..........................................11

    B.    Remand of EPA's Initial 2018 Decision ..........................15

**REDACTED PUBLIC VERSION**

C.    Proposed Denial and Petitioners' Comments .....................................15

D.    April Denial .................................................................................16

E.    June Denial .................................................................................17

F.    Related EPA Compliance Actions.........................................18

G.    Petitioners' Filings in This Court .....................................19

SUMMARY OF ARGUMENT ...........................................................19

STANDARD OF REVIEW ...............................................................23

ARGUMENT.................................................................................25

I.    VENUE FOR ALL PETITIONS FOR REVIEW OF THE
      DENIAL ACTIONS IS PROPER ONLY IN THIS COURT.....................25

      A.    The Regional Circuit Petitioners Have Forfeited Any
            Argument in This Court That Their Petitions Should Be
            Transferred .........................................................................26

      B.    The Denial Actions Are Nationally Applicable ................................27

      C.    EPA Properly Made and Published That the Denial
            Actions, To the Extent They Are Locally or Regionally
            Applicable, Are Based on Determinations of Nationwide
            Scope or Effect. ..................................................................28

II.   THE DENIAL ACTIONS ARE NOT IMPERMISSIBLY
      RETROACTIVE.................................................................................30

      A.    The Denial Actions Act Prospectively. ............................................31

      B.    Alternatively, Any Purported Retroactive Effect of the
            Denial Actions Is Permissible. ...........................................32

            1.    Any Reliance by Petitioners on EPA's Prior
                  Approach Is Unreasonable. .....................................34

**REDACTED PUBLIC VERSION**

      2.     EPA Considered and Minimized Hardship to Small Refineries Flowing From Its Untimely Decisions. .................38

III.  EPA'S REVISED INTERPRETATION OF THE CAA'S SMALL REFINERY EXEMPTION PROVISIONS IS CORRECT..................................................................................43

    A.    EPA's Interpretation Provides the Best Reading of the Statute and Is a Reasonable Way to Implement the RFS Program. ...........................................................................43

    B.    Petitioners' Arguments to the Contrary Are Meritless......................50

        1.     EPA Did Not Equate "Hardship" and "Compliance Costs."......................................................................51

        2.     EPA Did Not Unlawfully Restrict the Factors It May Consider in Evaluating Exemption Petitions. .................52

IV.  EPA'S DENIAL ACTIONS WERE CONSISTENT WITH THE CAA AND REASONABLE. ..............................................58

    A.    EPA Did Not Eliminate the Small Refinery Exemption. ..................64

    B.    EPA's Consultation With DOE Satisfied the Statutory Requirement. .....................................................................66

    C.    EPA's Denial Actions Adjudicated Multiple Petitions and Considered Refinery-Specific Facts in Detail. ...........................68

    D.    Petitioners' Remaining Arguments Fail to Show EPA Acted Unreasonably, or Unreasonably Explained Its Findings, and Fail to Address EPA's Responses to Petitioners' Comments.......................................................70

        1.     The Post-Decisional GAO Report Should Not Be Considered or Credited. ...........................................70

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

2.    The Timing of Petitioners' RIN Purchases Does Not Invalidate RIN Cost Passthrough, and Petitioners Did Not Show That They Cannot Purchase RINs Ratably. .........................................................74

3.    EPA Reasonably Rejected Petitioners' General Studies. ...............................................................79

4.    EPA Reasonably Responded to Petitioners' Comments...............................................................83

5.    Petitioners Have the Burden of Demonstrating Disproportionate Economic Hardship, and EPA Provided Clear Direction on the Information Necessary to Do So...............................................93

V.    EPA PROPERLY DENIED FOUR PETITIONS BECAUSE THE SUBMITTING ENTITIES WERE NOT ELIGIBLE TO PETITION FOR A SMALL REFINERY EXEMPTION. ...........................97

A.    EPA Correctly Found ▮▮▮ Ineligible for a Small Refinery Exemption Because ▮▮▮ was not a "Small Refinery" at the Time of the CAA's Initial Statutory Blanket Exemption. ..........................................99

B.    EPA Properly Found ▮▮▮▮▮ Ineligible for a Small Refinery Exemption...................................102

1.    ▮▮▮▮▮ Crude Throughput at Its ▮▮▮ Refinery Exceeded the Statutory Threshold During the Qualification Periods........................................102

2.    ▮▮▮▮ Crude Oil Throughput Exceeded the Statutory Threshold in 2019..................................104

CONCLUSION ..................................................105

CERTIFICATE OF COMPLIANCE...................................107

CERTIFICATE OF SERVICE.........................................108

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

APPENDIX TABLES.........................................................................App. 1

**REDACTED PUBLIC VERSION**

REDACTED PUBLIC VERSION

# TABLE OF AUTHORITIES<sup>*</sup>

**Cases**                                                                              Page(s)

*Air Transp. Ass'n of Am. v. FAA*,
  921 F.3d 275 (D.C. Cir. 2019) ........................................................................24

*Alcoa, Inc. v. EPA*,
  No. 04-1189, 2004 WL 2713116 (D.C. Cir. Nov. 24, 2004) ...........................30

*Aliceville Hydro Assocs. v. FERC*,
  800 F.2d 1147 (D.C. Cir. 1986) ......................................................................33

*\*Alon Refin. Krotz Springs, Inc v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) ...................................10, 11, 23, 60, 62, 100, 102

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) .....................................24, 53, 58, 59, 61, 63, 91

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017) ....................................................................58, 81

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) .......................................................78, 82, 83, 85

*Am. Methyl Corp. v. EPA*,
  749 F.2d 826 (D.C. Cir. 1984) ........................................................................31

*Ams. Clean Energy v. EPA*,
  864 F.3d 691 (D.C. Cir. 2017) ...................................................................40, 56

*Bartko v. SEC*,
  845 F.3d 1217 (D.C. Cir. 2017) ......................................................................26

*Bates v. United States*,
  522 U.S. 23 (1997) ..........................................................................................55

*Blue Water Navy Vietnam Ass'n v. McDonald*,
  830 F.3d 570 (D.C. Cir. 2016) ........................................................................53

---

<sup>*</sup> Authorities upon which we chiefly rely are marked with asterisks.

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988).................................................................33

*Cassell v. FCC*,
154 F.3d 478 (D.C. Cir. 1998) .............................................33, 35, 42

*Chadmoore Commc'ns, Inc. v. FCC*,
113 F.3d 235 (D.C. Cir. 1997) ..............................................32

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984).................................................................24

*Clark-Cowlitz Joint Operating Agency v. FERC*,
826 F.2d 1074 (D.C. Cir. 1987)....................................................32, 33

*Corson & Gruman Co. v. NLRB*,
899 F.2d 47 (D.C. Cir. 1990) ..............................................78

*Craker v. DEA*,
44 F.4th 48 (1st Cir. 2022) ...............................................32

*Dalton Trucking, Inc. v. EPA*,
808 F.3d 875 (D.C. Cir. 2015) ......................................25, 26, 27

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).................................................................47

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).................................................................32

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985).................................................................24, 70

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021) ...............................................61

*Guedes v. ATF*,
45 F.4th 306 (D.C. Cir. 2022) ..............................................57

*Hermes Consol., LLC v. EPA*,
787 F.3d 568 (D. C. Cir. 2015) .................................24, 45, 49, 54, 58, 59, 56

**REDACTED PUBLIC VERSION**

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
  141 S. Ct. 974 (2021) .......................................................................12

*\*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
  141 S. Ct. 2172 (2021) ..................................... 13, 46, 65, 98, 99, 101

*In re Kagan,*
  351 F.3d 1157 (D.C. Cir. 2003).........................................................56

*Jackson v. Mabus,*
  808 F.3d 933 (D.C. Cir. 2015) ..........................................................23

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994)...........................................................................31

*Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB,*
  727 F.2d 1184 (D.C. Cir. 1984)........................................................36

*Luna Perez v. Sturgis Pub. Schs.,*
  143 S. Ct. 859 (2023).........................................................................55

*Malladi Drugs & Pharms., Ltd. v. Tandy,*
  552 F.3d 885 (D.C. Cir. 2009) ..........................................................38

*Manor Care, Inc. v. United States,*
  630 F.3d 1377 (Fed. Cir. 2011) .........................................................94

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989)...............................................................58, 59, 86, 91

*McDonald v. Watt,*
  653 F.2d 1035 (5th Cir. 1981)...........................................................35

*Miss. Comm'n on Env't Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015) ..........................................................24

*Mobile Relay Assocs. v. FCC,*
  457 F.3d 1 (D.C. Cir. 2006) ..............................................................37

*Monroe Energy, LLC v. EPA,*
  750 F.3d 909 (D.C. Cir. 2014) ..........................................................49

**REDACTED PUBLIC VERSION**

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................... 23, 58

*Murray Energy Corp. v. EPA*,
    936 F.3d 597 (D.C. Cir. 2019) ............................................................ 24

*Newspaper Ass'n of Am. v. Postal Regul. Comm'n*,
    734 F.3d 1208 (D.C. Cir. 2013) .......................................................... 27

*NAACP v. FPC*,
    425 U.S. 662 (1976) .......................................................................... 69

*Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*,
    891 F.3d 1041 (D.C Cir. 2018) .......................................................... 30

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    630 F.3d 145 (D.C. Cir. 2010) ............................................................ 31

*Nat'l Wildlife Fed'n v. EPA*,
    286 F.3d 554 (D.C. Cir. 2002) ............................................................ 56

*N.L.R.B. v. Ky. River Cmty. Care, Inc.*,
    532 U.S. 706 (2001) .......................................................................... 86

*Nuclear Energy Inst., v. EPA*,
    373 F.3d 1251 (D.C. Cir. 2004) ...................................................... 64, 75

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ............................................................ 64

*Parola v. Weinberger*,
    848 F.2d 956 (9th Cir. 1988) ............................................................ 74

*Pub. Serv. Co. of Colo. v. FERC*,
    91 F.3d 1478 (D.C. Cir. 1996) ...................................................... 32, 33

*Renewable Fuels Ass'n v. EPA*,
    948 F.3d 1206 (10th Cir. 2020) .................................... 12, 36, 43, 49

*Retail, Wholesale & Dep't Store Union v. NLRB*,
    466 F.2d 380 (D.C. Cir. 1972) ............................................................ 36

**REDACTED PUBLIC VERSION**

*RMS of Ga., LLC v. EPA,*
 64 F.4th 1368 (11th Cir. 2023)...............................................................27

*S. Ill. Power Coop. v. EPA,*
 863 F.3d 666 (7th Cir. 2017)................................................................27

*Sinclair Wyo. Refin. Co. v. EPA,*
 887 F.3d 986 (10th Cir. 2017)........................................10, 36, 53

*Sosa v. Alvarez-Machain,*
 542 U.S. 692 (2004).......................................................................54, 55

*Suncor Energy, Inc. v. EPA,*
 50 F.4th 1339 (10th Cir. 2022)..............................................................94

*Texas v. EPA,*
 No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011)................................30

*Treasure State Res. Indus. Ass'n v. EPA,*
 805 F.3d 300 (D.C. Cir. 2015) .............................................................34

*Troy Corp. v. Browner,*
 120 F.3d 277 (D.C. Cir. 1997) .............................................................86

*United States v. Jones,*
 664 F.3d 966 (5th Cir. 2011).................................................................74

*Verizon Tel. Cos. v. FCC,*
 269 F.3d 1098 (D.C. Cir. 2001)..............................................................34

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
 435 U.S. 519 (1978)..........................................................................67

*Whitman v. Am. Trucking Ass'ns,*
 531 U.S. 457 (2001)..........................................................................48

*Wynnewood Refin. Co., LLC v. EPA,*
 77 F.4th 767 (D.C. Cir. 2023) ...........................................................42, 70

## **Statutes**

5 U.S.C. § 706 ................................................................................70

5 U.S.C. § 706(2)(A) .......................................................................23

42 U.S.C. § 7545(*o*) ........................................................................ 4

42 U.S.C. § 7545(*o*)(1)(K) ...................................................7, 59, 103

42 U.S.C. § 7545(*o*)(2)(A) ..............................................................59

42 U.S.C. § 7545(*o*)(2)(A)(i) ........................................................... 4

42 U.S.C. § 7545(*o*)(2)(A)(iii) ......................................................... 4

42 U.S.C. § 7545(*o*)(2)(B) ............................................................... 4

42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(IV) ............................................... 4

42 U.S.C. § 7545(*o*)(2)(B)(ii) .......................................................... 4

42 U.S.C. § 7545(*o*)(3)(B)(i) ........................................................... 4

42 U.S.C. § 7545(*o*)(3)(B)(ii)(I) ................................................31, 48

42 U.S.C. § 7545(*o*)(5) ...................................................................59

42 U.S.C. § 7545(*o*)(5)(D) ..........................................................5, 49

42 U.S.C. § 7545(*o*)(7) ................................................................... 4

42 U.S.C. § 7545(*o*)(7)(A) .............................................................. 4

42 U.S.C. § 7545(*o*)(7)(D)–(F) ....................................................... 4

42 U.S.C. § 7545(*o*)(9) ...................................................3, 6, 52, 55, 59

42 U.S.C. § 7545(*o*)(9)(A) .............................................3, 21, 46, 56, 97

42 U.S.C. § 7545(*o*)(9)(A)(i) ......................................................6, 44

42 U.S.C. § 7545(*o*)(9)(A)(ii) ...............................................8, 46, 53, 54

42 U.S.C. § 7545(*o*)(9)(A)(ii)(I) ...............................................6, 45, 59

42 U.S.C. § 7545(*o*)(9)(A)(ii)(II) ..............................................6, 67

42 U.S.C. § 7545(*o*)(9)(B) ..................................... 3, 12, 13, 16, 20, 22
.........................................................33, 43, 46, 49, 50, 58, 64, 94

42 U.S.C. § 7545(*o*)(9)(B)(i).........................7, 12, 45, 46, 66, 94, 97, 103

42 U.S.C. § 7545(*o*)(9)(B)(ii).............................. 7, 17, 46, 66, 67, 93

42 U.S.C. § 7545(*o*)(9)(B)(iii) ...............................................38, 44

42 U.S.C. § 7607(b)(1) .............................1, 2, 3, 20, 25, 26, 29, 30, 102

Pub. L. No. 109-58 ................................................................ 4

Pub. L. No. 110-140 .............................................................. 4

## **Regulations**

40 C.F.R. § 80.1101(g) (2021) ...........................................7, 103

40 C.F.R. § 80.1141 (2021).................................................... 7

40 C.F.R. § 80.1141(b) (2021) .................................98, 100, 103

40 C.F.R. § 80.1141(b)(1) (2021) ............................................. 7

40 C.F.R. § 80.1401 ........................................................7, 103

40 C.F.R. § 80.1406.......................................................4, 31

40 C.F.R. § 80.1406(a)(1) (2022).........................................100

40 C.F.R. §§ 80.1425–27 .....................................................60

40 C.F.R. §§ 80.1425–29 ....................................................... 5

40 C.F.R. § 80.1426(a)......................................................... 5

40 C.F.R. § 80.1426(e)......................................................... 5

40 C.F.R. § 80.1427(a)(1) ..................................................... 5

40 C.F.R. § 80.1427(a)(6) ..................................................... 5

40 C.F.R. § 80.1428(c)......................................................... 5

40 C.F.R. § 80.1429(b) ................................................................ 5

40 C.F.R. § 80.1441 .................................................................... 7

40 C.F.R. § 80.1441(b) ................................................ 7, 98, 100, 103

40 C.F.R. § 80.1441(e)(2) .............................................. 8, 94, 104

40 C.F.R. § 80.1441(e)(2)(i) ..........................................................95

40 C.F.R. § 80.1441(e)(2)(iii) ........................................................95

40 C.F.R. § 80.1451(f)(1)(i) ........................................................... 5

40 C.F.R. § 80.1451(f)(1)(i)(A)(1) ............................................5, 36

## Other Authorities

72 Fed. Reg. 23900 (May 1, 2007) ................................................ 6

75 Fed. Reg. 14670 (Mar. 26, 2010) ............................................. 6

86 Fed. Reg. 17073 (Apr. 1, 2021) ...............................................18

86 Fed. Reg. 70999 (Dec. 14, 2021) ........................................... xvi

87 Fed. Reg. 5696 (Feb. 2, 2022) .................................................19

87 Fed. Reg. 24294 (Apr. 25, 2022) ............................................ xvi

87 Fed. Reg. 24300 (Apr. 25, 2022) ...............................xvi, 28, 29

87 Fed. Reg. 34872 (June 8, 2022) ................................xvi, 28, 29

87 Fed. Reg. 39600 (July 1, 2022) ...............................................42

87 Fed. Reg. 54158 (Sept. 2, 2022) .............................................19

**REDACTED PUBLIC VERSION**

# GLOSSARY

| | |
|---|---|
| 2011 Study | U.S. Department of Energy, Small Refinery Exemption Study, An Investigation into Disproportionate Economic Hardship |
| April Denial | April 2022 Denial of Petitions for RFS Small Refinery Exemptions, 87 Fed. Reg. 24300 (Apr. 25, 2022) |
| Compliance Actions | April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries, 87 Fed. Reg. 24294 (Apr. 25, 2022), and June 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries, 87 Fed. Reg. 34872 (June 8, 2022) (collectively) |
| Denial Actions | April 2022 Denial of Petitions for RFS Small Refinery Exemptions and June 2022 Denial of Petitions for RFS Small Refinery Exemptions (collectively) |
| GAO Report | U.S. Government Accountability Office, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program (Nov. 2022), *available at* https://www.gao.gov/assets/gao-23-104273.pdf |
| Initial 2018 Decision | Final Agency Action Entitled "Decision on 2018 Small Refinery Exemption Petitions," Anne Idsal, Acting Assistant Administrator, Office of Air and Radiation |
| June Denial | June 2022 Denial of Petitions for RFS Small Refinery Exemptions, 87 Fed. Reg. 34873 (June 8, 2022) |
| Proposed Denial | Proposed RFS Small Refinery Exemption Decision, 86 Fed. Reg. 70999 (Dec. 14, 2021) |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |

**REDACTED PUBLIC VERSION**

REDACTED PUBLIC VERSION

## INTRODUCTION

The Environmental Protection Agency ("EPA") denied Petitioners'
exemptions from their Clean Air Act ("CAA") obligations for certain compliance
years between 2016 and 2021 under the Renewable Fuel Standard ("RFS")
program.  EPA did so in two actions: the April 2022 Denial of Petitions for RFS
Small Refinery Exemptions ("April Denial") and the June 2022 Denial of Petitions
for RFS Small Refinery Exemptions ("June Denial") (collectively, "Denial
Actions").  Petitioners ask this Court to review both Denial Actions.

Many of the Petitioners also have challenged one or both Denial Actions in
other circuit courts.  But venue is proper only in this Court because each of the two
Denial Actions is "nationally applicable"—or, if "locally or regionally applicable,"
is "based on a determination of nationwide scope or effect" made and published by
EPA.  42 U.S.C. § 7607(b)(1).  In this Court, Petitioners have forfeited any
arguments to the contrary.

The Court should uphold the Denial Actions.  When Congress amended the
CAA to include the RFS program, it did so to increase the production of clean
renewable fuels.  The small refinery exemption provisions act as a safety valve to
enable a small refinery to seek relief in the narrow circumstances where it can
show disproportionate economic hardship from RFS compliance.  EPA has
concluded that Congress intended to limit exemptions to those small refineries

1

initially granted an exemption at the outset of the program and then only if they demonstrate that their hardship is both "disproportionate" and caused by RFS compliance.

For the compliance years at issue, EPA determined that RFS compliance did not cause disproportionate economic hardship for Petitioners or other petitioning small refineries. In fact, the evidence—and EPA's comprehensive analysis of the "RIN discount" and "RIN cost passthrough" principles—demonstrates that Petitioners and other small refineries passed their RFS compliance costs through to their customers in the form of increased sales prices of their gasoline and diesel.

Petitioners offer no basis to second-guess EPA's statutory interpretation or its rational, record-based determinations. Petitioners' retroactivity and statutory arguments lack foundation and are not supported by the record. Indeed, Petitioners' interpretation reads words out of the statute. And Petitioners fail to demonstrate that EPA's RIN discount and RIN cost passthrough principles are not supported by the record.

For these reasons, the petitions for review should be denied.

## JURISDICTIONAL STATEMENT

The challenged EPA actions constitute final agency actions subject to judicial review pursuant to 42 U.S.C. § 7607(b)(1), and Petitioners timely filed their petitions for judicial review. And this Court is without jurisdiction to hear

any supposed arising-after claim over EPA's regulations as to the eligibility

determinations of two petitioners.  *See infra* at 22-31; 42 U.S.C. § 7607(b)(1).

## STATEMENT OF THE ISSUES

1.      Whether venue is proper only in this Court because the Denial

Actions are either "nationally applicable" or else "based on a determination of

nationwide scope or effect" made and published by EPA, 42 U.S.C. § 7607(b)(1).

2.      Whether EPA's revised interpretation of 42 U.S.C. § 7545($o$)(9)(B)

and approach to determining disproportionate economic hardship are

impermissibly retroactive, notwithstanding that Petitioners had notice of the

changes and took multiple opportunities to comment and supplement their pending

exemption petitions accordingly.

3.      Whether EPA permissibly interprets 42 U.S.C. § 7545($o$)(9)(B) to

require that disproportionate economic hardship be caused by RFS compliance.

4.      Whether EPA's Denial Actions are consistent with 42 U.S.C.

§ 7545($o$)(9)(B), reasonable, and reasonably explained.

5.      Whether EPA permissibly interprets 42 U.S.C. § 7545($o$)(9) to require

a small refinery to have received the initial blanket exemption under 42 U.S.C.

§ 7545($o$)(9)(A) as a condition precedent to be eligible to later petition for an

extension of exemption under 42 U.S.C. § 7545($o$)(9)(B).

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes and regulations are contained in the accompanying

statutory addendum.

## STATEMENT OF THE CASE

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Renewable Fuel Standard Program

In 2005 and 2007, Congress amended the CAA to establish the RFS

program, now codified at 42 U.S.C. § 7545(*o*), seeking, among other purposes, to

"increase the production of clean renewable fuels."  Pub. L. No. 110-140, 121 Stat.

1492; *see also* Pub. L. No. 109-58, 119 Stat. 594.  The statute requires increasing

annual "applicable volumes" of four categories of renewable fuel for the

transportation sector.  42 U.S.C. § 7545(*o*)(2)(B)(i)(I)-(IV).  Congress prescribed

specified applicable volumes for certain renewable fuels through 2022; EPA sets

annual volume requirements after that.  *Id.* § 7545(*o*)(2)(B)(ii), (*o*)(7).

Congress also directed EPA to establish a compliance program and annual

percentage standards to ensure that the applicable volumes are sold or introduced

into commerce each year.  *Id.* § 7545(*o*)(2)(A)(i), (iii), (2)(B), (3)(B)(i), (7)(A),

(7)(D)-(F).  EPA's implementing regulations identify refineries and importers of

gasoline and diesel as obligated parties.  40 C.F.R. § 80.1406.  Obligated parties

apply the percentage standards to their annual production or importation of

gasoline and diesel to calculate their individual renewable volume obligation for each renewable fuel category.

EPA regulations also set the RFS annual compliance date. *See id.* § 80.1451(f)(1)(i). The compliance date has always fallen after the calendar year covered by the applicable annual rule. *See id.* § 80.1451(f)(1)(i)(A)(1).

### B.    Renewable Identification Numbers ("RINs")

To implement Congress's requirement for a credit-trading program, EPA established a system of Renewable Identification Numbers ("RINs"). Producers and importers of renewable fuel generate RINs for each gallon of renewable fuel they produce or import for use in the United States. *Id.* § 80.1426(a). The producers and importers assign each RIN to a batch of renewable fuel. *Id.* § 80.1426(e). A RIN may be "separated" from its batch only by an obligated party or an entity that blends the renewable fuel into gasoline or diesel. *Id.* § 80.1429(b). Once separated, RINs may be kept for compliance or sold. *Id.* §§ 80.1425-29.

A RIN may be used for compliance only for the calendar year in which it was generated or the following calendar year. *Id.* §§ 80.1427(a)(6), 80.1428(c), 80.1431(a). Obligated parties meet their renewable volume obligation by "retiring" RINs in an annual compliance demonstration. *Id.* § 80.1427(a)(1). Parties who cannot comply may carry forward a compliance deficit to the next year. 42 U.S.C. § 7545(*o*)(5)(D). The RIN system gives obligated parties

flexibility in demonstrating compliance by allowing them to acquire RINs in several different ways, including by purchasing and blending renewable fuels to separate RINs themselves or by purchasing RINs reflecting renewable fuel volumes blended by other entities.  72 Fed. Reg. 23900, 23942 (May 1, 2007); *see also* 75 Fed. Reg. 14670, 14722-23 (Mar. 26, 2010).

### C.    The Temporary Exemption for "Small Refineries" as Defined Under the CAA

Congress created a temporary exemption from the RFS program for certain obligated parties that qualify as "small refineries."  42 U.S.C. § 7545(*o*)(9); *see also id*. § 7545(*o*)(1)(K).  This exemption has three phases.  First, Congress granted all small refineries a blanket exemption from the requirements of the RFS program until 2011.  *Id*. § 7545(*o*)(9)(A)(i).

Second, Congress directed the U.S. Department of Energy ("DOE") to study "whether compliance with the requirements of [the RFS program] would impose a disproportionate economic hardship on small refineries."  *Id*. § 7545(*o*)(9)(A)(ii)(I).  For any small refinery that DOE determined "would be subject to a disproportionate economic hardship if required to comply," Congress directed EPA to extend the exemption for "not less than [two] additional years." *Id*. § 7545(*o*)(9)(A)(ii)(II).

Third, Congress provided that a small refinery "may at any time petition [EPA] for an extension [beyond 2011] of the exemption under subparagraph (A)

for the reason of disproportionate economic hardship." *Id*. § 7545(*o*)(9)(B)(i). In evaluating such a petition, EPA, "in consultation with" DOE, "shall consider the findings of [DOE's study] and other economic factors." *Id*. § 7545(*o*)(9)(B)(ii).

Congress defined a small refinery as a "refinery for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels." 42 U.S.C. § 7545(*o*)(1)(K). In its 2007 and 2010 RFS regulations, EPA similarly defined a small refinery as one processing fewer than 75,000 barrels per day in calendar years 2004 and 2006, respectively, to determine eligibility for the initial small refinery blanket statutory exemption from 2006-2010. 40 C.F.R. § 80.1101(g) (2021); 40 C.F.R. § 80.1401. Under EPA's regulations, "gasoline" and "transportation fuel" produced at a "small refinery" were exempt from RFS compliance. *See* 40 C.F.R. §§ 80.1141 (2021), 80.1441. EPA required small refineries that were producing either "gasoline" or "transportation fuel" to notify EPA and verify that they qualified for the initial small refinery blanket exemption. *See* 40 C.F.R. §§ 80.1141(b)(1) (2021) (requiring verification letters by August 31, 2007); 80.1441(b) (requiring verification letters by July 1, 2010). In doing so, EPA defined the universe of small refineries that received the initial blanket exemption from the RFS program. These regulations were never challenged.

EPA promulgated additional regulations establishing an individual small refinery's eligibility to petition for an extension of its initial blanket exemption

pursuant to 42 U.S.C. § 7545(*o*)(9)(A)(ii).  *See* 40 C.F.R. § 80.1441(e)(2).  These regulations require that, for a refinery to meet the regulatory definition of "small refinery," it must meet the statutory "small refinery" definition for the most recent full calendar year before the year for which it seeks the extension and must also demonstrate that it is projected to meet the "small refinery" definition for the petition year(s).  *Id.*  ("In order to qualify for an extension of *its* small refinery exemption, a refinery must . . . .") (emphasis added).  These later provisions apply in addition to, not instead of, the original qualification period provisions.

### D.    Historical Approaches to "Disproportionate Economic Hardship"

Due to changing approaches to disproportionate economic hardship and other factors, the number of exemptions granted for each compliance year increased from seven or eight during 2013 to 2015 to nineteen in 2016 and thirty-five in 2017.  Petitioners' Joint Appendix ("JA") at JA003010.

DOE issued its first small refinery study in 2009 in which it found that, in a liquid and competitive market, compliance with the RFS would not impose disproportionate economic hardship on any small refinery and recommended against extending exemptions beyond 2010.  JA003503.  Thereafter, in 2011, DOE issued a second study—"Small Refinery Exemption Study, An Investigation into Disproportionate Economic Hardship" ("2011 Study"), JA000003-102—which evaluated whether "compliance with the RFS" caused small refineries

disproportionate economic hardship.  JA000013.  Unlike DOE's 2009 Study,

DOE's 2011 Study assumed that "[i]f certain small refineries must purchase RINs

that are far more expensive than those that may be generated through blending, this

will lead to disproportionate economic hardship for those effected [*sic*] entities"

because they would experience a "high cost of compliance relative to the industry

average."  JA000014-15.

Based on this assumption, DOE included a scoring matrix with two indices

at the end of the 2011 Study to assess which small refineries would have less

opportunity to blend and thus would have to buy RINs, which could result in

disproportionate economic hardship ("DOE Matrix").  JA000043-48.  These

indices tracked the "two broad components" of "disproportionate economic

hardship," as interpreted by DOE: a "high cost of compliance relative to the

industry average, and an effect sufficient to cause a significant impairment of the

refinery operations."  JA000015.  After the 2011 Study, DOE scored its Matrix to

recommend hardship for exemption petitions where the average on *both* indices

exceeded "1."

In 2015 and 2016, members of Congress directed DOE and EPA to conclude

that a 50% exemption—i.e., the small refinery need meet only half of its RFS

obligations for a given compliance year—was warranted if DOE scored *either*

Matrix index above "1."  *See* JA003135 & nn.59-60 (citations omitted).

Considering these congressional statements, along with changing administration policies and vacatur of EPA's exemption petition denials in *Sinclair Wyoming Refining Company v. EPA*, 887 F.3d 986, 997 (10th Cir. 2017) ("*Sinclair*"), EPA changed its approach to "disproportionate economic hardship" to allow for a grant of an exemption petition where a small refinery received a score above "1" on *either* matrix.  EJA003135.

### E.    EPA's Assessments of RIN Market Dynamics

EPA first assessed obligated parties' ability to "pass through" RIN costs and the effect of RIN prices on the price of blended fuel in 2015 in "A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects" ("2015 Burkholder Study").  JA000106-136.  Based on market data, EPA concluded that all obligated parties, ███████████, recover the cost of acquiring RINs by selling the gasoline and diesel that they produce at the market price, which *includes* the RIN price, thereby passing through the cost of the RIN with the unblended fuel.  JA000107-08.  This is known as the RIN cost passthrough. Therefore, acquiring RINs imposes no additional costs on obligated parties, and those exempted from compliance still receive the cost of the RIN in their sales price, which acts as a subsidy.  JA003169; JA003143; *see also Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628, 649-53 (D.C. Cir. 2019), *cert. denied sub nom.*, *Valero Energy Corp. v. EPA*, 140 S. Ct. 2792 (2020).  EPA further concluded that

blenders, who are not obligated parties but generate RINs by blending fuel, use the revenue earned from selling RINs to then discount the price of the blended fuel they sell, which is known as the RIN discount. JA003132; JA003169. EPA reiterated both the RIN cost passthrough and RIN discount principles from the 2015 Burkholder Study in its November 2017 Denial of Petitions for Rulemaking to Change the RFS Point of Obligation ("2017 Point of Obligation Denial"), which this Court affirmed in *Alon Refining Krotz Springs, Inc. v. EPA*, 936 F.3d at 641. EPA has based the Denial Actions on additional market data, studies by outside parties, and public comments. JA000159-169.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Events Prompting Remand of EPA's Initial 2018 Decision and Proposed Denial

On August 9, 2019, EPA acted on thirty-six 2018 RFS exemption petitions, including the Petitioners noted in Appendix Table 1b, in a two-page decision, granting thirty-one of the petitions and denying five ("Initial 2018 Decision"). *See* JA003518-19. EPA announced that it would grant a full exemption where DOE had recommended a full or 50% exemption and deny where DOE recommended no exemption. JA003518-19. Multiple parties petitioned for review of EPA's Initial 2018 Decision, including the Petitioners noted in Appendix Table 1b. *See* D.C. Circuit Nos. 19-1196, 19-1197, 19-1216, 19-1220 & 20-1099.

**REDACTED PUBLIC VERSION**

The Tenth Circuit issued *Renewable Fuels Association v. EPA*, 948 F.3d 1206 ("*RFA*"), in January 2020, vacating and remanding three of EPA's 2016 and 2017 exemption petition grants, including two HollyFrontier Refining and Marketing, LLC ("HollyFrontier") 2016 exemption petitions and one Wynnewood Refining Company, LLC's ("Wynnewood") 2017 exemption ███████ ███. The court held that: (1) to be eligible for an "extension" of the exemption under 42 U.S.C. § 7545(*o*)(9)(B)(i), a small refinery needed to have maintained a continuous, uninterrupted exemption, which the small refineries at issue had not; (2) EPA's prior approach of finding "disproportionate economic hardship" for reasons other than RFS compliance was "outside the scope of the EPA's statutory authority" in § 7545(*o*)(9)(B); and (3) EPA "failed to consider an important aspect of the problem" when it "did not address the applicability of the [RIN cost] pass-through principle *at all*" when evaluating the exemption petitions. *RFA*, 948 F.3d at 1244-57 (emphasis in original).

In January 2021, the Supreme Court granted a petition for a writ of certiorari limited to the Tenth Circuit's eligibility holding. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 974 (2021).

On February 2, 2021, EPA filed a consent motion to hold the petitions challenging EPA's Initial 2018 Decision in abeyance pending a decision from the Supreme Court, which was set to rule on overlapping eligibility issues. *Sinclair*

12
**REDACTED PUBLIC VERSION**

*Wyo. Refin. Co. v. EPA*, No. 19-1196 (D.C. Cir.), Doc. 1883334.  Several of the

Petitioners, as noted in Appendix Table 1b, did not oppose that motion.  The D.C.

Circuit granted the motion.  *See id.*, Doc. 1885774.

On June 25, 2021, the Supreme Court reversed the single Tenth Circuit

holding on which certiorari was granted, concluding that the term "extension" as

used in 42 U.S.C. § 7545(*o*)(9)(B) does not require a continuous exemption for

future eligibility.  *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,

141 S. Ct. 2172 (2021) ("*HollyFrontier*").  As to the remaining issues decided in

*RFA*, the Tenth Circuit's mandate noted that "jurisdiction is transferred back to the

lower court/agency," *Renewable Fuels Ass'n v. EPA*, No. 18-9533 (10th Cir. July

29, 2021), Doc. 010110555262, including for HollyFrontier's 2016 exemption

petitions and Wynnewood's 2017 exemption petition now at issue.  EPA sought

clarification, indicating that it would follow the alternate *RFA* holdings on remand

if the Tenth Circuit denied the motion or did not clarify otherwise.  Doc.

010110564301 at 6-7.  The Tenth Circuit declined to act.  Doc. 010110567206.

In July and August 2021, EPA met with small refineries about the holdings

of *HollyFrontier* and *RFA*, as well as EPA's findings on RIN discount and RIN

cost passthrough, inviting them to submit any other information for their pending

petitions.  JA003522-23; JA004854; *see also* JA003520-21; JA004852-53.  EPA

also emailed small refineries with pending exemption petitions "to be sure that you

**REDACTED PUBLIC VERSION**

are aware that EPA is evaluating what this holding [in *RFA*] means and that you, too, have the opportunity to submit additional information to support your small refinery exemption petition(s)." JA002934.

Thirteen of the Petitioners emailed multiple letters to EPA on June 14-16, 2021, ████████████████████████████████████

████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████. Many Petitioners, or their counsel, attended an August 25, 2021 meeting with EPA. And each Petitioner supplemented their pending exemption petitions by attempting, for example, ████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████

14

███████████. Most Petitioners submitted several supplements to their exemption petitions following *HollyFrontier*, with fifteen Petitioners submitting more than six supplements. *See* Appendix Table 2.

### B.     Remand of EPA's Initial 2018 Decision

On August 25, 2021, EPA moved for voluntary remand without vacatur in the challenges to EPA's Initial 2018 Decision in the D.C. Circuit to allow EPA the opportunity to reconsider its action given the alternate holdings in *RFA*. *E.g.*, *Renewable Fuels Assoc. v. EPA*, No. 19-1220, Doc. 1911608. In these cases, Wynnewood was a petitioner (in No. 20-1099) and did not oppose EPA's remand motion other than to argue for action on remand within ninety days. Other Petitioners were intervenor-respondents who initially took no position on EPA's remand motion, *id.* at 2-3 n.4, but later opposed. *See id.*, Doc. 1913077, at 2-3; *see also* Appendix Table 1b. The D.C. Circuit remanded the thirty-six 2018 exemption decisions to EPA on December 8, 2021, with instructions to act within 120 days. *See id.*, Doc. 1925942.

### C.     Proposed Denial and Petitioners' Comments

On December 7, 2021, EPA proposed to deny sixty-five pending exemption petitions ("Proposed Denial"), ████████████. *See* JA000224-89; JA000001-2 (publishing notice). Informed by the decisions in *RFA* and *HollyFrontier*, EPA took a fresh look at the exemption provisions in 42 U.S.C.

**REDACTED PUBLIC VERSION**

§ 7545(*o*)(9)(B) and proposed to interpret it to require a showing of disproportionate economic hardship caused by RFS compliance. JA00249-52. In light of *RFA*, EPA also analyzed how the principles of RIN discount and RIN cost passthrough apply in the context of the pending petitions. JA000252-88. EPA's analysis found that the "market-based design of the RFS program and the RIN-based compliance system have equalized the cost of compliance among all market participants, such that no refinery would face [disproportionate economic hardship] from its RFS obligations" and that "the costs of RFS compliance (i.e., RINs) are passed through in the prices of refined products." JA000288. Therefore, EPA proposed to deny all the pending petitions.

On January 3, 2022, EPA notified stakeholders that it was considering inclusion of the thirty-six remanded 2018 exemption petitions as part of the Proposed Denial and solicited comment on the issue. *See* JA000290-91. As shown in Appendix Table 3, nearly every Petitioner submitted at least one and some submitted up to *five* supplemental comments on the Proposed Denial, either with other small refineries or in confidential, refinery-specific comments.

### D.    April Denial

On April 7, 2022, EPA denied all thirty-six exemption petitions for the 2018 compliance year that had been remanded to EPA. JA002945-3016. EPA adopted its revised interpretation of 42 U.S.C. § 7545(*o*)(9)(B) and approach to determining

disproportionate economic hardship, as proposed in December 2021. Based on the RIN discount and RIN cost passthrough principles, EPA confirmed its finding that none of the petitioning small refineries suffered disproportionate economic hardship.

As required by 42 U.S.C. § 7545(*o*)(9)(B)(ii), EPA consulted with DOE for the Proposed Denial and Denial Actions, described in a memorandum to the record ("Consultation Memorandum"), JA002936-41. EPA also included detailed responses to nonconfidential small refinery arguments about EPA's economic analysis in the April Denial, as well as separate appendices responding to nonconfidential small refinery comments (Appendix B, JA003044-3107), and confidential, refinery-specific comments and spans over 225 pages. *See* Appendix Table 1b.

### E.    June Denial

On June 3, 2022, EPA denied sixty-nine exemption petitions for the 2016 through 2021 compliance years. Save for the compliance years and specific petitioning small refineries, the June Denial is nearly identical to the April Denial and includes its own Appendix B, JA003198-3261, and confidential refinery-specific appendices span over 230 pages.[1] *See* Appendix Table 1a. EPA

---

[1] Accordingly, EPA will largely cite the June Denial; cited content appears in the April Denial or Appendices to the April Denial at the same or similar pages.

concluded that none of the sixty-nine petitions demonstrated disproportionate economic hardship caused by RFS compliance.

### F.    Related EPA Compliance Actions

On the same day that it issued the April Denial, EPA undertook an action zeroing out the RIN retirement obligations for thirty-one small refineries for the 2018 compliance year.  JA003017-40 ("April 2022 Compliance Action").  On the same day that it issued the June Denial, EPA supplemented its April 2022 Compliance Action to allow three small refineries to zero out their RIN retirement obligations for the 2016 and 2017 compliance years.  *See generally* JA003265-91 ("June 2022 Compliance Action").  ████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████

███████

EPA took additional steps to mitigate the effects related to the application of its reevaluated approach to small refinery exemption petitions.  As relevant to Petitioners, EPA twice extended the compliance deadline for compliance years 2019 and 2020.  *See* 86 Fed. Reg. 17073 (Apr. 1, 2021) (extending the 2019 RFS

compliance deadline from Mar. 31, 2020 to Nov. 30, 2021, and the 2020 RFS

compliance deadline from Mar. 31, 2021, to January 31, 2022); 87 Fed. Reg. 5696

(Feb. 2, 2022) (extending the 2019 and 2020 RFS compliance deadlines to Sept. 1,

2022 and Dec. 1, 2022, respectively, as applied).

In September 2022, EPA finalized a rule that provided small refineries with

the option to fully comply with their 2020 RFS obligations (which could include

any 2019 RIN deficits they elected to carry forward into the 2020 compliance year)

by February 1, 2024, rather than the December 1, 2022 compliance deadline for all

other obligated parties. *See* 87 Fed. Reg. 54158 (Sept. 2, 2022) ("Alternative RIN

Retirement Schedule").

### G.    Petitioners' Filings in This Court

This Court granted Calumet Montana Refining, LLC's motion for a stay

pending appeal of the June Denial,  Doc. 1992426, and denied Sinclair Wyoming

Refining Company LLC's and Sinclair Casper Refining Company LLC's motions

for stay pending appeal of the June Denial, Doc. 1995979.

### SUMMARY OF ARGUMENT

I.    Venue is proper in this Court and this Court alone.  EPA's Denial

Actions are "nationally applicable," because they apply a nationwide analysis to

refineries throughout the country.  Alternatively, the Denial Actions are based on

determinations of nationwide scope or effect—the Agency's statutory

interpretation and analysis of the RIN and fuel markets—made and published by

EPA under 42 U.S.C. § 7607(b)(1).

II.     The Denial Actions are not impermissibly retroactive.  When EPA

proposed its revised approach to determining disproportionate economic hardship

under 42 U.S.C. § 7545(*o*)(9)(B), Petitioners' pending petitions were incomplete

transactions to which no legal rights or reasonable reliance interests could have

attached.

In any event, any retroactive effect would be permissible.  █████████

██████████████████████████████████████████████████████████████

██████  Against that backdrop, any expectations premised on Petitioners'

receipt of prior exemptions were unreasonable.  The timing of EPA's Denial

Actions also does not lead to a different result, and EPA's related compliance

actions—forgiving 2016, 2017, and 2018 RIN retirement obligations and extending

compliance time frames—mitigate any potential hardship.

III.    EPA's revised interpretation of 42 U.S.C. § 7545(*o*)(9)(B) is the best

reading of the statute and, at the very least, a permissible one.  EPA's prior

interpretation allowed it to grant exemptions where a small refinery experienced

disproportionate economic hardship for reasons other than RFS compliance.  But

after the Tenth Circuit declared that interpretation unlawful, EPA prudently re-

examined the statute and independently determined that an interpretation requiring

REDACTED PUBLIC VERSION

that disproportionate economic hardship be caused by RFS compliance was the best reading of § 7545(*o*)(9)(A) & (B) in context.  EPA's interpretation is the best reading of the statute and would merit *Chevron* deference, if applied.

IV.    EPA's Denial Actions are otherwise reasonable and reasonably explained.  Based on the RIN discount and RIN cost passthrough principles, EPA reasonably concluded that Petitioners and other petitioning small refineries did not suffer disproportionate economic hardship caused by RFS compliance.  EPA robustly supported its findings, which are entitled to significant deference and should be upheld.

Contrary to Petitioners' contention, EPA has not eliminated small refinery exemptions.  To obtain an exemption, petitioning small refineries must make a sufficient showing of disproportionate economic hardship caused by RFS compliance that refutes or overcomes the evidence that EPA has before it that small refineries, like Petitioners, recover their RFS compliance costs.  Petitioners have not done so here.  Petitioners argue that EPA's consultation with DOE was not "meaningful," ignoring that EPA has discretion to shape the consultation and, in fact, consulted DOE thirteen times, covering a wide range of factors.  And Petitioners' contention that EPA did not consider refinery-specific information is belied by the record, which shows that EPA considered and responded to the

21
REDACTED PUBLIC VERSION

information received from Petitioners and other small refineries in nonconfidential, aggregated responses, as well as confidential, refinery-specific appendices.

Moreover, Petitioners' rehash of their administrative comments about EPA's economic analysis fails to substantively address EPA's responses to Petitioners' comments in the Denial Actions. In light of the deference afforded to EPA's technical analysis, Petitioners do not come close to demonstrating that EPA's conclusions were unreasonable based on the information before the Agency.

V.    EPA's interpretation of § 7545(*o*)(9)(B), under which small refineries that did not receive the initial blanket exemption cannot petition for an extension of that exemption is consistent with *HollyFrontier* and is the most reasonable interpretation of the statute. That Petitioners ▇▇▇▇ and ▇▇▇▇▇▇ met the definition of "small refinery" at some point after the RFS program began does not qualify them to receive a small refinery exemption. Instead, to have received the initial blanket exemption—which is the condition precedent to being able to receive an extension of a small refinery exemption going forward—a refinery must have met the statutory and regulatory requirements to be an RFS "obligated party" and "small refinery" at the very start of the RFS program. That is, they must have been producing gasoline or diesel subject to the RFS program and processing crude oil in amounts under the statutory 75,000 barrels per day threshold *and* must have submitted a letter to EPA verifying their small refinery status. The contrary

**REDACTED PUBLIC VERSION**

interpretation of the CAA advanced by ▓▓▓ and ▓▓▓▓▓▓ would mean that, by definition, if at any time a refinery processes fewer than 75,000 barrels per day of crude oil, it would be deemed to have received the initial blanket exemption until 2011, despite having not met the statutory or regulatory requirements in effect when the blanket exemption was granted. Not only is this reading of the CAA's small refinery exemption provisions patently unreasonable, the time to challenge EPA's underlying 2007 and 2010 regulations passed over a decade ago.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), this Court may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, EPA's actions are "presumptively valid provided [they] are 'reasonable and reasonably explained.'" *Alon*, 936 F.3d at 641 (citing *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015)). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decisions must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Courts afford EPA an "extreme degree of deference" regarding analysis within its technical expertise, particularly as it relates to the "EPA's administration of the complicated provisions of the [CAA]." *Am. Fuel & Petrochemical Mfrs. v.*

23

*EPA*, 937 F.3d 559, 574 (D.C. Cir. 2019) ("*AFPM*"); *see also Murray Energy Corp. v. EPA*, 936 F.3d 597, 616 (D.C. Cir. 2019) (citing *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) ) (holding that a reviewing court should afford EPA significant deference on evaluation of factual issues that implicate EPA's expertise).  This Court's review is limited to the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

In reviewing EPA's statutory interpretation, this Court applies the two-step framework from *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).  *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 574 (D. C. Cir. 2015).[2]  First, using all the ordinary tools of construction, this Court asks whether "Congress has directly spoken to the precise question at issue," and if so, this Court must "give effect to the unambiguously expressed intent of Congress."  *Id.* (citations and internal quotations omitted).  If the statute is ambiguous, the Court defers to EPA's "permissible construction of the statute."  *Id.* at 575.  If *Chevron* does not apply, the Court follows the analysis set forth in *Skidmore*.  *See Air Transp. Ass'n of Am. v. FAA*, 921 F.3d 275, 279 (D.C. Cir. 2019) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

---

[2] The Supreme Court has granted a writ of certiorari to decide, among other things, whether to overrule *Chevron*.  *Loper Bright Enters. v. Raimondo*, No. 22-451 (*cert. granted* May 1, 2023).

## ARGUMENT

## I.    VENUE FOR ALL PETITIONS FOR REVIEW OF THE DENIAL ACTIONS IS PROPER ONLY IN THIS COURT.

Only this Court can review the Denial Actions.  To determine venue, the CAA classifies final actions into three categories.  First, challenges to "nationally applicable" EPA actions "may be filed only in the" D.C. Circuit. 42 U.S.C. § 7607(b)(1).  Second, a petition for review of an EPA final action "which is locally or regionally applicable" may be filed only in the court of appeals for the appropriate regional circuit.  *Id.*  Third, if, however, the locally or regionally applicable action "is based on a determination of nationwide scope or effect and if in taking such action the Administrator [of EPA] finds and publishes that such action is based on such a determination," then any petition for review "may be filed only in the" D.C. Circuit.  *Id.*  That is, even an action that is otherwise locally or regionally applicable nonetheless must be reviewed in the D.C. Circuit if it is based on EPA's determination of nationwide scope or effect and, if in taking that action, EPA makes and publishes a finding that the action is based on that determination.  *See Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 878-80 (D.C. Cir. 2015).  Both Denial Actions are nationally applicable, and EPA made and published findings that each Denial Action, to the extent it is locally or regionally applicable, is based on a determination of "nationwide scope or effect."  42 U.S.C.

§ 7607(b)(1).  All merits challenges to EPA's Denial Actions must be heard by this Court.

### A.    The Regional Circuit Petitioners Have Forfeited Any Argument in This Court That Their Petitions Should Be Transferred

Eleven of the Petitioners filed challenges only in this Court and have not contested venue is proper here.  *See Dalton Trucking*, 808 F.3d at 880.  Fifteen of the twenty-nine Petitioners filed petitions for review in both this Court and other circuits.  *See* Appendix Table 1a.  For eight of those Petitioners, the Third, Seventh, Ninth, and Tenth Circuits all granted EPA's motions to dismiss or transfer the petitions to this Court over petitioners' objections.  *See* Doc. 1973045 at 3-4, 6-7 (Nov. 9, 2022).  By contrast, for seven of those Petitioners, the Fifth and the Eleventh Circuits carried the question of venue with the case, the Fifth after initially granting EPA's motion to dismiss or transfer.  *Id.* at 4 n.4.

However, *none* of these twenty-nine Petitioners has argued in *this case* that venue is improper in this Circuit.  Instead, certain Petitioners assert—in a single paragraph in their statement of jurisdiction—that they have preserved their objections to venue in this Court by filing Petitions in *other* Circuits.  *See* Petitioners' Brief ("Br.") at 1.  This bare-bones claim, not developed at all in Petitioners' argument, cannot preserve a claim that venue is appropriate in other Circuits.  *See Bartko v. SEC*, 845 F.3d 1217, 1224, n.7 (D.C. Cir. 2017) ("It is not

enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); *see also Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1212 (D.C. Cir. 2013) ("[W]e have repeatedly held that we do not consider arguments raised only in a reply brief.").

**B.    The Denial Actions Are Nationally Applicable**

Whether an action is "nationally applicable" or "locally or regionally applicable" is a narrow inquiry based only on the "face" of the action. *Dalton Trucking*, 808 F.3d at 881.  The question is whether the action itself is nationally applicable, not whether the nature and scope of the arguments raised or the relief requested by a petitioner are nationally applicable. *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372 (11th Cir. 2023); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670-71 (7th Cir. 2017).

The Denial Actions are nationally applicable on their face.  While EPA decided a combined 105 exemption petitions in the Denial Actions, it did so using a "common, nationwide analytical method." *S. Ill. Power*, 863 F.3d at 671 (concluding that a rule "of broad geographic scope containing air quality attainment designations covering 61 geographic areas across 24 states" was nationally applicable).

EPA based the denials on its "revised interpretation of the relevant CAA provisions and the RIN discount and RIN cost passthrough principles that are

applicable to all small refineries no matter the location or market in which they operate."  JA003015-16; 87 Fed. Reg. 24300, 24300-24301 (Apr. 25, 2022); JA003194; 87 Fed. Reg. 34873, 34874 (June 8, 2022).  The Denial Actions applied the same "common, nationwide analytical method" to all petitioning refineries when determining their ability to recover the costs of RFS compliance, and, while EPA did consider refinery-specific information in its evaluation, *see infra* at 69-71, EPA did not adjust its uniform statutory interpretation and nationwide economic principles to its evaluation of the particulars of any specific small refinery, or to the region in which a refinery operates, despite EPA's "case-by-case consideration" of the exemption petitions.  The Denial Actions are therefore nationally applicable.

### C.    EPA Properly Made and Published That the Denial Actions, To the Extent They Are Locally or Regionally Applicable, Are Based on Determinations of Nationwide Scope or Effect.

Alternatively, venue lies in the D.C. Circuit because the Denial Actions are based on several determinations of "nationwide scope or effect" made and published by EPA.  *See* JA003015-16, 87 Fed. Reg. at 24300-24301; JA003193-94; 87 Fed. Reg. at 34874.

A locally or regionally applicable action must be challenged only in the D.C. Circuit if: (1) the action is "based on a determination of nationwide scope or effect"; and (2) "the Administrator finds and publishes that such action is based on such a determination."  42 U.S.C. § 7607(b)(1).  EPA satisfied the second prong by

making and publishing the requisite findings.  *See, e.g.*, JA003015; 87 Fed. Reg. at

24300-24301; JA003193; 87 Fed. Reg. at 34874.  The only remaining question is

whether the "action" being challenged is "based on a determination of nationwide

scope or effect."  The answer is yes.

The Denial Actions are based on multiple determinations—that is,

motivating reasons of the Denial Actions—of nationwide scope or effect.  Among

other things, together with EPA's revised statutory interpretation, EPA also found

that, regardless of location nationwide: (1) "all obligated parties recover the cost of

acquiring RINs by selling the gasoline and diesel fuel they produce at the market

price, which reflects these RIN costs (RIN cost passthrough)"; (2) all "blenders use

the revenue from RIN sales to discount the price of the blended fuel they sell (RIN

discount)"; (3) "[t]he RFS obligation is the same for every gallon of gasoline and

diesel fuel"; (4) "RINs are generally widely available in an open and liquid

market"; and (5) "[t]he cost of acquiring RINs is the same for all parties."

JA003151; see also *id.* ("All types of obligated parties bear the same cost from

compliance with the RFS program as these aspects of the RFS program and the RIN

market facilitate the RIN cost passthrough and the RIN discount principles

discussed above."); JA002973.  This Court should apply the plain language of 42

U.S.C. § 7607(b)(1) and conclude that venue is proper, as the Denial Actions are

based on determinations of "nationwide scope or effect."

This outcome is not only consistent with the plain language of 42 U.S.C.

§ 7607(b)(1), but it also promotes the principles underlying that provision.  *See,*

*e.g.*, *Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *4 (5th Cir. Feb. 24, 2011)

(concluding that "Congress intended the D.C. Circuit to review matters on which

national uniformity is desirable" and because "[c]entralized review of national

issues is preferable to piecemeal review of national issues in the regional circuits,

which risks potentially inconsistent results" (cleaned up)).  Consistent with this

congressional intent, this Court has recognized that EPA's decision to direct

challenges on matters of national importance to the D.C. Circuit should be

reviewed under a highly deferential standard.  *See Nat'l Env't Dev. Ass'ns Clean*

*Air Project v. EPA*, 891 F.3d 1041, 1053 (D.C Cir. 2018) (Silberman, J.,

concurring); *Alcoa, Inc. v. EPA*, No. 04-1189, 2004 WL 2713116, at *1 (D.C. Cir.

Nov. 24, 2004).

For all these reasons, venue is proper in this Court.  42 U.S.C. § 7607(b)(1).

## II.    THE DENIAL ACTIONS ARE NOT IMPERMISSIBLY RETROACTIVE.

Petitioners contend that the Denial Actions deprive Petitioners of due

process in violation of the Fifth Amendment and are impermissibly retroactive.

Br. at 87-91.  These arguments lack merit.

REDACTED PUBLIC VERSION

### A.    The Denial Actions Act Prospectively.

The Denial Actions are not retroactive.  EPA applied its revised approach to determining disproportionate economic hardship only to then-pending exemption petitions.  Unlike impermissibly retroactive regulations, the adjudications in the Denial Actions do not take away or impair "vested rights acquired under existing laws," or create a "new obligation, impose[] a new duty, or attach[] a new disability, in respect to transactions or considerations already past," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (citation omitted); nor do they "impose[] new sanctions on past conduct," *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010) (citations omitted).  The Denial Actions merely confirm the status quo that the petitioning small refineries comply with their *preexisting* RFS obligations.  *See, e.g.*, 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I); 40 C.F.R. § 80.1406.

Accordingly, no rights had vested in any of Petitioners' uncompleted transactions:  Petitioners' 2016, 2017, and 2018 exemption petitions *pending* on remand from the Tenth and D.C. Circuits,[3] respectively, or Petitioners' *pending* (and never-before decided) 2019 through 2021 petitions.  *See, e.g., Chadmoore*

---

[3] These remands render null Petitioners' reliance, Br. at 91, on *American Methyl Corporation v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) because there was no vested right or completed transaction for EPA to revoke at the time it issued the Denial Actions.

REDACTED PUBLIC VERSION

*Commc'ns, Inc. v. FCC*, 113 F.3d 235, 241 (D.C. Cir. 1997) (citing cases holding that no rights vest upon the filing of an administrative application).  As one court explained, "'the mere filing of'" an exemption petition "'is not the kind of completed transaction in which a party could fairly expect stability . . . as of the transaction date,'" and where, as here, "a change involves 'the substantive standards for granting the application on the merits,' it does not typically raise . . . 'fair notice and retroactivity concerns.'"  *Craker v. DEA*, 44 F.4th 48, 64 (1st Cir. 2022) (citation omitted).[4]  The Court should reject Petitioners' retroactivity argument on this basis alone.

> **B.   Alternatively, Any Purported Retroactive Effect of the Denial Actions Is Permissible.**

The Denial Actions are lawful even if this Court considers them to apply "retroactively."  In general, "when an agency proceeds by adjudication, it will apply its ruling to the case at hand."  *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1082 (D.C. Cir. 1987).  "The governing principle is that when there is a 'substitution of new law for old law that was reasonably clear,' the new rule may justifiably be given prospectively-only effect in order to 'protect the settled expectations of those who had relied on the preexisting rule.'"  *Pub. Serv.*

---

[4] Petitioners rely on inapplicable authorities involving completed transactions or other distinguishable facts.  *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-58 (2012) (First Amendment vagueness case in which regulated party was not on notice of forbidden conduct for which it was later sanctioned).

*Co. of Colo. v. FERC*, 91 F.3d 1478, 1488 (D.C. Cir. 1996). Otherwise, an

adjudicatory decision will receive retroactive effect unless it would work a

manifest injustice. *Clark-Cowlitz*, 826 F.2d at 1081.

EPA did not substitute "new law for old law that was reasonably clear."

*Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1152 (D.C. Cir. 1986). EPA

never announced an interpretive rule for 42 U.S.C. § 7545(*o*)(9)(B) nor subjected

any of its prior interpretations to notice and comment; rather, EPA applied

differing interpretations in confidential, informal adjudications at different times.

*See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224 (1988) (Scalia, J.,

concurring) ("[W]here no pre-existing interpretive rule construing those

requirements is in effect, nothing prevents the agency from acting retroactively

through adjudication.").

Even before *RFA*, it was uncertain whether EPA would interpret and apply

"disproportionate economic hardship" or consider the 2011 Study in the same way

for the same refinery in consecutive years. *See* Statement of the Case, Part I.D,

*supra*; *Cassell v. FCC*, 154 F.3d 478, 486 (D.C. Cir. 1998) (allowing retroactive

effect where "the *status quo ante* was not a benchmark at all, but rather a case-by-

case assessment" lacking certainty). After the Tenth Circuit held in *RFA* that

EPA's prior statutory interpretation was unlawful and that EPA had to address its

RIN discount and RIN cost passthrough findings, EPA's need to reevaluate its

approach became acute. *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C.
Cir. 2001) (agencies may "rectify legal mistakes identified by a federal court" in
adjudications, even if seemingly retroactive). EPA's Denial Actions are therefore
permissible. *Id.* at 1109; *see also Treasure State Res. Indus. Ass'n v. EPA*, 805
F.3d 300, 306 (D.C. Cir. 2015) (concluding that EPA's actions were not
improperly retroactive where EPA conducted a periodic review of certain air
quality standards, intervening litigation caused EPA to embark on further data
collection and review, and EPA's actions led to the promulgation of new standards
after public comment).

### 1. Any Reliance by Petitioners on EPA's Prior Approach Is Unreasonable.

Petitioners could not reasonably have relied on EPA's prior approach of
"applying the 2011 DOE Study and DOE's scoring matrix" when evaluating their
pending petitions. Br. at 89. As an initial matter, EPA told Petitioners "that they
should not plan for an exemption but should instead plan to comply with their
obligations," as their "compliance obligations exist . . . until such time as an
exemption is granted." JA003246. In any event, Petitioners were aware of EPA's
proposed new approach, as shown by thirteen of them sending June 2021 letters to
EPA on the issue, the August 25, 2021 meeting with EPA, and nearly 130
supplements to their then-pending exemption petitions. *See* Statement of the Case,
Part II.A, *supra*. And Petitioners had ample notice of EPA's changed approach

before (and certainly after) the Proposed Denial. *See Cassell*, 154 F.3d at 486.

Indeed, Petitioners and other small refineries had clear notice of EPA's intent to

change its approach to disproportionate economic hardship in response to *RFA* and

*HollyFrontier* based on many EPA efforts in which Petitioners actively

participated. *See* Statement of the Case, Parts II.A & .C, *supra*. Any reliance by

Petitioners on EPA's prior approach and its use of the DOE Matrix was "badly

misplaced and hence inappropriate for consideration" by this Court. *Cassell*, 154

F.3d at 486.

    None of Petitioners' arguments demonstrates otherwise. Petitioners presume

that they would have received an exemption if EPA had decided the petitions based

on the 2011 Study and the DOE Matrix, Br. at 89, but Petitioners ignore the well-

documented adjustments in EPA's prior approaches in responses to judicial

opinions, congressional statements, and other factors, *see* Statement of the Case,

Parts I.D & II.A, *supra*, which distinguishes this case from *McDonald v. Watt*, in

which "every existing administrative statement concerning the regulation" favored

the regulated party's interpretation. 653 F.2d 1035, 1039 (5th Cir. 1981).

    While EPA has considered the DOE Matrix in the past, the Agency has *not*

invariably followed DOE's recommendation based on the Matrix, nor does the Act

require it to do so. For example, for the 2014 compliance year, DOE

recommended a 50% waiver of Sinclair's refineries' obligations, but EPA denied

**REDACTED PUBLIC VERSION**

Sinclair's petitions because compliance with the RFS program did not threaten the long-term prospects of those refineries. *See Sinclair*, 887 F.3d at 994. By contrast, DOE recommended *denying* in full HollyFrontier's 2016 petition for its Cheyenne refinery and in part its 2016 petition for its Woods Cross Refinery, as well as Wynnewood's 2017 petition, but EPA granted all three petitions in full because the Agency concluded that "disproportionate economic hardship" could be caused by "a difficult year for the industry as a whole." *RFA*, 948 F.3d at 1227-30. This history of varying interpretations by EPA distinguishes this case from *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972), and EPA's current interpretation "cannot be called an abrupt break with a well-settled policy," *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1195 (D.C. Cir. 1984).

Petitioners' argument that the issuance of the Denial Actions after the relevant compliance years prevented Petitioners from changing their behavior during the individual compliance years, Br. at 89-90, fails because RFS compliance is due, and exemption petitions have typically been decided, *after* the compliance year at issue is over, *see* 40 C.F.R. § 80.1451(f)(1)(i)(A)(1). Petitioners also fail to demonstrate that they relied at all on EPA's most recent approach. ██████████████████████████████████

██████████████████████████████████████

36
**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**



Petitioners do not set forth any *facts*, rather just unsupported assertions, that any small refinery actually relied on EPA's most recent method of evaluating small refinery exemption petitions.

. A reasonable small refinery in Petitioners' position would have planned for compliance, including by acquiring RINs as they incurred RFS obligations, as early as ████ or December 2021—in what Petitioners claim was a more favorable market—or otherwise adjusting operations.

Petitioners' argument "would hamstring not only the [EPA] in its [exemption decisions], but also any agency whose decision affects the financial expectations of regulated entities." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006). This Court should reject it.

37

### 2. EPA Considered and Minimized Hardship to Small Refineries Flowing From Its Untimely Decisions.

Petitioners argue that EPA failed to adequately consider and minimize

hardship to small refineries from the lack of action on their petitions within the

ninety-day statutory time frame under 42 U.S.C. § 7545(*o*)(9)(B)(iii).  Br. at 91-93.

Petitioners' argument fails for four reasons.

First, Petitioners have forfeited this argument by failing to raise it before

EPA.  This Court "consistently refuse[s] to consider arguments litigants raise for

the first time in court rather than before the agency."  *Malladi Drugs & Pharms.,*

*Ltd. v. Tandy*, 552 F.3d 885, 891 (D.C. Cir. 2009).  Here, no small refinery

commented to EPA that EPA failed to mitigate any alleged hardship caused by

issuing its denials after the 90-day statutory deadline.  Therefore, this Court should

not consider this argument raised for the first time on review.

Second, EPA promptly acted following the *RFA* and *HollyFrontier*

decisions, as many Petitioners implicitly recognized when consenting to an

abeyance in the D.C. Circuit in February 2021.  *See generally* Consent Motion to

Hold Cases in Abeyance, *Sinclair Wyo. Refin. Co. v. EPA*, No. 19-1196 (D.C. Cir.

Feb. 2, 2021), Doc. 1883334; *see also* Appendix Table 1b.  As EPA explained in

its remand motion, "[i]t would have been premature for EPA to consider these

issues prior to" *HollyFrontier* because "[m]ost small refineries that have applied

for an extension of the small refinery exemption have not received continuous

**REDACTED PUBLIC VERSION**

extensions of the exemption." EPA Motion for Voluntary Remand 11, *Sinclair Wyo. Refin. Co. v. EPA*, No. 19-1196 (D.C. Cir. Aug. 25, 2021), Doc. 1911606. Therefore, "had the Supreme Court upheld the Tenth Circuit's decision," nearly all small refineries would have been ineligible for an exemption, regardless of the alternate *RFA* holdings. *Id.* at 11-12. Likewise, after *RFA*, EPA would have risked an adverse ruling had it decided the pending petitions under its prior approach to disproportionate economic hardship, which ignored *RFA*'s alternate holdings. Petitioners' complaint rings hollow.

Third, there is no causal link between EPA's delayed decision on Petitioners' small refinery exemption petitions and the harm claimed because of the present-day cost of RINs.[5] The price of RINs is affected by many factors, including the volume obligations set by EPA, the cost of producing and using renewable fuels relative to the petroleum-based fuels they displace, and the number of exemptions granted by EPA. *See, e.g.*, EPA, *Denial of Petitions for Rulemaking to Change the RFS Point of Obligation* at 18-21 (Nov. 2017), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100TBGV.pdf. Had EPA timely

---

[5] Recognizing this fact, Petitioners do not state explicitly "the harm" they believed was "caused by EPA's delays for the 2019-2021 compliance years." Br. at 93. However, based on Petitioners' references to the current price of RINs, as well as previous arguments made in related cases, EPA interprets Petitioners' claimed harm as the difference in price between the date EPA was required to decide the exemption petitions at issue and the current RIN prices.

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

denied Petitioners' exemption requests, the result could have been the same: higher RIN prices compared to those that may have occurred if EPA granted the exemptions.  If, on the other hand, Petitioners contend that EPA would have *granted* the exemptions had it timely acted, given the pending challenges to EPA's exemption policy at the time and the uncertain state of the law, EPA reasonably waited until the Supreme Court decided *HollyFrontier* and acted expeditiously, as Petitioners themselves recognized.  *See supra* at 39.  Instead, Petitioners have only themselves to blame for having to buy RINs as a result of the Denial Actions: had they timely planned for compliance, they could have purchased RINs at the earlier, lower prices.

Fourth, while EPA has determined that RFS compliance does not cause any hardship to obligated parties, *see* Argument, Part IV.D.5, *infra*, EPA nevertheless sought to reduce the financial impacts claimed by small refineries after the Denial Actions, *see Americans for Clean Energy v. EPA*, 864 F.3d 691, 718-19 (D.C. Cir. 2017) ("*ACE*").  The many actions EPA took include requiring *no* RIN retirements for ███████████████████████████████████s for the 2016 compliance year, *no* RIN retirements for ████████ for the 2017 compliance year, and *no* RIN retirements ████████████████████████████████████ ████████ in the two Compliance Actions, *see* Appendix Table 1a; multiple extensions of the compliance deadline for compliance years 2019 and 2020; and

40

**REDACTED PUBLIC VERSION**

promulgating the Alternative RIN Retirement Schedule to allow *all* small

refineries to extend the period to comply with their 2020 RFS obligations—

including any RIN deficits from 2019 carried forward into the 2020 compliance

year—by February 1, 2024.  *See* Statement of the Case, Part II.F, *supra*.  In fact,

███████████████████████████████████

███████████████████████, asking this Court to remand with

instructions for EPA to undertake the same type of action for compliance years

2019 through 2021.  Br. at 92.

In taking the many actions described above, EPA reasonably distinguished

between the various RFS compliance years and circumstances in providing

compliance flexibilities to small refineries.  For example, the Compliance Actions

addressed the unique circumstances faced by the small refineries that had

previously had petitions granted and then reversed by the Denial Actions following

the decisions in *RFA* and *HollyFrontier*; the result of the Denial Actions was that

these refineries had newly unmet compliance obligations for the 2016, 2017, and

2018 compliance years.  JA003026; JA003276.  Having determined that "there

[were] not sufficient RINs available," which would have significant negative

effects on the RIN market and RFS program, JS003028; JA3278, EPA permitted

these small refineries to demonstrate compliance without retiring any additional

RINs, JA003020; JA003269.  The Compliance Actions address unique

circumstances not applicable to other small refineries where EPA had neither

decided small refineries' exemption petitions, nor required them to satisfy their

RFS obligations.  For subsequent compliance years, EPA did not grant any

exemptions and determined that compliance by the small refineries with their RFS

obligations for 2019 and forward would not have the same negative effect on the

RIN market as requiring compliance with the 2016-18 obligations.  Renewable

Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39600, 39614-15

(July 1, 2022).

Finally, Petitioners' additional arguments claiming that the RFS deadline

extensions and Alternative RIN Retirement Schedule do not provide enough time

for compliance fail because this Court has already held that the deadline extensions

were "reasonable and reasonably explained," *Wynnewood Refin. Co., LLC v. EPA*,

77 F.4th 767, 784 (D.C. Cir. 2023), and refineries received a similar time between

compliance deadlines as they did in the rule at issue in *ACE*, *id.* at 783.  Moreover,

Petitioners have since voluntarily dismissed their challenge to the Alternative RIN

Retirement Schedule.  *See* Stipulation of Voluntary Dismissal, *The San Antonio*

*Refinery, LLC v. EPA*, Case No. 22-1276 (D.C. Cir. Aug. 17, 2023), Doc. 2012908.

At bottom, Petitioners should have been planning to comply all along rather

than gamble on a discretionary exemption that "was not a sure bet." *Cassell*, 154

F.3d at 486 (citations omitted).  Petitioners' timing argument should be rejected.

## III.  EPA'S REVISED INTERPRETATION OF THE CAA'S SMALL REFINERY EXEMPTION PROVISIONS IS CORRECT.

In the Denial Actions, EPA determined that small refineries seeking an exemption under § 7545(*o*)(9)(B) must both: (1) demonstrate that they experience "disproportionate economic hardship" *from RFS obligations*; and (2) reconcile this showing with RIN cost passthrough—i.e., demonstrate that the small refinery cannot passthrough or recoup its RIN costs.  This two-step analysis is both the best interpretation of the statutory language and the most reasonable way to implement the small refinery exemption provisions.

### A.  EPA's Interpretation Provides the Best Reading of the Statute and Is a Reasonable Way to Implement the RFS Program.

Under prior approaches, EPA granted an exemption petition where a small refinery experienced disproportionate economic hardship for reasons *other than* RFS compliance.  JA003138.  In January 2020, the Tenth Circuit declared that approach unlawful.  *RFA*, 948 F.3d at 1253-54.  EPA then analyzed and reconsidered the language, structure, and purposes of the CAA's small refinery exemption provisions and determined that disproportionate economic hardship must be caused only by RFS compliance to allow EPA to grant an exemption petition.  JA003148-50.

Applying the ordinary tools of statutory construction, EPA's revised interpretation is the best reading of the CAA.  To begin with, the usual purpose of

REDACTED PUBLIC VERSION

a hardship exemption—in any context—is to avoid harm caused by the requirement at issue. *See* Exempt, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002 ed.) ("*Webster's*") ("to release or deliver from some liability or requirement to which others are subject"); Hardship, *Webster's* ("something that causes or entails suffering or privation"). In the RFS program, Congress required obligated parties to increase their use of renewable fuel or to demonstrate the purchase of sufficient credits to increase the overall use of renewable fuel. An exemption serves the purpose of avoiding hardship caused by these requirements; avoiding such harm is, after all, the reason not to apply them to certain entities. If Congress had exempted small refineries that are suffering "hardship" for unrelated reasons or allowed an exemption when no "hardship" was occurring, that would turn the RFS program into a financial benefit for small refineries that suffer economic hardship for reasons unrelated to the RFS program or who have no hardship. It would be quite odd for Congress to use the phrase "hardship exemption" in § 7545(*o*)(9)(B)(iii) if that provision was intended to be a "subsidy."

The three-part structure of the exemption reinforces EPA's interpretation. First, in § 7545(*o*)(9)(A)(i), Congress granted a blanket exemption for all small refineries until 2011. This "blanket exemption gave small refineries time to

REDACTED PUBLIC VERSION

develop compliance strategies and increase blending capacity." *Hermes*, 787 F.3d at 572-72.

Second, Congress directed DOE to study "*whether compliance with the requirements* of [the RFS program] *would impose* a disproportionate economic hardship on small refineries" and allowed an extension of the blanket exemption for two years if DOE determined in the study that a small refinery "*would be subject to* a disproportionate economic hardship *if required to comply*" with RFS requirements. 42 U.S.C. § 7545(*o*)(9)(A)(ii)(I)-(II) (emphasis added). The language in subparagraph (A) shows that a small refinery would only receive another two-year exemption if it experienced disproportionate economic hardship caused by RFS compliance. Looking to the ordinary meaning of the words chosen by Congress, DOE was studying whether RFS compliance would "cause [small refineries] to be burdened" with disproportionate economic hardship. Impose, *Webster's*. Similarly, Congress allowed DOE to grant an exemption if RFS compliance would "cause [a small refinery] to undergo" disproportionate economic hardship. Subject, *Webster's*.

Third, § 7545(*o*)(9)(B)(i) authorizes EPA to grant an "extension" of the exemption from RFS compliance obligations "*under subparagraph (A)* for the reason of disproportionate economic hardship." (emphasis added). In evaluating exemption petitions, EPA must "consider the findings of the [DOE] study *under*

*subparagraph (A)(ii)* and other economic factors." 42 U.S.C. § 7545(*o*)(9)(B)(ii)

(emphasis added). In other words, this provision applies after the two-year

exemption extension set forth in § 7545(*o*)(9)(A)(ii). And § 7545(*o*)(9)(B)—the

provision under which Petitioners sought an exemption for the years at issue

here—*extends* that two-year exemption. *See HollyFrontier*, 141 S. Ct. at 2177

("[S]ubparagraph (B)(i) uses 'extension' in its temporal sense—referring to the

lengthening of a period of time."). Therefore, subparagraph A dictates what may

be petitioned for—"an extension of the exemption" from RFS compliance

obligations "for the reason of disproportionate economic hardship"—and sets forth

what EPA must consider, including DOE's study and other economic factors. 42

U.S.C. § 7545(*o*)(9)(B)(i).

The interrelated small refinery exemption provisions therefore use language

demonstrating that disproportionate economic hardship must be caused by RFS

compliance. The cross-references in subparagraph (B) to subparagraph (A) require

that allowing exemptions for "disproportionate economic hardship" must be for the

same reasons in subparagraphs (A) and (B), including the causal element:

compliance "would impose" and "subject to . . . if required to comply." *See*

*HollyFrontier*, 141 S. Ct. at 2177 (recognizing that § 7545(*o*)(9)(B) should be

interpreted consistent with § 7545(*o*)(9)(A)). And Congress again used causal

language in subparagraph (B)—"for the reason of"—consistent with the structure

of the exemption provisions and statute overall.  Thus, after its independent review of the statute, EPA rationally concluded that disproportionate economic hardship must be caused by RFS compliance, consistent with the Tenth Circuit's approach in *RFA*.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency change need be permissible only under the statute, with an explanation of why the new approach is better).

There is another component of EPA's analysis: to secure an exemption, a small refinery's compliance costs must be disproportionate to those of other refineries and must be of sufficient magnitude to warrant an exemption. JA003138.  This interpretation gives meaning to the requirement that a small refinery's economic hardship be *disproportionate* and be a real economic *hardship*. According to the ordinary meaning of the words, any such economic impact must be "out of proportion" to any hardship imposed by RFS compliance on other obligated parties, Disproportionate, *Webster's*, and therefore of a "magnitude, quantity, or degree" greater than for other obligated parties, Proportion, *Webster's*. EPA's approach—focusing on whether a given small refinery pays disproportionate compliance costs—is driven by the Agency's RIN market analysis that demonstrates that refineries pass through RIN costs to consumers.  *See* JA003138-39; *infra* at 75-80.  Because refineries—including the Petitioners— recover the cost of acquiring RINs when they sell gasoline and diesel at the market

price, they experience *no* hardship from RFS compliance.  JA003139.  However, *if* a small refinery could demonstrate that it pays disproportionate compliance costs compared to other refineries—e.g., that it did *not* recover the cost of acquiring RINs through market price sales while other refineries did—*only then* could the small refinery demonstrate that it experienced disproportionate economic hardship caused by RFS compliance.  Finally, the cost of compliance must cause actual economic hardship for the petitioning small refinery to obtain an exemption.  JA003139.

EPA's interpretation also comports with the purpose of the statute.  Congress sought to "increase the production of clean renewable fuels," 121 Stat. 1492, by creating a market for renewable transportation fuel and allowing EPA to identify refineries as obligated parties, *see* 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I).  While Congress provided a safety valve from compliance for small refineries, it limited that exemption to a "temporary" time, after which compliance would resume, and to those that could establish disproportionate economic hardship caused by RFS compliance.  It would be odd for Congress to have intended for a "temporary" exemption from a program designed to increase renewable fuel use to create a general, permanent subsidy for small refineries to offset or better withstand *other factors* impacting profitability that are unrelated to RFS compliance.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (explaining that "Congress . . .

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"). Considering the language that Congress chose for the small refinery exemption provisions and its other choices allowing for flexibility to better ensure compliance by all obligated parties, such as carrying over a RIN deficit from one compliance year to the next, 42 U.S.C. § 7545(*o*)(5)(D), EPA's interpretation tracks the purpose of the statute. EPA's interpretation should therefore be upheld.

Finally, EPA's interpretation not only follows from the statutory text and purpose, but is also a reasonable way to implement the RFS small refinery exemption program, particularly in light of EPA's longstanding RIN cost passthrough analysis. As this Court concluded in *Hermes*, as the statute does not define "disproportionate economic hardship" and "identifies no particular economic factors or metrics to be considered," § 7545(*o*)(9)(B) "conveys 'nothing more than a refusal to tie the agency's hands.'" 787 F.3d at 575 (quoting *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014)). EPA's RIN cost passthrough analysis renders its administrative choices reasonable, and it follows DOE's interpretation of the same provision. *See* JA003139. Indeed, the Tenth Circuit held that EPA acted arbitrarily and capriciously by *not* considering RIN cost passthrough in *RFA*. 948 F.3d at 1255.

Since refiners recover their compliance costs through higher market-wide prices for their refined products—which are then passed onto their customers—they do not experience *any* harm, and parties excused from compliance instead receive a subsidy: they recover the cost of the RIN—because they charge the market price for the fuel, which includes the RIN cost—without having to shoulder the RIN's cost. Given this feature of the RIN market, an approach that granted exemptions to small refineries because of structural market impacts or poor business decisions would result in net revenue to the small refinery from the nationwide application of the RFS program. It would transform an exemption intended to relieve the hardship of complying with the RFS program requirements into a subsidy EPA could dispense whenever a small refinery falls on hard times for any reason.

## B. Petitioners' Arguments to the Contrary Are Meritless.

Petitioners admit that "compliance with the RFS program must be a causal factor contributing to the small refinery's economic hardship," Br. at 35, but then raise a host of statutory arguments contending that § 7545(*o*)(9)(B) requires EPA to consider a range of other, additional factors unrelated to RFS compliance. These broad assertions founder on three main obstacles. First, they are unmoored from the statutory text. Second, they ignore RIN cost passthrough. And third, they ignore EPA's broad discretion to implement the small refinery exemption program.

### 1. EPA Did Not Equate "Hardship" and "Compliance Costs."

Petitioners' argument that EPA equated "economic hardship" and "compliance costs" misreads and mischaracterizes EPA's actual analysis. Br. at 39-42. EPA requires a small refinery to demonstrate disproportionate compliance costs because a small refinery's claimed disproportionate economic hardship must be caused by compliance costs in order to obtain an exemption. *See supra* at 43-51; JA003216. Given RIN cost passthrough, *only* a small refinery paying disproportionate compliance costs—which is to say, a small refinery unable to pass through the cost of acquiring RINs—*could* experience disproportionate economic hardship imposed by compliance with its RFS obligations. *See* JA003139 ("[T]he RIN cost passthrough analysis demonstrates that there is no economic hardship caused by RFS compliance costs; therefore, no small refinery experiences [disproportionate economic hardship] as a result of compliance with the RFS program."). That other provisions of the CAA use the phrase "cost of compliance" as, for example, a factor to consider in setting standards, *see* Br. at 40-41, does not compel Congress to use that phrase here to require compliance costs to cause disproportionate economic hardship sufficient to obtain a small refinery exemption, *see infra* at 54-55 (addressing canon of material variation). EPA additionally includes "hardship" as a separate part of its analysis: in order to obtain an exemption, a small refinery must also demonstrate that its compliance costs

cause actual economic hardship. JA003139. This interpretation also accords with

DOE's definition of "disproportionate economic hardship" in the 2011 DOE

Study; DOE concluded that disproportionate economic hardship "must encompass

. . . a high cost of [RFS] compliance relative to the industry average, and an effect

sufficient to cause a significant impairment of the refinery operations." JA003139

(internal quotation marks omitted). Indeed, Petitioners concede that compliance

must *cause* disproportionate hardship for a small refinery to receive an exemption.

Br. at 35. Therefore, Petitioners' claim—that EPA conflated "economic hardship"

with "compliance costs"—finds no support in EPA's thorough statutory analysis.

## 2. EPA Did Not Unlawfully Restrict the Factors It May Consider in Evaluating Exemption Petitions.

Petitioners' assertion that EPA unlawfully restricted its analysis to whether

compliance costs cause disproportionate economic hardship suffers from these

same flaws. Br. at 42-56. This argument proceeds in three parts[6]; none is

convincing.

First, Petitioners contend that EPA read an extratextual sole-causation

requirement into § 7545(*o*)(9). Br. at 44-49. But the statute is clear: EPA must

determine whether "compliance with the requirements of [the RFS program] would

---

[6] EPA addresses Petitioners' argument that EPA must consider *how* small
refineries have chosen to use their compliance flexibilities *infra* at Argument Part
IV.D.2.

impose a disproportionate economic hardship" on small refineries[7]; no magic words, such as "solely," are required.  42 U.S.C. § 7545(*o*)(9)(A)(ii); *see also id.* § 7545(*o*)(9)(B)(i) (permitting EPA to extend the exemption set forth in § 7545(*o*)(9)(A)).[8]  Petitioners seek textual refuge in "economic hardship" and contend that, in evaluating hardship, EPA must undertake a "holistic analysis."  Br. at 34-35, 46.  This phrase, however, does not refer to the *cause* of hardship; it only denotes what small refineries must *experience* in order to obtain an exemption; Petitioners point to no language authorizing EPA to consider other causes of economic hardship.  For this reason, *Sinclair*, which held that EPA impermissibly narrowed the definition of "disproportionate economic hardship," is not applicable.[9]  887 F.3d at 997.

---

[7] The specificity of the statutory language distinguishes this case from *Blue Water Navy Vietnam Association v. McDonald*, which addressed a statute containing "broad language" barring judicial review in district courts of decisions affecting the provision of veterans' benefits.  830 F.3d 570, 574 (D.C. Cir. 2016).

[8] *See also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 579 (D.C. Cir. 2019) (sustaining interpretation of RFS provision that permits EPA to waive certain volumes if EPA determines that the requirements "would severely harm the economy or environment"; EPA's interpretation required "that implementation of the RFS Program itself would cause severe economic harm (as opposed to allowing a waiver if severe economic harm were demonstrated for any reason, or if the RFS merely contributed to severe harm)." (cleaned up).

[9] Similarly, because the Supreme Court in *HollyFrontier* had no occasion to consider EPA's determinations about the RIN market, that case does not control the analysis.  *See* Br. at 35-36.

Moreover, EPA *would* consider evidence that compliance costs significantly impaired a refinery's operations—that is, a small refinery's "overall economic situation"—*if* that refinery demonstrated that it could not pass on its RIN costs to its customers. *See* JA003139 ("[F]or a small refinery to demonstrate [disproportionate economic hardship], it must have . . . actual economic hardship due to those disproportionate RFS compliance costs."). Therefore, Petitioners' claim that EPA has restricted its analysis of that term must fail. In any event, "EPA retains substantial discretion to decide how to evaluate hardship petitions," *Hermes*, 787 F.3d at 575, and has done so reasonably here. *See supra* at 59-65.

Petitioners mistakenly claim that, because other provisions of the Act—most drafted decades before § 7545(*o*)—use the word "solely" in other contexts, its absence here means the Court should not give § 7545(*o*)(9)(A)(ii) its plain and ordinary meaning. Br. at 44-46. But the canon of material variation "is particularly defeasible by context," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 171 (2012), and the context here does not *require* Congress to use the word "solely" to restrict the causes of disproportionate economic hardship that EPA may consider when evaluating exemption petitions.

Rather, courts apply this canon when the structure of the statute provides a reason to read together the provisions compared. For example, in *Sosa v. Alvarez-Machain,* the Court contrasted two exemptions from the Federal Tort Claims Act

**REDACTED PUBLIC VERSION**

appearing in the same section.  542 U.S. 692, 711, n.9 (2004); *see also Bates v. United States*, 522 U.S. 23, 29-30 (1997) (comparing two provisions of the same section "enacted at the same time").  By contrast, Petitioners have plucked a single word appearing in different contexts in different programs that are structured in different ways.  *See* Br. at 44-46.  That Congress used "solely" in other parts of the Act—most drafted decades before § 7545(*o*)(9)—structured differently than the small refinery exemption provisions does not *require* Congress to use that word to limit the considerations EPA may consider when the plain language of the statute does so.

Second, relying on a broad theory of the statutory "purpose," Petitioners additionally claim that small refinery exemptions protect these small refineries from any effects of the RFS program—not just from compliance.  *See* Br. at 48-49, 53-54.  This argument cannot survive contact with the statutory language: just as "no law pursues its purposes at all costs," *Luna Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859, 865 (2023) (cleaned up), no exemption does either.  Congress crafted an exemption to provide relief for small refineries from hardship caused by RFS *compliance*, not the RFS program generally or any other harm that might be lessened by forgiving compliance costs.

Finally, Petitioners' claim that EPA must consider decreased demand nationwide for petroleum fuel when evaluating exemption petitions finds no basis

**REDACTED PUBLIC VERSION**

in the statute. Any depressed demand for petroleum-based fuels flows not from compliance, but from the nationwide operation of the RFS program itself whose very purpose is to displace petroleum-based fuels with renewable transportation fuels. *See Ams. for Clean Energy v. EPA*, 864 F.3d 691, 710 (D.C. Cir. 2017) ("the Renewable Fuel Program is supposed to work" by "forc[ing] the market to create ways to produce and use greater and greater volumes of renewable fuel each year"). Petitioners *assert*, but failed to *demonstrate*, that this depressed demand affected any particular small refinery disproportionately. *See* JA000841. EPA determined that it did not. *See* JA003238. As a result, generalized and market-wide reduced demand is not among "the kinds of direct, individual-refinery impacts that Congress intended the [small refinery exemption] provisions to address." *Id.*

Petitioners additionally claim that their lost sales because of depressed demand are "due to compliance," because if relieved from complying with the RFS program, small refineries could either lower their prices or make a higher profit margin with fewer sales. Br. at 55-56. Petitioners have forfeited this argument because no small refinery made this argument during the comment period. *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002), *supplemented sub nom. In re Kagan*, 351 F.3d 1157 (D.C. Cir. 2003) ("It is well established that issues not raised in comments before the agency are waived and this Court will not

consider them."). Rather, ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████.

In any event, Petitioners' argument is wrong. ████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████. And while one would expect *some* reduced demand for

transportation fuel as a result of higher prices, in the fuels market "demand is

nearly inelastic," i.e., large increases in prices lead to very little, if any, reduced

demand. JA003156. Therefore, the windfall to exempted small refineries—none

of whom has demonstrated a dispr███████ demand-side impact from RFS

compliance—would swamp any minor decrease in sales. No small refinery has

shown otherwise.

Petitioners' deference arguments, *see* Br. at 59-62, are irrelevant because

EPA's revised interpretation is the best reading of the statute. *See Guedes v. ATF,*

45 F.4th 306, 313 (D.C. Cir. 2022) (When "traditional tools of statutory

interpretation" show that the agency's interpretation is "the best one," the court can

REDACTED PUBLIC VERSION

uphold the interpretation without resorting to deference principles.).  But even if it were otherwise, this Court has already applied *Chevron* to EPA's prior interpretation of the provisions at issue, and EPA's reading should be upheld as permissible for the reasons explained above.  *E.g.*,  *Hermes*, 787 F.3d at 575. Should only *Skidmore* deference apply, EPA's interpretation should be upheld for the same reasons.

Because EPA's interpretation of § 7545(*o*)(9)(B) is the best (and at a minimum, permissible) reading considering the text, structure, and purposes of the CAA, it should be upheld.

## IV.    EPA'S DENIAL ACTIONS WERE CONSISTENT WITH THE CAA AND REASONABLE.

EPA's Denial Actions should be upheld under the deferential APA standard. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-377 (1989); *see also AFPM*, 937 F.3d at 574.  EPA reasonably denied Petitioners' exemption petitions based on the RIN discount and RIN cost passthrough principles, considered all relevant factors, and articulated a rational connection between the facts found and the choices made.  *State Farm*, 463 U.S. at 43; *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 69 (D.C. Cir. 2017) ("EPA is free to rely on [model-based approaches], as long as that reliance is reasonable in context.").  Congress authorized EPA to implement the RFS and small refinery exemption programs and to evaluate claimed disproportionate economic hardship.  EPA's analysis falls within EPA's technical

REDACTED PUBLIC VERSION

expertise and involves evaluation of a vast amount of technical data and is thus entitled to significant deference. *AFPM*, 937 F.3d at 574; *see also Marsh*, 490 U.S. at 376-377.

Congress required EPA to create a market for renewable fuel and a credit system to allow obligated parties to comply. *See* 42 U.S.C. § 7545(*o*)(5). Congress also provided an exemption from that program for "small refineries" who could demonstrate their compliance caused "disproportionate economic hardship." *See* 42 U.S.C. §§ 7545(*o*)(1)(K), (*o*)(9). But Congress did not define the phrase "disproportionate economic hardship." Lacking information on how the newly-authorized RFS program would ultimately operate in the marketplace, Congress tasked DOE with studying the impact on small refineries, *id.* § 7545(*o*)(9)(A)(ii)(I), and left RFS program implementation choices to EPA, including deciding exemption petitions. *See, e.g.*, *id.* §§ 7545(*o*)(2)(A), (5), (9); *Hermes Consol., LLC*, 787 F.3d at 575 (noting that Congress "gave EPA general guidance on the evaluation of economic hardship petitions" and that EPA "retains substantial discretion to decide how to evaluate hardship petitions").

Through many years of implementation, EPA honed its understanding of how the RFS program works for obligated parties, beginning with the 2015 Burkholder Study and then with EPA's 2017 Point of Obligation Denial, which considered multiple studies and analyses supporting EPA's RIN discount and RIN

cost passthrough principles.  *See* JA003153; *see also id.* at n.154, n.155.  As a

compliance mechanism, RINs correspond to particular quantities of renewable

fuel.  40 C.F.R. §§ 80.1425-27.  Because the RIN and fuels markets are highly

competitive, they do not allow for one market participant to be advantaged or

disadvantaged by its role within the market; instead, all "types of obligated parties

bear the same cost from compliance with the RFS program."  JA003151.

On that point and as shown in Appendix Table 1a, thirteen of the current

Petitioners challenged EPA's 2017 Point of Obligation Denial.  *See Alon*, 936 F.3d

at 649-51.  This Court ultimately upheld and found that EPA's RIN cost

passthrough and RIN discount principles were adequately supported and valid.  *Id.*

EPA's Point of Obligation Denial, which *Alon* affirmed, forms a critical foundation

for EPA's Denial Actions analysis here, but Petitioners make no mention of that or

*Alon* in their brief.

*Alon* concluded that: (1) "EPA reasonably rejected" the argument that

"refiners cannot recover their RIN costs"; (2) "EPA reasonably explained" that

"refiners recover the cost of the RINs they purchase by passing that cost *along* in

the form of higher prices for the petroleum based fuels they produce" and

"grounded that conclusion in studies and data in the record"; (3) "EPA (accurately)

reported that" various studies "concluded that the RIN cost was generally included

in the sale prices of obligated fuels"; (4) blenders and integrated refiners "must

discount their blended fuel by roughly the value of the RINs that they detached and kept for themselves"; (5) EPA reasonably concluded that "(obligated) refiners do not pay excess costs, neither do blenders (who are not obligated under the program) nor integrated refiners (who perform their own in-house blending) reap windfall profits"; and (6) "RINs work as a 'cross-subsidy,' effectively taxing the use of petroleum-based fuels (e.g., gasoline) and subsidizing the use of renewables (e.g., ethanol) in making a blended transportation fuel like E10." *Id.* at 649-51.

In doing so, *Alon* rejected many of the same "recycle[d] arguments" that Petitioners repeat yet again here. *Id.* at 635. For example, the *Alon* petitioners claimed that EPA's action "inflicts economic hardship on small refineries [in] the form of inflicting wildly disproportionate RIN acquisition costs." *Id.* at 650. *Alon* specifically rejected that point and noted that the claims "presuppos[ed] that refiners cannot recover their RIN costs and that blenders reap windfall profits—suppositions that [ ] EPA reasonably rejected" based on the RIN discount and RIN cost passthrough principles. *Id.* Indeed, "in a competitive market, there's no such thing as a free lunch," and obligated parties "pay their tab just as others do." *Id.* at 650; *see also Growth Energy v. EPA*, 5 F.4th 1, 16 (D.C. Cir. 2021) (upholding EPA's finding that refinery commenters "did not provide any concrete evidence that their financial difficulties are caused primarily or even significantly by the RFS program, rather than by other factors"); *AFPM*, 937 F.3d at 581 (upholding

EPA's finding that "refineries had failed to show why they cannot recoup the cost of RINs through higher prices of their products").

Here, as the record demonstrates, EPA has considered even more market and pricing data provided by many market participants, including Petitioners and other small refineries, retested its economic principles, and reasonably concluded that obligated parties pass through RFS compliance costs.  *See* JA003151-80 (explaining RIN discount and RIN cost passthrough, RIN market dynamics, underlying economic principles, impacts on different market participants, and evaluation of market data confirming the analysis).  Through its detailed analysis of studies, data, and market dynamics, EPA found that the price Petitioners receive when selling their transportation fuel includes the cost of acquiring the RINs needed to meet their RFS obligations associated with that fuel (RIN cost passthrough).  JA003151-80.

Contrary to Petitioners' claims, Br. at 70-71, through additional EPA analysis, EPA determined that entities blending renewable fuel with gasoline or diesel do not incur lower compliance costs because they discount the sales price of their blended fuel to reflect the revenue that they will receive from selling the RINs separated from blending (RIN discount).  JA003151-80.  As in *Alon*, EPA "grounded [these] conclusion[s] in studies and data in the record" and reasonably addressed and rejected Petitioners' contrary claims.  *Alon*, 936 F.3d at 649.

**REDACTED PUBLIC VERSION**

Because EPA's economic analysis is supported by a robust record and based on EPA's long-time experience and expertise implementing the program, this Court should uphold the Denial Actions.  *AFPM*, 937 F.3d at 574.

Petitioners experience RIN cost passthrough when each operates as a merchant refiner because the market price of Petitioners' gasoline or diesel includes the cost of the RINs.  JA003157-62.  The merchant refiner sells its fuel to the blender, who accepts the market price (which reflects the RIN cost) because the blender will be able to offer blended fuels at a competitive price after accounting for the separation and sale of RINs associated with the blended renewable fuel. *See id.*  Petitioners also experience RIN discount in their roles as integrated refiners when they sell a blended fuel like E10 (gasoline containing ten percent ethanol) to another party under contract, discounting the price of the E10 to reflect the value of the RINs separated from the blended ethanol.  *See* JA003159-62.[10]

For example, ███  ██████████  and  ████  provided EPA with several E10 contracts, and EPA determined that █████████████████████████████████

████████████████████████████████████████████████████████████

---

[10] The RIN cost passthrough and discount principles operate the same for the sale of diesel products.  JA003151; JA003170.

████████████████████████████████████████

████████████████████████.[11]

Petitioners fail to establish otherwise. As explained below, EPA's Denial Actions were consistent with the opportunity that 42 U.S.C. § 7545(*o*)(9)(B) provides small refineries to petition for an exemption for the reason of disproportionate economic hardship; EPA consulted DOE and considered the 2011 Study and other economic factors in deciding exemption petitions; EPA considered and rejected refinery-specific information, including Petitioners'; Petitioners' challenges to EPA's economic analysis fail; and EPA provided sufficient guidance for future exemption petitioners.

## A.    EPA Did Not Eliminate the Small Refinery Exemption.

Contrary to Petitioners' claims, EPA has not "eliminated" the small refinery exemption. *Contra* Br. at 36-38. The CAA makes small refinery exemptions available only to small refineries that demonstrate disproportionate economic hardship because of RFS compliance. As initially presented in EPA's 2017 Point of Obligation Denial and affirmed by this Court in *Alon*, and subsequently updated and further explained in the Denial Actions, EPA's economic analysis of the data

---

[11] Petitioners fail to address EPA's specific conclusions on the operation of RIN discount at their refineries in these contracts; any challenges to those conclusions are thus forfeit. *See Nuclear Energy Inst.*, *v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004) (quoting *Omnipoint Corp. v. FCC,* 78 F.3d 620, 635 (D.C. Cir. 1996)).

available to it at the time of EPA's 2017 Point of Obligation Denial found that RFS compliance did not cause economic hardship to any refineries. Petitioning small refineries have not presented information or argument demonstrating otherwise. Accordingly, EPA properly denied the exemption petitions. While small refineries are therefore unlikely to incur any economic hardship in future years— disproportionate or not—from RFS compliance absent changes in market dynamics or other circumstances, EPA has made clear that an extension of the small refinery exemption remains available upon a sufficient showing. *See* JA003213-14 (explaining that, "if a small refinery had provided data and evidence of other economic factors upon which EPA could determine[] . . . that the particular small refinery had demonstrated that it faced" disproportionate economic hardship, then "EPA would have issued an exemption to that small refinery"), JA003223 (explaining that the Denial Actions do "not prejudge future [exemption] petitions or eliminate the possibility of new, different data becoming available in the future that could support a different conclusion"). That "no individual small refinery has made such a showing in the [exemption] petitions EPA reviewed in taking" the Denial Actions, JA003214, does not "repeal" the relevant statutory provision, as Petitioners suggest, Br. at 37-38. And contrary to Petitioners' brief, *id.*, the Denial Actions are consistent with the holding in *HollyFrontier*, which addressed eligibility only for an exemption and not an entitlement, *see* 141 S. Ct. at 2180-81

(small refineries may petition for—"if not always receive"—an exemption "at any time" under 42 U.S.C. § 7545(*o*)(9)(B)(i)); *see also* Br. at 18 (conceding this point).  Petitioners' argument fails.

### B.    EPA's Consultation With DOE Satisfied the Statutory Requirement.

Petitioners' argument that EPA did not "meaningfully" consult DOE also lacks merit.  *See* Br. at 76-80.  In evaluating small refinery exemption petitions, Congress required only that, "in consultation with" DOE, EPA "consider the findings of the study under subparagraph (A)(ii) and other economic factors."  42 U.S.C. § 7545(*o*)(9)(B)(ii).  The word "consultation" is not defined in the CAA, and "Congress placed no limits on how DOE should provide its consultation to EPA."  *Hermes*, 787 F.3d at 577.  EPA and DOE, exercising their expertise, have discretion to determine the shape of the procedural consultation requirement.

EPA extensively consulted DOE.  As described in the Consultation Memorandum, EPA met with DOE thirteen times during the development of the Proposed Denial and Denial Actions; considered how EPA would conduct its consultation with DOE in compliance with its statutory obligation; and considered the 2011 Study, various economic factors, whether DOE should score the petitions under its Matrix, responses to public comments, and the final actions denying petitions.  *See generally* JA002936-41.  EPA properly consulted DOE and considered the 2011 Study and other economic factors in doing so.

**REDACTED PUBLIC VERSION**

Petitioners cannot force EPA to use its previous method of consultation by fiat. *See Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978); Br. at 78-79. Unlike Congress's choice to allow DOE to determine disproportionate economic hardship in the 2011 Study without EPA involvement in § 7545(*o*)(9)(A)(ii)(II), subparagraph (B)(ii) requires only that EPA *consider* the 2011 Study, which EPA did here, and does not require EPA to rely on the DOE Matrix or any specific scoring or to even accept DOE's scoring or recommendation. Likewise, Petitioners' argument that the descriptions of the calls and meetings with DOE do not include sufficiently specific details, Br. at 78-79, fails because EPA is not even statutorily required to disclose any specific details of its consultation. At any rate, the Consultation Memorandum and its descriptive entries provide ample detail of the substance of the consultation, including the topics discussed, factors considered, and conclusions reached. *See generally* JA002936-41.

Nor did EPA force DOE to presume that the RIN cost passthrough analysis was correct. *See* Br. at 79. DOE's 2011 Study, including the DOE Matrix, assumes that "[i]f certain small refineries must purchase RINs that are far more expensive than those that may be generated through blending, this will lead to disproportionate economic hardship for those effected [sic] entities" because they would experience that "high cost of compliance relative to the industry average."

JA000014-15.  During consultation, DOE recognized the flaw of this assumption

when it concluded "that, if . . . the cost of compliance is the same whether

refineries buy RINs or blend renewable fuel to acquire RINs" and "RFS

compliance costs are passed through in the price of refined products," then small

refineries "would not face a higher cost of RFS compliance relative to the industry

average," and thus no disproportionate economic hardship occurs.  JA002937

(cleaned up).  DOE also "confirm[ed] that its 2011 Study did not evaluate

empirical evidence pertaining to RIN cost passthrough" and confirmed that it has

not "conducted a more recent assessment that would enable [DOE] to reach any

independent conclusions regarding RIN cost passthrough."  JA002937.  If DOE

had reached some other conclusion, that would be reflected in the Consultation

Memorandum.  Based on DOE's and EPA's conclusions, there was no reason to

continue using the DOE Matrix.

### C.    EPA's Denial Actions Adjudicated Multiple Petitions and Considered Refinery-Specific Facts in Detail.

Petitioners argue that EPA improperly failed to consider the pending

exemption petitions individually.  Br. at 21, 29, 56-59.  To the contrary, EPA

considered each petition on its merits and determined—based on factors and facts

common to each petition—that every one of the 105 petitions should be denied.

EPA reasonably followed the principle, honored by both administrative agencies

and courts, that like cases should have like results.  Neither the uniform outcomes,

nor EPA's choice to aggregate the petitions for decision, renders the Denial

Actions unlawful. *See, e.g.*, *NAACP v. FPC*, 425 U.S. 662, 668 (1976) (agencies

have discretion to shape their actions).

What's more, the record shows that EPA considered individual refinery

information.[12]  The Denial Actions are based on EPA's revised statutory

interpretation and economic analysis applied to all petitioning small refineries.

EPA accordingly adjudicated each of 105 exemption petitions in the Denial

Actions, responded to cross-cutting small refinery comments and arguments in the

aggregate, and responded to specific confidential facts and arguments raised by

each petitioning small refinery in confidential appendices—including each

Petitioner.  *See* JA003213-14 (discussing EPA's efforts to consider individual

petitions and comments), JA003227 (same); *see also* JA003147 (EPA "carefully

reviewed data, contracts, and other information from small refineries to evaluate

if[] . . . refineries that acquire RINs through blending get them at a lower cost than

do refineries that purchase RINs on the open market").

The confidential appendices include detailed discussions of Petitioners'

refinery-specific contracts, markets, and studies.  *See generally* Appendix Tables

---

[12] Petitioners' out-of-context quote that EPA determined that the petitioning small refineries were merely "unlikely" to suffer disproportionate economic hardship caused by RFS compliance, Br. at 58-59 & 80, is belied by the rest of the paragraph that Petitioners cite and the Denial Actions in general.  *See, e.g.*, JA003139-40.

1a & 1b. EPA explained that none of the refinery-specific information invalidated EPA's economic analysis and therefore concluded that none of the petitioning small refineries established disproportionate economic hardship. Petitioners' argument fails.

### D. Petitioners' Remaining Arguments Fail to Show EPA Acted Unreasonably, or Unreasonably Explained Its Findings, and Fail to Address EPA's Responses to Petitioners' Comments.

#### 1. The Post-Decisional GAO Report Should Not Be Considered or Credited.

Petitioners' arguments referencing the November 2022 GAO Report are improper, incomplete, and incorrect. *See* Br. at 24-26, 62-66. The GAO Report is not part of the administrative record for the Denial Actions. As this Court recently determined in *Wynnewood* when presented with the same extra-record GAO Report, the GAO Report should not be considered. *Wynnewood*, 77 F.4th at 784; *see also* 5 U.S.C. § 706; *Fla. Power & Light*, 470 U.S. at 743-44.

Even then, any consideration must account for EPA's criticisms included in Appendix IV to the GAO Report—left unmentioned in Petitioners' brief. EPA evaluated and analyzed the GAO Report and criticized GAO's unexplained "assumptions and simplifications" on RIN pricing, which predictably led to GAO's "unexpected" and wrong results. JA003460.

EPA explained how "GAO's analysis of [RIN] trades suffers from several fundamental flaws," which "calls into question the relevance of GAO's analysis

for purposes of evaluating whether small refineries suffer disproportionate economic hardship from the RFS, specifically whether small refineries face a higher cost to acquire separated RINs compared to other refineries." JA003457. Rather than analyze "small refinery" data and information, GAO undertook to "find a relationship between the relative size of two trading partners and the relative price of a RIN," JA003460, to conclude that "companies that tended to trade lower quantities of RINs (likely smaller refineries) were disadvantaged by either paying more to buy RINs or receiving less when they sell RINs relative to larger refineries." JA003460.

After careful review of GAO's conclusions, "EPA identified three significant concerns with GAO's draft analysis and raised these concerns to GAO," explaining how these "three modeling choices by GAO [were] the basis for an analysis that produces inexplicable results" and that "GAO erred in relying on this fundamentally flawed analysis to conclude that EPA's determination is faulty." JA003461. The GAO Report never modeled or studied pricing for "small refineries" and did not consider whether the buyers or sellers were "small refineries" under the CAA. JA003456-58. GAO even concluded that for some sales, the small party—not a small refinery—paid prices that were 2.4% "*higher or lower* for RINs, on average." GAO-Report-at-10 (emphasis added). Without directly addressing EPA's concerns, the GAO Report concedes it is "unclear the

REDACTED PUBLIC VERSION

extent to which [GAO's findings] materially affect[] individual small refineries." JA003412.

Moreover, GAO's finding "does not account for the scope of review . . . to evaluate [exemption] petitions, the notice and comment process that EPA conducted prior to issuing its adjudications, or the information EPA reviewed and evaluated as a result of the comments it received." JA003457-58. EPA "conducted additional analyses of the same RIN transaction data that GAO analyzed using an updated approach that addresses the various methodological problems" with the GAO Report. JA003463. EPA's preliminary results showed "little significant difference in the price that small refineries pay to acquire RINs when compared to the rest of the RIN market," which would not "impact an evaluation of potential disproportionate economic hardship by a small refinery." JA003460, JA003463.

Given GAO's fundamental flaws, EPA went back in December 2022 and confirmed its conclusions with additional analyses ("EPA's December 2022 RIN Price Analysis"), concluding that small refineries only "paid 1.1% (1.2¢) more per RIN when buying separated RINs when compared to the average daily price and 0.5% (0.6¢) more per RIN than the largest 20 refiners." JA003479.[13] On May 2,

---

[13] EPA also discussed more granular—but still insignificant—differences in prices for conventional renewable fuel RINs and biomass-based diesel RINs, as well as variations based on RIN vintage. JA003479.

REDACTED PUBLIC VERSION

2023, EPA reiterated these findings in its final Response to the GAO Report[14] ("EPA Final GAO Response"), a response also unmentioned in Petitioners' brief. EPA affirmed that the "small variation" in RIN price data "may simply reflect noise in the data EPA evaluated and do[es] not reflect any real difference in the prices parties pay in acquiring RINs." JA003493. Accordingly, "[t]his is clearly not the type of situation where small refineries suffer [disproportionate economic hardship] from compliance with the RFS program." *Id.*[15]

Depending on the type of RIN, EPA's analysis shows that a small refinery may pay an insignificant amount more *or less* per RIN than a larger refinery. JA003493. Contrary to Petitioners' unsupported assertions of millions of dollars in higher compliance costs compared to large refineries, Br. at 26, EPA's December 2022 RIN Price Analysis and EPA Final GAO Response *support* EPA's overall conclusions. Indeed, even if these RIN prices are more than those of a larger refinery, any difference is "insignificant" and does not constitute disproportionate economic hardship as the statute requires. JA003493.

---

[14] Letter from EPA re Response to GAO Report (May 2, 2023), available at https://www.epa.gov/system/files/documents/2023-05/EPA-Response-to-Final-GAO-SRE-Report-Letter-to-House-and-Senate-Appropriations-Committees.pdf.

[15] *See also* JA003495 (discussing "additional evidence that a small refinery—even a very small one—can contract to acquire RINs at or perhaps even very slightly below the prevailing market price" and that "EPA does not find compelling the argument that small refineries face a significantly higher cost to acquire RINs when compared to the industry average").

REDACTED PUBLIC VERSION

Petitioners' reliance on the GAO Report is therefore misplaced.  *See, e.g.*, *United States v. Jones*, 664 F.3d 966, 975 (5th Cir. 2011) (affirming exclusion of GAO reports "in light of the reports' limited probative worth").  Nor does GAO have any special expertise in administering environmental statutes; it is owed no deference, should this Court consider the GAO Report.  *See Parola v. Weinberger*, 848 F.2d 956, 960 (9th Cir. 1988).  If the Court does consider the GAO Report, any consideration should include EPA's criticisms included in the report, as well as the specifics of EPA's December 2022 RIN Price Analysis and Final GAO Response, which all support EPA's conclusions.[16]

## 2. The Timing of Petitioners' RIN Purchases Does Not Invalidate RIN Cost Passthrough, and Petitioners Did Not Show That They Cannot Purchase RINs Ratably.

Petitioners wrongly argue that EPA's economic analysis assumes that all obligated parties purchase RINs ratably.  Br. at 71-76.  In doing so, Petitioners conflate the operation of the RIN cost passthrough principle, which occurs no matter *when* RINs are purchased, with EPA's recommendation that small refineries purchase RINs needed to satisfy their obligations for all the fuel sold ratably: "on a systematic, regular basis," to ensure that obligated parties "recover the cost of the RINs they purchase in the sales price of the petroleum fuel they sell."  JA003176.

---

[16] Any consideration should also account for the GAO Report's conclusion that the 2011 Study is "critically flawed."  JA003415-16.

74

When an obligated party, like Petitioners, chooses to purchase RINs well in advance or well after the sale of its gasoline or diesel, it will still recover an amount of revenue sufficient to purchase RINs on the day that it sells its fuel, but that obligated party ultimately may have to spend more (or less) to purchase RINs than it would have if it had purchased RINs ratably.  *See* JA003176.  In other words, while obligated parties may try to time the market to their relative advantage, all obligated parties receive an increased price (and increased revenue) from the operation of the RFS program in the market at the time the transportation fuel is sold.

The timing of RIN purchases therefore does not invalidate the concepts of RIN cost passthrough or RIN discount.  Nor does a small refinery's own business choices about *when* to purchase RINs support a finding of disproportionate economic hardship caused by RFS compliance.[17]  Indeed, were EPA to grant relief when a small refinery mistimed the RIN market, that would create substantial inequities in the RFS program (between those who choose to reduce risk in

---

[17] Petitioners advance a new argument in their brief that, because EPA previously "rejected a proposal to require 'real-time' RIN retirement," this meant Petitioners did not need to purchase RINs ratably.  *See* Br. at 10, 52.  Having not raised this issue in their petitions or comments to the Proposed Denial, Petitioners have forfeited those arguments here.  *See Nuclear Energy Inst.*, 373 F.3d at 1290.  In any event, just because the RFS program does not require real-time RIN retirement does not mean that an obligated party cannot retire RINs however it chooses.  Retiring RINs is simply an obligated party's RFS compliance reporting mechanism.

compliance and those who do not) and a self-fulfilling hardship process by incentivizing parties to delay RIN purchases with the hope that RIN prices decline or if not, to simply claim economic hardship.

Petitioners' argument that EPA has imported a proximate-cause requirement into the statute, Br. at 51-53, finds no support in any of EPA's analysis; EPA has never suggested that "a small refinery's decision to purchase RINs non-ratably [is] a superseding cause that necessarily breaks the chain of causation between the RFS and the small refinery's" claim of disproportionate economic hardship. *Id.* at 51. Rather, a small refinery cannot wait until the last minute to comply, having banked on receiving an exemption, and then claim that its choice as to how to comply has caused it disproportionate economic hardship.

Petitioners also fail to establish that they cannot purchase RINs ratably. They instead present a circular argument first that they could not do so and second that, even if they *could* purchase RINs ratably, it "would have been nonsensical" for them to do so.  Br. at 74.  Petitioners claim that, because they could not purchase RINs in "amounts small enough to match their daily production volumes" or "find a trading house that sells RIN bundles of that size," they relied on the possibility that EPA might grant exemptions rather than plan for compliance. *Id.* at 74-76.

76

**REDACTED PUBLIC VERSION**

EPA reasonably "reject[ed] small refinery arguments regarding the cost of capital" and their "ability to afford" ratable RIN purchases and further concluded that "small refineries can enter into contracts with various RIN brokers to purchase RINs on a ratable basis." JA003260; *see also* Final-GAO-Response-at-7 (providing "additional evidence that a small refinery—even a very small one—can contract to acquire RINs" ratably and "at or perhaps even very slightly below the prevailing market price"). EPA also similarly rejected Petitioner-specific comments. *See* ███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████

As to Petitioners' claim that they relied on their previous exemptions when choosing not to purchase RINs ratably, EPA explained why such a reliance was unreasonable given EPA's statements year-after-year to Petitioners and all small refineries to plan for compliance. JA003261. Petitioners' failure to even acknowledge EPA's responses supports EPA's conclusions that Petitioners *can*

**REDACTED PUBLIC VERSION**

buy RINs ratably and further cements EPA's conclusion that Petitioners *can* pass

through their RIN costs.[18]



---

[18] Petitioners have forfeited any argument challenging EPA's responses.  *See Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1341 (D.C. Cir. 2023) (quoting *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990)) ("We require petitioners [to] raise all of their arguments in the opening brief to prevent 'sandbagging' [of] respondents and to provide opposing counsel the chance to respond.").

[19] 

[20] Petitioners' unsupported statement that they "cannot now pass through the new astronomical compliance costs," Br. at 75, omits that Petitioners have *already*

███████████████████████████████████████████████

███

### 3.     EPA Reasonably Rejected Petitioners' General Studies.

Petitioners' reliance on various generally applicable studies, *see, e.g.*, Br. at 66-70, 80-86, fails because EPA reasonably explained how and why those studies fail to undermine or invalidate EPA's economic analysis.

Instead, the studies submitted by multiple small refinery Petitioners "on balance . . . provide more evidence in support of the conclusion that RIN costs are passed through than evidence to suggest they do not." JA003243.  The Fitzgerald study's focus on the unavailability of RIN quote prices on weekends and holidays does not invalidate EPA's conclusion that small refineries pass through RIN costs or can purchase RINs ratably.  JA003236.  Petitioners suggest that the mere existence of weekends and holidays disproves EPA's RIN discount and RIN cost passthrough principles based on the Fitzgerald study.  *See* Br. at 67-68.  EPA responded to the Petitioners' earlier comments on this point, *see* JA003236, and explained that it analyzed the Fitzgerald study and found that there was "no significant correlation between the estimated 'increase' or 'decrease' in RIN prices on Saturday or Sunday because no such RIN prices exist."  JA003236.

---

passed through the cost of compliance and that their current compliance costs result from their ill-advised strategies.

The lack of weekend pricing information does not have the "significant implications" that Petitioners suggest, Br. at 68, nor does it compromise in any way EPA's economic principles or ratable RIN purchasing, *see id.* An obligated party can, as EPA explained in its response to comments, purchase RINs at "Friday's RIN price but at a volume that reflects Friday, Saturday, and Sunday's sales volumes." JA003236. But perhaps most critically, *all* obligated parties, whether a small refinery or not, are subject to the same strictures of supposed non-existent weekend RIN pricing, meaning there can be no disadvantage—disproportionate or otherwise—to small refineries on this point.

The Louisiana State University ("LSU") study's assumption that "compliance costs are not the same for all obligated parties" based on regional and other differences overlooks that RINs "are generated by renewable fuel producers" whose "cost structure varies very little across the country" and that blenders must "discount their fuel blends by the entire value of the RIN to remain competitive." JA003237. EPA rejected the notion that regional variation prevents complete passthrough because, among other reasons, "interrelation between linked fuel markets" shows "that many small refineries acting in local markets directly index the prices for the products they sell to the major coastal markets and posted prices from those markets," which "ensure[s] that the local market price indexes (rises

and falls) with those major markets." JA003244, JA003254-55 (similar); *see also* JA003153-56, JA003171-77 (discussing competitive markets).

Petitioners rely on other general studies to claim that EPA had an inadequate basis to find passthrough in all fuel markets by analyzing "just two fuel markets." *See, e.g.*, Br. at 68-69. Petitioners are correct that EPA extrapolated market data and pricing information from the New York Harbor and Gulf Coast fuel markets. *See* JA003153-56; JA003243; JA003255. That is typical, and Petitioners acknowledge a few sentences later that certain Petitioners' fuel prices are dictated or indexed to various fuel markets. Br. at 69. Petitioners ignore EPA's detailed explanation of its extrapolation of the fuel prices and fuel markets as well as the additional data and analysis that EPA considered, including from Petitioners and other small refineries. *See Am. Petroleum Inst.*, 862 F.3d at 69; JA003153-54. EPA determined that the data provided by Petitioners "either could not be used to draw conclusions regarding RIN market dynamics, or, in contrast to the [P]etitioners' claims, actually *supported* [EPA's] conclusions"[21] on RIN discount and RIN cost passthrough. JA003154. And because refineries operate in a highly competitive nationwide fuels market, EPA determined that such refineries "are linked," as shown by "the structure of many fuel supply contracts across the

---

[21] EPA observed that "on balance these studies provide more evidence in support of the conclusion that RIN costs are passed through than evidence to suggest they do not." JA003243.

country that establish pricing based on the price of fuel at a major market (e.g.,

Houston or New York Harbor) plus or minus transportation costs between the local

market and the major market, depending on the direction of product flow."

JA003155.  Petitioners concede this "link" and indexing to various fuel markets.

Br. at 69.

EPA also did not "see [any] correlation between refining margins and RIN

prices," nor did EPA "see any indication that higher RIN prices put small refineries

at an advantage or disadvantage relative to large refineries."  JA003155.  EPA's

result mirrors prior studies, which similarly found there to be "full pass-through of

RIN costs to nationwide output prices on average, and no statistical difference

between pass-through rates for large and small refineries."  JA003234.[22]

Therefore, EPA's determinations were reasonable and supported by the record.

Moreover, Petitioners' brief fails to discuss EPA's explanations from the

Denial Actions.  Petitioners should not be allowed to wait and sandbag their

arguments on this aspect of EPA's Denial Actions until their reply.  *See Am. Pub.

Gas Ass'n*, 72 F.4th at 1341.

---

[22] EPA explained that local fuel pricing is generally based on the price at a major
fuel hub "plus (or minus) transportation costs to or from that hub," which strongly
suggests that, because "RIN costs are passed through in major fuels markets, such
as New York Harbor, these costs are passed through in other markets as well."
JA003255.  Petitioners' brief does not dispute or challenge this point.

### 4.     EPA Reasonably Responded to Petitioners' Comments.

Far from "ignor[ing] or intentionally misrepresent[ing]" Petitioners'
exemption petitions, Petitioners' many supplements, and Petitioners' extensive
comments, *see* Br. at 80, EPA reasonably responded to all of Petitioners'
submissions through the Denial Actions themselves, Appendix B in both Denial
Actions, and the confidential appendices for refinery-specific comments.
Petitioners' brief fails to substantially address EPA's responses to Petitioners'
Proposed Denial comments—those raised in Petitioners' brief are detailed below—
thereby waiving any argument.  *See Am. Pub. Gas Ass'n*, 72 F.4th at 1341.

### i.     There is no difference in RFS compliance costs for small refineries that produce primarily (or exclusively) diesel rather than gasoline.

Several Petitioners claimed that, because their primary or exclusive
production was that of diesel rather than gasoline, it purportedly "produces" a
disproportionate economic hardship because these small refineries "cannot blend
diesel adequately" and are "forced into the RIN market."  *See* Br. at 81.  While
omitted from Petitioners' brief, EPA reviewed, analyzed, considered, and rejected
these claims in the Denial Actions and Appendix B.  EPA's economic analysis
concluded that RIN costs are passed through equally for gasoline *and* diesel
because the form of the RFS program, RIN system, and compliance are the same
for both.  *See* JA003170; JA003239.  Indeed, "as a result of the nationwide RIN

trading program, all refineries have equal access to the RINs they need for

compliance with the RFS program and at the same nationwide price" for the

required RINs.  JA003190.



Br. at 80-81.  But

EPA rebutted the validity of this analysis and related arguments in Appendix B and

in each of the applicable confidential appendices.

**REDACTED PUBLIC VERSION**

███████████████████████████████████████████████████

████████████████████████████████

     Indeed, ██████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████.

The Denial Actions explain how obligated parties, even those who produce primarily (or only) diesel, fully recover their costs of RFS compliance. JA003170. Petitioners' claim that their comments disprove EPA's economic analysis is belied by the record. Rather than engaging on EPA's responses to these comments, Petitioners' brief instead repeats the same conclusions in its supplemental exemption petitions and comments. They have therefore forfeited the opportunity to dispute EPA's responses. *See Am. Pub. Gas*, 72 F.4th at 1341.

     Commenters, including Petitioners, provided no evidence to EPA that they somehow operate under materially different conditions for RIN cost passthrough and RIN discount because they produce a higher percentage of diesel than gasoline. Ultimately, because the cost of compliance on a per gallon basis is the same for every obligated party—including a small refinery—whether the RINs are acquired through blending or purchasing, it is of no consequence whether a small refinery must purchase more RINs than an average refinery.

ii.    **Petitioners did not provide EPA with any evidence demonstrating regional market disparities that constitute disproportionate economic hardship.**

The Denial Actions explain that an obligated party's size or market makes no difference because EPA's analysis confirmed that "not only are [RIN costs] passed through in diesel fuel prices on average nationally, but also when evaluated across different geographic regions and company sizes."  JA003234.  Petitioners are therefore no different than any other small or large refinery passing on their RIN costs.  Petitioners' brief simply claims that EPA is wrong, but Petitioners must do more than make a conclusory statement that they disagree with EPA's analysis, which is accorded significant deference by this Court.  *See, e.g.*, *N.L.R.B. v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (holding that the burden of proving justification or exemption under a special exception to a statute generally rests on one claiming its benefits.); *see also Marsh*, 490 U.S. at 377; *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).

As to Petitioner ███████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████, EPA noted that ███████████ provided no pricing data, no market data, or any other information to verify this unsupported claim.  ████████████████████████████████████████

███████████████████████████████████████ EPA need not attempt

**REDACTED PUBLIC VERSION**

to disprove ████████ unsupported theory at this point; ████████ has

forfeited its opportunity to present that theory.  *See Am. Pub. Gas Ass'n*, 72 F.4th

at 1341.

Even so, ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████

Finally, RIN discount has nothing to do with Petitioners' claims that there

are "market and regional compliance cost disparities" because of the competition

Petitioners face against large refiners that benefit from "meaningful economies of

scale."  Br. at 82.  In the Denial Actions, EPA acknowledged that these same

factors "may in fact provide a competitive advantage to large integrated refiners."[24]

---

[24] EPA also examined and rejected Petitioners' claim that some small refineries are
"forced to discount" their sales prices "below the pipeline import parity price set
by the largest integrated refiners to avoid being driven out of the market," Br. at

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

JA003186-88.  However, EPA also acknowledged that the continued presence of small refineries in the marketplace proves that "small refineries typically have other market advantages, such as access to local crude supplies and local markets lowering their distribution costs, specialty products, and niche markets with fewer competitors."  JA003186-88.

Here, *none* of these market advantages or disadvantages is caused by RFS compliance or the result of the RFS program.  Indeed, *all* these market advantages and disadvantages existed before the RFS program.[25]  JA003187.  Petitioners did not provide any evidence to suggest that the RFS program exacerbated the advantages to the large integrated refineries.  *Id.*  EPA found no such evidence and concluded that "the competitiveness of small refineries in the fuels market, be it favorable or unfavorable, does not change as a result of RFS compliance obligations."  *Id.*

---

82.  *See* JA003256-57.  But no evidence suggests that large retailers and traders disproportionately profit from the RIN market, as Petitioners again suggest.  *See* JA003248; JA003162-80.  Indeed, EPA has not had any obligated party "report that they have exceeded the RIN holding thresholds under the RFS regulations." JA003248.

[25]

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

88

### iii. Small refineries are not disadvantaged in their acquisition of RINs or in compliance with the RFS program.

Petitioners provide further conclusory claims that RIN brokers and RIN contracts are unavailable to small refineries because of their size. Br. at 73-74. But EPA explained that small refineries, including Petitioners here, can acquire RINs by, for example, entering into contracts with RIN brokers to purchase RINs on a ratable basis and that these contracts could specify amounts and prices based on an index or metric. JA003260-61; ██████████████. While fees may be part of such a contract, there is no reason to believe that any such fees would be any different than those offered to any other market participants, that they rise to the level of *disproportionate* economic hardship, or that they are greater than the costs to a small refinery to internally manage RIN acquisitions. *See* JA003260-61.

Several Petitioners claim that they sell their products below the market pipeline price and that they cannot increase their prices because of inefficiencies in local markets, small sizes, locations, relationships with retailers, and high levels of diesel production. Br. at 67-68, 80-86. The Denial Actions explain why each of these claims fail. JA003234; JA003239. For one, ███████████████

████████████████████████

████████████████████████

████████████████████████████



Some Petitioners claim that they must purchase more RINs for RFS compliance than other refineries for various reasons (e.g., resistance to biodiesel, inability to blend biodiesel, pipeline concerns, and high diesel production), Br. at 80-83, 85-86, but that is irrelevant. EPA explained that, no matter how many RINs that a small refinery needs to purchase for RFS compliance, small refineries— including each of the Petitioners—recover their RFS compliance costs in the price of their transportation fuel and are thus no different from any other obligated

---

26 ████████████████████████████████████

27 Rather than acknowledge the existence of these RIN discount principles, Petitioners instead characterize this as "RIN theft," claiming that they are "forced to forfeit the value of their investments to produce blended fuel." Br. at 85. What Petitioners are describing is the RIN discount principle at work. *See* JA007404-05.

party.[28]  *See, e.g.*, JA003154-70; JA003239; JA005991-92; JA006097-98.  Despite

dozens of supplements to their exemption petitions and extensive comments to the

Proposed Denial, Petitioners have provided no evidence that demonstrates

otherwise.

In sum, EPA applied its experience and technical expertise to explain why

Petitioners' comments fail, and Petitioners fail to address or rebut EPA's

explanations.  EPA's determinations warrant deference, and Petitioners' arguments

should be rejected.  *See AFPM*, 937 F.3d at 574; *see also Marsh*, 490 U.S. at 376-

77).

> **iv.    EPA analyzed and rejected refinery-specific analyses and studies, many of which, support EPA's RIN discount and RIN cost passthrough principles.**

EPA also responded to Petitioner-specific claims about RIN economic

principles.  For example, EPA explained that the conclusions in ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

------

[28] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

EPA also analyzed ████████████████████████████

Petitioners also claim that ██████████████████████████

In the end, EPA thoroughly reviewed and analyzed Petitioner-specific studies and concluded that the RIN discount and RIN cost passthrough principles applied to each of the Petitioners.

> **5.   Petitioners Have the Burden of Demonstrating Disproportionate Economic Hardship, and EPA Provided Clear Direction on the Information Necessary to Do So.**

Petitioners argue that EPA has not provided sufficiently clear guidance on what they must provide to obtain an exemption.  Br. at 80.  But Petitioners cannot shift the burden of establishing a disproportionate economic hardship caused by RFS compliance to EPA.  The CAA places that burden on small refineries.  42 U.S.C. § 7545(*o*)(9)(B)(ii); *see also* Br. at 57 (recognizing that "Congress put the onus on small refineries themselves to petition for relief," and "[t]hey must show 'disproportionate economic hardship'" (citations omitted)).  "If Congress had

intended to excuse [RFS compliance] where the [EPA] had failed to provide clear guidance" to small refineries, "it would have said so in the Code or authorized regulatory rules," and this Court should not "rewrite the plain language of" 42 U.S.C. § 7545(*o*)(9)(B) "in order to accommodate supposed equitable principles." *Manor Care, Inc. v. United States*, 630 F.3d 1377, 1386 (Fed. Cir. 2011).

Petitioners' reliance on dicta from the Tenth Circuit's *Suncor Energy, Inc. v. EPA* decision does not compel the result they seek here. *Suncor* vacated and remanded EPA's decision interpreting the term "small refinery" for failure to consider important aspects of the definition. 50 F.4th 1339, 1342, 1352-53, 1355 (10th Cir. 2022). EPA undertook no such interpretation in the Denial Actions. Rather, EPA detailed at length its approach to interpreting the CAA small refinery exemption provisions as a whole and, contrary to Petitioners' assertion, considered each refinery's many comments crafting the Denial Actions, as evidenced by the refinery-specific appendices. *Suncor* is inapplicable.

On their face, the CAA and EPA's regulations provide refineries with sufficient direction. To receive an exemption, the petitioning small refinery has the burden of demonstrating that RFS compliance causes disproportionate economic hardship. *See* 42 U.S.C. § 7545(*o*)(9)(B)(i); 40 C.F.R. § 80.1441(e)(2). The RFS regulations require that an exemption petition specify the factors that demonstrate disproportionate economic hardship, detail the hardship the refinery

would face in complying with the RFS requirements, and identify the date by which the small refinery expects that compliance with the RFS requirements can reasonably be achieved.  40 C.F.R. § 80.1441(e)(2)(i); *see also* EPA-HQ-OAR-2021-0566-0117-at-24 (summarizing requirements).  The RFS regulations also require that "[i]n order to qualify" for a small refinery exemption, "a refinery must meet the definition of 'small refinery'" based on average aggregate daily crude oil throughput "for the most recent full calendar year prior to seeking an extension and must be projected to meet the definition [] for the year or years for which an exemption is sought."  40 C.F.R. § 80.1441(e)(2)(iii).

EPA also identified exactly what would be needed to demonstrate disproportionate economic hardship in the Proposed Denial, which Petitioners simply ignore.  EPA sought comment on its statutory interpretation and economic analysis, and its underlying findings, including:  (1) whether "the structure of the RFS program places a proportional burden on all obligated parties based on their gasoline and diesel fuel production volume"; (2) whether "the structure of the RFS compliance system EPA put in place, which enables the use of" RINs, "provides equal access to all obligated parties to the same means of compliance"; (3) whether "the fuel and RIN markets are competitive and that RIN costs per gallon are the same to all obligated parties regardless of their role in the market, their size, or whether they acquire RINs through blending renewable fuel or by purchasing RINs

95

(credits) representing that volume of fuel"; (4) whether "RIN costs are passed through to consumers"; (5) whether "the compliance costs of the RFS program do not impose economic harm to obligated parties and, therefore, the RFS program does not cause [disproportionate economic hardship] for small refineries or any obligated party"; and (6) "additional data that may illustrate the relationship between RFS compliance costs and the price of transportation fuel and blendstocks." JA000227-28 (cleaned up). EPA put Petitioners on notice that this was the specific type of information that would be necessary for a small refinery to demonstrate why the economic principles at work in the RIN market at large do not apply to it, which would allow EPA to reach a different conclusion for that particular refinery given its individualized circumstances.

In the Denial Actions, EPA confirmed that the evidence before the Agency supported the conclusions of the Proposed Denial, and indeed the significant volume of information submitted—including by Petitioners themselves— confirmed EPA's conclusions. EPA also reiterated the type of specific information necessary for a small refinery to demonstrate that RFS compliance causes disproportionate economic hardship for it despite the evidence characterizing the market as a whole. EPA provided small refineries with ample opportunity to provide specific evidence that, for example, a specific small refinery did operate under the RIN discount and the RIN cost passthrough principlesJA003213-14.

Small refineries, including Petitioners, submitted supplemental petitions and documentation.  After reviewing the information submitted by each petitioning small refinery, EPA determined that none provided evidence sufficient to rebut EPA's RIN discount and RIN cost passthrough principles either at large or in the small refinery's particular circumstances.

EPA thus clearly stated what a small refinery would have to provide to overcome EPA's well-supported conclusions on RIN cost passthrough and RIN discount, and no "speculation" is required.  Petitioners' argument fails.

## V.    EPA PROPERLY DENIED FOUR PETITIONS BECAUSE THE SUBMITTING ENTITIES WERE NOT ELIGIBLE TO PETITION FOR A SMALL REFINERY EXEMPTION.

EPA denied four small refinery exemption petitions from two refineries—

███████ and ██████████—on the additional and independent ground that both refineries are ineligible to petition for an extension of a small refinery exemption because they failed to satisfy the statutory and regulatory requirements. JA003141-45; JA00594-96; JA007242-47.  EPA's conclusion is appropriate and consistent with the CAA.

The small refinery exemption in § 7545($o$)(9)(B)(i) is, by the express terms of the CAA, an *extension* of the initial blanket exemption provided in § 7545($o$)(9)(A).  Therefore, a petitioning party cannot receive an *extension* unless it was eligible for and received the initial blanket exemption.  EPA confirmed this

**REDACTED PUBLIC VERSION**

reading through its regulations, requiring a refinery to submit a verification letter confirming its status as a small refinery to receive the blanket exemption. *See* 40 C.F.R. §§ 80.1141(b) (2021), 80.1441(b); JA003141.

██████ and ████████ did not submit information demonstrating they were eligible for or received the initial blanket exemption, and therefore neither is eligible to receive an exemption. EPA explained its approach in the Proposed Denial and Denial Actions. *See* JA003138-41; JA003141-45. EPA's interpretation of the CAA's text tracks *HollyFrontier*, where both the majority and dissenting opinions recognized that an initial exemption must have at least existed for that extension to be *extended*, regardless of the continuity requirement.[29]

EPA's interpretation best supports the policy interests of the RFS program and promotes greater use of renewable fuels and greater fairness in the RFS exemption process. New participants were on notice of the RFS compliance obligations, whereas the existing small refineries were not. Thus, Congress granted an initial blanket exemption for them. *See* JA003143.

---

[29] *See HollyFrontier*, 141 S. Ct. at 2177 ("It is entirely natural—and consistent with ordinary usage—to seek an 'extension' of time even after some lapse."); *id.* at 2177-78 (Barrett, J. dissenting) (the Court's extension analogies assume something existed initially to be extended: 'a term paper after the deadline has passed, the tenant who does the same after overstaying his lease, or parties who negotiate an 'extension' of a contract after its expiration.'").

**REDACTED PUBLIC VERSION**

*HollyFrontier* recognized these points by noting that the dissent finds it "odd" that the majority's reading "would permit hardship relief only to small refineries in existence in 2008 and not to new ones" and the majority responded that there is nothing "odd about the fact that Congress *chose only to protect existing small refineries rather than new entrants*." *HollyFrontier*, 141 S. Ct. at 2181-82 (emphasis added). "Often Congress chooses to protect existing market participants from shifts in the law while applying new restrictions fully to new entrants." *Id.* That is precisely the case here. ████ was a new entrant to the RFS program and knew of the existing statutory and regulatory requirements, but made business decisions that caused it to later become an obligated party. And ████ knew its ████ refinery had not qualified for the initial blanket exemption as the refinery's previous owner retired RINs to demonstrate compliance during that period, which means it cannot now petition for an extension of something it never received.

A.    **EPA Correctly Found ████ Ineligible for a Small Refinery Exemption Because ████ was not a "Small Refinery" at the Time of the CAA's Initial Statutory Blanket Exemption.**

████ admits that it was not a small refinery at the time of the initial blanket exemption yet claims that it received the initial blanket exemption simply by meeting the definition of small refinery a decade later. Br. at 94-96, 98. ████ fails to note that it was not an obligated party at the time the initial blanket

exemption was available because, as ███████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████  Moreover, ██████  never

submitted the verification letter required by EPA to receive the initial blanket

exemption, nor has ██████ ever explained why it did not do so.  JA005794-95; *see*

40 C.F.R. §§ 80.1141(b) (2021), 80.1441(b).  Because ██████ was not eligible to

receive the initial blanket exemption, EPA reasonably determined that ██████ is

ineligible to petition for an "extension" of a small refinery exemption.

Rather than address this point, ██████ now suggest that EPA's 2007 and 2010

regulations contradict the CAA and should be "set aside."  Br. at 95.  But ██████

cannot now challenge EPA's 2007 and 2010 regulations; the time for making such

a challenge passed well over a decade ago.  *See* 42 U.S.C. § 7607(b)(1).  Nor has

██████ properly advanced an after-arising claim under 42 U.S.C. § 7607(b)(1)

because, for one, Petitioners' requested relief does not seek to invalidate either of

EPA's regulations.  *See Alon*, 936 F.3d at 647 (finding after-arising claim

abandoned where petitioners "do not ask [the court] to set aside the rule").

████ also argues that EPA's eligibility decision "departs without explanation from its past practice of granting ████ 2018 exemption petition." Br. at 96. That argument belies the record: in the Proposed Denial and Denial Actions, EPA explained its revised interpretation and considered the information submitted by ████ *See* JA007242-47. ████████████████

████████████████████

████████████

Finally, ████ suggests that EPA's eligibility determination was arbitrary and capricious because ██████████████████

██████████████████████

██████████████████████

██████████████████████ ████ was in a very different position than the small refineries in operation during the initial blanket exemption period; the initial blanket exemption protected those small refineries from changes in the law while they adapted production and operations to the new RFS program. *See HollyFrontier*, 141 S. Ct at 2182. EPA therefore was reasonable in finding ████ ineligible for the small refinery exemptions it sought here.

**B.    EPA Properly Found ████████ Ineligible for a Small Refinery Exemption.**

**1.    ████████ Crude Throughput at Its ████ Refinery Exceeded the Statutory Threshold During the Qualification Periods.**

Like ████ ████████ claims that it is eligible for an extension of a small refinery exemption for 2019 and 2020 because it met the "small refinery" definition after the qualification period.  In its comments on the Proposed Denial, ████████ asserted that the ████ refinery[30]



now suggests that EPA's reliance on the qualification periods is adding "new" requirements and that EPA's regulations from 2007 and 2010 "contradict[] [EPA's] own regulations."  Br. at 100.  Like ████ ████████ cannot now challenge EPA's 2007 and 2010 regulations; the time for making such a challenge passed well over a decade ago.  *See* 42 U.S.C. § 7607(b)(1).  Nor has ████████ properly advanced an after-arising claim under 42 U.S.C. § 7607(b)(1) because, again, Petitioners' requested relief does not seek to invalidate either of EPA's

---

[30] In 2013, ████████████ purchased the ████ refinery from ████████ ████ JA007244.

**REDACTED PUBLIC VERSION**

regulations.  *See Alon*, 936 F.3d at 647 (finding after-arising claim abandoned

where petitioners "do not ask [the court] to set aside the rule").

███████ is not exempt from EPA's 2004 and 2006 regulatory production

qualification periods, during which it is undisputed that the throughput exceeded

the 75,000 barrels per day limits, thereby making the ██████ refinery ineligible

for the initial blanket exemption.  JA003144; JA007242; *see* 42 U.S.C.

§ 7545(*o*)(1)(K); 40 C.F.R. §§ 80.1101(g) (2021), 80.1401.  Like ████ █

██████ failed to comply with the regulatory requirements of 40 C.F.R.

§§ 80.1141(b) and 80.1441(b) by not submitting a verification letter to EPA at the

time of the initial blanket exemption confirming its "small refinery" status.  █████



does not dispute these facts and

has therefore waived any argument to the contrary.  Accordingly, because the

refinery was ineligible to receive the initial blanket exemption, ████████ cannot

now receive an "extension" of that exemption under subparagraph (A).  *See* 42

U.S.C. § 7545(*o*)(9)(B)(i).

Nor can EPA's application of these longstanding regulations be considered

impermissibly retroactive.  EPA's approach is consistent with the statutory and

regulatory requirements.  EPA explained its justification for its revised

interpretation in the Proposed Denial, to which ███████ submitted several

comments and to which EPA responded.  *See* JA007242-47. ███████████

███████████████████████████████████

████████████████

## 2. ███████████ **Crude Oil Throughput Exceeded the Statutory Threshold in 2019.**

Contrary to ███████ claims, Br. at 101-03, EPA correctly determined

that ███████ did not comply with the requirements of 40 C.F.R. § 80.1441(e)(2)

for the years in question based on ████████████████

███████████████████████

████████████████████ cannot

credibly claim that, for RFS compliance, ██████████████

███████████████████████

███████████████████████

██████████████████

███████████████████████

████████████████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

██████████████████

**REDACTED PUBLIC VERSION**

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████[31]  Thus,

EPA reasonably found ████████ to be ineligible to petition for the small refinery

exemptions for the years at issue.

## CONCLUSION

This Court should deny Petitioners' consolidated petitions for review.

---

[31] ████████ also claims now that, in other calculations, EPA aggregated two
different ████████ refineries.  Br. at 101-02.  But ████████ omits that it
processed crude oil at both locations, that it reported *itself* to the government as a
single refinery, and that it did not report these refinery assets separately.
████████

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

s/ *Bryan J. Harrison*
BRYAN J. HARRISON
JEFFREY HUGHES
U.S. Department of Justice

Of Counsel:                                   Environment and Natural Resources Division
                                              Environmental Defense Section
SUSAN STAHLE                                  P.O. Box 7611
U.S. Environmental Protection Agency          Washington, DC  20044-7611
Office of General Counsel                     Tel:  (202) 307-0930 (Harrison)
Washington, DC                                Tel:  (202) 305-4598 (Hughes)
                                              bryan.harrison@usdoj.gov
Dated: January 10, 2024                       jeffrey.hughes@usdoj.gov

106
**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's April 24, 2023 Order, Doc. 1995976, because excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 23,817 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated:  January 10, 2024              s/ *Bryan J. Harrison*

BRYAN J. HARRISON

*Counsel for Respondent EPA*

107
**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to the D.C. Circuit Rules and this Court's

February 22, 2023 Protective Order, Doc. 1987069 at ¶ 3(b), I filed via Box.com

the foregoing Sealed Final Response Brief and also filed via CM/ECF the

foregoing Redacted Response Brief, which will cause service on all counsel of

record who are required to be registered on CM/ECF.  I further certify that I will

provide electronic copies of EPA's Sealed Final Response Brief to counsel for

Petitioners and Intervenor-Respondents via email.


Dated:  January 10, 2024                          s/ *Bryan J. Harrison*
                                                  BRYAN J. HARRISON

                                                  *Counsel for Respondent EPA*

**REDACTED PUBLIC VERSION**

**REDACTED PUBLIC VERSION**

**APPENDIX TABLES**

**REDACTED PUBLIC VERSION**

# Appendix Table 1a: Petitioner-specific Information

| Petitioner | Petitions for review filed in the regional circuit courts challenging the Denial Actions? | Petitioner in the *Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) litigation? | Number of submittals supplementing petitioners' small refinery exemption petitions? (Appendix Table 2) | Number of submittals containing comments on the Proposed Denial? (Appendix Table 3) | 2016–2021 small refinery exemption petitions decided in the June Denial? | June Denial Refinery-Specific Appendix Reference? | Year(s) of RFS compliance obligations relieved in the Compliance Actions? |
|---|---|---|---|---|---|---|---|
| Alon Refin. Krotz Springs, Inc. | None | Yes | - | - | | | |
| Am. Refin. Grp., Inc. | Third Circuit: transferred to D.C. Circuit | Yes | 8 | 3 | | | |
| Calumet Mont. Refin., LLC | Ninth Circuit: dismissed | Yes* | 7 | 4 | | | |
| Calument Shreveport Refin., LLC | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes* | 6 | 5 | | | |
| Calumet Specialty Partners, L.P. | N/A - not a small refinery^ | N/A | - | 1 | | | |
| Cenovus Energy Inc. | N/A - not a small refinery^ | N/A | - | - | | | |
| CHS Inc. | None | No | 1 | 2 | | | |
| Countrymark Refin. and Logistics, LLC | Seventh Circuit: transferred to D.C. Circuit | No | 7 | 4 | | | |
| Cross Oil Refin. & Mktg. Inc. | None | N/A | 6 | 1 | | | |
| Delek Refin., Ltd. | None | No | 8 | - | | | |

^ These entities are not small refineries but are parent companies of small refineries.

* In Alon, the petitioner was Calumet Specialty Products Partners LP, the parent company of these small refineries. Also, at the time, TSAR was the Calumet San Antonio Refinery.

** At the time, TSAR was the Calumet San Antonio Refinery.

# Appendix Table 1a: Petitioner-specific Information

| Petitioner | Petitions for review filed in the regional circuit courts challenging the Denial Actions? | Petitioner in the *Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) litigation? | Number of submittals supplementing petitioners' small refinery exemption petitions? (Appendix Table 2) | Number of submittals containing comments on the Proposed Denial? (Appendix Table 3) | 2016–2021 small refinery exemption petitions decided in the June Denial? | June Denial Refinery-Specific Appendix Reference? | Year(s) of RFS compliance obligations relieved in the Compliance Actions? |
|---|---|---|---|---|---|---|---|
| Delek US Holdings, Inc. | N/A - not a small refinery^ | N/A | 7 | 2 | | | |
| Ergon Refin., Inc. | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes | 7 | 5 | | | |
| Ergon-W. Va., Inc. | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes | 7 | 5 | | | |
| HollyFrontier Cheyenne Refin. LLC | None | No | - | - | | | |
| HollyFrontier Refin. & Mktg. LLC | N/A - not a small refinery^ | N/A | - | 1 | | | |
| HollyFrontier Woods Cross Refin. LLC | None | No | - | - | | | |
| Hunt Refin. Co. | Eleventh Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes | 6 | 5 | | | |
| Kern Oil & Refin Co. | Ninth Circuit: dismissed | No | 2 | 6 | | | |

^ These entities are not small refineries but are parent companies of small refineries.
* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.
** At the time, TSAR was the Calumet San Antonio Refinery.

App. 2

# Appendix Table 1a: Petitioner-specific Information

| Petitioner | Petitions for review filed in the regional circuit courts challenging the Denial Actions? | Petitioner in the *Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) litigation? | Number of submittals supplementing petitioners' small refinery exemption petitions? (Appendix Table 2) | Number of submittals containing comments on the Proposed Denial? (Appendix Table 3) | 2016–2021 small refinery exemption petitions decided in the June Denial? | June Denial Refinery-Specific Appendix Reference? | Year(s) of RFS compliance obligations relieved in the Compliance Actions? |
|---|---|---|---|---|---|---|---|
| Lion Oil Co., LLC | None | Yes | - | - | | | |
| Par Haw. Refin., LLC | Ninth Circuit: dismissed | No | 6 | 6 | | | |
| Placid Refin. Co. LLC | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes | 6 | 3 | | | |
| San Joaquin Refin. Co., Inc. | Ninth Circuit: dismissed | No | 2 | 2 | | | |
| Sinclair Casper Refin. Co. LLC | None | No | 5 | 2 | | | |
| Sinclair Wyo. Refin. Co. LLC | None | No | 5 | 3 | | | |
| Superior Refin. Co. LLC | None | No | - | 1 | | | |
| The San Antonio Refinery, LLC ("TSAR") | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes* | 9 | 2 | | | |
| U.S. Oil & Refin. Co. | Ninth Circuit: dismissed | Yes | 5 | 3 | | | |
| United Refin. Co. | None | No | 1 | 1 | | | |

^ These entities are not small refineries but are parent companies of small refineries.

* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.

** At the time, TSAR was the Calumet San Antonio Refinery.

App. 3

## Appendix Table 1a: Petitioner-specific Information

| Petitioner | Petitions for review filed in the regional circuit courts challenging the Denial Actions? | Petitioner in the *Alon Refin. Krotz Springs, Inc v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) litigation? | Number of submittals supplementing petitioners' small refinery exemption petitions? (Appendix Table 2) | Number of submittals containing comments on the Proposed Denial? (Appendix Table 3) | 2016–2021 small refinery exemption petitions decided in the June Denial? | June Denial Refinery-Specific Appendix Reference? | Year(s) of RFS compliance obligations relieved in the Compliance Actions? |
|---|---|---|---|---|---|---|---|
| Wynnewood Refin. Co. LLC | Fifth Circuit: venue question carried to merits panel, case fully briefed and argued and awaiting decision | Yes | 7 | 3 | | | |
| Wyo. Refin. Co. | Tenth Circuit: transferred to D.C. Circuit | Yes | 7 | 4 | | | |

^ These entities are not small refineries but are parent companies of small refineries.
* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.

App. 4

** At the time, TSAR was the Calumet San Antonio Refinery.

Appendix Table 1b: Petitioner-specific Information (continued)

| Petitioner | Small refinery exemption petition decided in the initial 2018 Decision dated Aug. 9, 2019? | Petitioner or Intervenor in *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | Petitioner or Intervenor in the *RFA v. EPA*, 948 F.3d 1206 (10th Cir. 2020) and *HollyFrontier v. EPA*, 141 S.Ct. 2172 (2021) litigation? | Agreed to consent motion to hold in abeyance *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision pending *HollyFrontier*? | Did not oppose or took no position on motion for voluntary remand in RFA v. EPA, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | 2018 small refinery exemption petition decided in the April Denial? | April Denial Refinery-Specific Appendix Reference? |
|---|---|---|---|---|---|---|---|
| Alon Refin. Krotz Springs, Inc. | ■ | Yes | No | Yes | Yes | ■ | |
| Am. Refin. Grp., Inc. | ■ | Yes | No | Yes | Yes | ■ | |
| Calumet Mont. Refin., LLC | ■ | Yes | No | Yes | Yes | ■ | |
| Calument Shreveport Refin., LLC | ■ | Yes | No | Yes | Yes | ■ | |
| Calumet Specialty Partners, L.P. | ■ | N/A | N/A | N/A | N/A | ■ | |
| Cenovus Energy Inc. | ■ | N/A | N/A | N/A | N/A | ■ | |
| CHS Inc. | ■ | No | No | N/A | N/A | ■ | |
| Countrymark Refin. and Logistics, LLC | ■ | No | No | N/A | N/A | ■ | |
| Cross Oil Refin. & Mktg. Inc. | ■ | No | No | N/A | N/A | ■ | |
| Delek Refin., Ltd. | ■ | Yes | No | Yes | Yes | ■ | |
| Delek US Holdings, Inc. | ■ | N/A | N/A | N/A | N/A | ■ | |

^ These entities are not small refineries but are parent companies of small refineries.
* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.

App. 5

** At the time, TSAR was the Calumet San Antonio Refinery.

# Appendix Table 1b: Petitioner-specific Information (continued)

| Petitioner | Small refinery exemption petition decided in the initial 2018 Decision dated Aug. 9, 2019? | Petitioner or Intervenor in *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | Petitioner or Intervenor in the *RFA v. EPA*, 948 F.3d 1206 (10th Cir. 2020) and *HollyFrontier v. EPA*, 141 S.Ct. 2172 (2021) litigation? | Agreed to consent motion to hold in abeyance *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision pending *HollyFrontier*? | Did not oppose or took no position on motion for voluntary remand in RFA v. EPA, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | 2018 small refinery exemption petition decided in the April Denial? | April Denial Refinery-Specific Appendix Reference? |
|---|---|---|---|---|---|---|---|
| Ergon Refin., Inc. | | Yes | No | Yes | Yes | | |
| Ergon-W. Va., Inc. | | Yes | No | Yes | Yes | | |
| HollyFrontier Cheyenne Refin. LLC | | Yes | Yes | Yes | Yes | | |
| HollyFrontier Refin. & Mktg. LLC | | N/A | N/A | N/A | N/A | | |
| HollyFrontier Woods Cross Refin. LLC | | Yes | Yes | Yes | Yes | | |
| Hunt Refin. Co. | | Yes | No | Yes | Yes | | |
| Kern Oil & Refin Co. | | Yes | No | Yes | Yes | | |
| Lion Oil Co., LLC | | Yes | No | Yes | Yes | | |
| Par Haw. Refin., LLC | | Yes | No | Yes | Yes | | |
| Placid Refin. Co. LLC | | No | No | N/A | N/A | | |

^ These entities are not small refineries but are parent companies of small refineries.
* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.
** At the time, TSAR was the Calumet San Antonio Refinery.

App. 6

Appendix Table 1b: Petitioner-specific Information (continued)

| Petitioner | Small refinery exemption petition decided in the initial 2018 Decision dated Aug. 9, 2019? | Petitioner or Intervenor in *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | Petitioner or Intervenor in the *RFA v. EPA*, 948 F.3d 1206 (10th Cir. 2020) and *HollyFrontier v. EPA*, 141 S.Ct. 2172 (2021) litigation? | Agreed to consent motion to hold in abeyance *RFA v. EPA*, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision pending *HollyFrontier*? | Did not oppose or took no position on motion for voluntary remand in RFA v. EPA, Case No. 19-1220 (D.C. Cir.) challenging the initial 2018 Decision? | 2018 small refinery exemption petition decided in the April Denial? | April Denial Refinery-Specific Appendix Reference? |
|---|---|---|---|---|---|---|---|
| San Joaquin Refin. Co., Inc. | ■ | No | No | N/A | N/A | Yes | ■ |
| Sinclair Casper Refin. Co. LLC | ■ | Yes | No | Yes | Yes | Yes | ■ |
| Sinclair Wyo. Refin. Co. LLC | ■ | Yes | No | Yes | Yes | Yes | ■ |
| Superior Refin. Co. LLC | ■ | No | No | N/A | N/A | Yes | ■ |
| The San Antonio Refinery, LLC ("TSAR") | ■ | No | No | Yes | Yes | Yes | ■ |
| U.S. Oil & Refin. Co. | ■ | Yes | No | Yes | Yes | Yes | ■ |
| United Refin. Co. | ■ | No | No | N/A | N/A | Yes | ■ |
| Wynnewood Refin. Co. LLC | ■ | Yes | Yes | Yes | Yes | Yes | ■ |
| Wyo. Refin. Co. | ■ | Yes | No | Yes | Yes | Yes | ■ |

^ These entities are not small refineries but are parent companies of small refineries.
* In Alon, the petitioner was Calumet Specialty Products Partners LP,
the parent company of these small refineries. Also, at the time,
TSAR was the Calumet San Antonio Refinery.
** At the time, TSAR was the Calumet San Antonio Refinery.

App. 7

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Alon Refin. Krotz Springs, Inc. | - | - | - | - |
| Am. Refin. Grp., Inc. | 6/14/2021 | JA004999–5001 | | 354 |
| Am. Refin. Grp., Inc. | 6/17/2020 | JA005002–07 | | 716 |
| Am. Refin. Grp., Inc. | 6/14/2021 | JA005062–64 | | 354 |
| Am. Refin. Grp., Inc. | 7/9/2021 | JA008716–30 | | 329 |
| Am. Refin. Grp., Inc. | 9/17/2021 | JA008731–8822 | | 259 |
| Am. Refin. Grp., Inc. | 11/2/2021 | JA008823–40 | | 213 |
| Am. Refin. Grp., Inc. | 12/2/2021 | JA008841–48 | | 183 |
| Am. Refin. Grp., Inc. | 2/7/2022 | JA008849–8924 | | 116 |
| Calumet Mont. Refin., LLC | 6/16/2021 | JA005108–10 | | 352 |
| Calumet Mont. Refin., LLC | 7/13/2021 | JA008931–50 | | 325 |
| Calumet Mont. Refin., LLC | 8/6/2021 | JA008951–77 | | 301 |
| Calumet Mont. Refin., LLC | 9/17/2021 | JA008978–9075 | | 259 |
| Calumet Mont. Refin., LLC | 11/3/2021 | JA009076–86 | | 212 |
| Calumet Mont. Refin., LLC | 12/2/2021 | JA009087–94 | | 183 |
| Calumet Mont. Refin., LLC | 2/3/2022 | JA009095–9137 | | 120 |
| Calumet Shreveport Refin., LLC | 6/16/2021 | JA005292–64 | | 352 |
| Calumet Shreveport Refin., LLC | 8/6/2021 | JA009322–48 | | 301 |
| Calumet Shreveport Refin., LLC | 9/17/2021 | JA009349–9448 | | 259 |
| Calumet Shreveport Refin., LLC | 11/3/2021 | JA009449–59 | | 212 |

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Calumet Shreveport Refin., LLC | 12/2/2021 | JA009460–67 | ███ | 183 |
| Calumet Shreveport Refin., LLC | 2/3/2022 | JA009468–9510 | ███ | 120 |
| CHS Inc. | 8/31/2021 | JA009517–21 | ███ | 276 |
| Countrymark Refin. and Logistics, LLC | 6/14/2021 | JA005435–37 | ███ | 354 |
| Countrymark Refin. and Logistics, LLC | 6/14/2021 | JA005502–04 | ███ | 354 |
| Countrymark Refin. and Logistics, LLC | 7/8/2021 | JA009522–31 | ███ | 330 |
| Countrymark Refin. and Logistics, LLC | 9/17/2021 | JA009532–9606 | ███ | 259 |
| Countrymark Refin. and Logistics, LLC | 9/23/2021 | JA009607–88 | ███ | 253 |
| Countrymark Refin. and Logistics, LLC | 11/2/2021 | JA009689–9706 | ███ | 213 |
| Countrymark Refin. and Logistics, LLC | 12/2/2021 | JA009707–15 | ███ | 183 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA005635 | ███ | 268 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA005636–5704 | ███ | 268 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA005724 | ███ | 268 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA005725–93 | ███ | 268 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA009828 | ███ | 268 |
| Cross Oil Refin. & Mktg. Inc. | 9/8/2021 | JA009829–56 | ███ | 268 |
| Delek Refin., Ltd. | 7/21/2021 | JA009878–9904 | ███ | 317 |

App. 9

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Delek Refin., Ltd. | 7/22/2021 | JA009905–38 | | 316 |
| Delek Refin., Ltd. | 10/5/2021 | JA009939–44 | | 241 |
| Delek Refin., Ltd. | 10/5/2021 | JA009945–46 | | 241 |
| Delek Refin., Ltd. | 3/23/2022 | JA009975–83 | | 72 |
| Delek Refin., Ltd. | 3/29/2022 | JA009984–10002 | | 66 |
| Delek Refin., Ltd. | 4/4/2022 | JA010003–10 | | 60 |
| Delek Refin., Ltd. | 7/1/2021 | JA010011–31 | | 337 |
| Delek US Holdings, Inc. | 7/12/2021 | JA009878–9904 | | 326 |
| Delek US Holdings, Inc. | 7/15/2021 | JA009905–38 | | 323 |
| Delek US Holdings, Inc. | 10/5/2021 | JA009939–44 | | 241 |
| Delek US Holdings, Inc. | 10/5/2021 | JA009945–46 | | 241 |
| Delek US Holdings, Inc. | 3/23/2022 | JA009975–83 | | 72 |
| Delek US Holdings, Inc. | 3/29/2022 | JA009984–10002 | | 66 |
| Delek US Holdings, Inc. | 4/4/2022 | JA010003–10 | | 60 |
| Ergon Refin., Inc. | 6/14/2021 | JA005940–42 | | 354 |

App. 10

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Ergon Refin., Inc. | 6/14/2021 | JA005987–89 | | 354 |
| Ergon Refin., Inc. | 8/10/2021 | JA010032–39 | | 297 |
| Ergon Refin., Inc. | 9/17/2021 | JA010040–10130 | | 259 |
| Ergon Refin., Inc. | 9/23/2021 | JA010131–10212 | | 253 |
| Ergon Refin., Inc. | 11/4/2021 | JA010213–231 | | 211 |
| Ergon Refin., Inc. | 12/6/2021 | JA010232–41 | | 179 |
| Ergon-W.V., Inc. | 6/14/2021 | JA006045–47 | | 354 |
| Ergon-W.V., Inc. | 6/14/2021 | JA006093–95 | | 354 |
| Ergon-W.V., Inc. | 8/6/2021 | JA010400–10 | | 301 |
| Ergon-W.V., Inc. | 9/17/2021 | JA010411–77 | | 259 |
| Ergon-W.V., Inc. | 9/21/2021 | JA010478–560 | | 255 |
| Ergon-W.V., Inc. | 11/4/2021 | JA010561–79 | | 211 |
| Ergon-W.V., Inc. | 12/6/2021 | JA010580–89 | | 179 |
| HollyFrontier Cheyenne Refin. LLC | - | - | | - |
| HollyFrontier Woods Cross Refin. LLC | - | - | | - |
| Hunt Refin. Co. | 6/15/2021 | JA006679–81 | | 353 |
| Hunt Refin. Co. | 6/15/2021 | JA006764–66 | | 353 |
| Hunt Refin. Co. | 7/8/2021 | JA010749–66 | | 330 |
| Hunt Refin. Co. | 9/10/2021 | JA010767–867 | | 266 |

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Hunt Refin. Co. | 9/23/2021 | JA010868–945 | | 253 |
| Hunt Refin. Co. | 11/2/2021 | JA010950–67 | | 213 |
| Kern Oil & Refin. Co. | 8/31/2021 | JA011208–21 | | 276 |
| Kern Oil & Refin. Co. | 1/27/2022 | JA013373–77 | | 127 |
| Lion Oil Co., LLC | - | - | | - |
| Par Haw. Refin., LLC | 6/14/2021 | JA007183–85 | | 354 |
| Par Haw. Refin., LLC | 7/16/2021 | JA013378–91 | | 322 |
| Par Haw. Refin., LLC | 9/17/2021 | JA013392–465 | | 259 |
| Par Haw. Refin., LLC | 9/24/2021 | JA013466–547 | | 252 |
| Par Haw. Refin., LLC | 11/2/2021 | JA013548–64 | | 213 |
| Par Haw. Refin., LLC | 12/2/2021 | JA013565–72 | | 183 |
| Placid Refin. Company LLC | 6/15/2021 | JA007312–14 | | 353 |
| Placid Refin. Company LLC | 7/23/2021 | JA013682–701 | | 315 |
| Placid Refin. Company LLC | 9/10/2021 | JA013702–78 | | 266 |
| Placid Refin. Company LLC | 9/24/2021 | JA013779–862 | | 252 |
| Placid Refin. Company LLC | 11/4/2021 | JA013863–75 | | 211 |
| Placid Refin. Company LLC | 12/3/2021 | JA013876–86 | | 182 |
| San Joaquin Refin. | 8/30/2021 | JA014047–49 | | 277 |

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| San Joaquin Refin. | 4/1/2022 | JA015467–658 | | 63 |
| Sinclair Casper Refin. Co. LLC | 8/17/2021 | JA014053–83 | | 290 |
| Sinclair Casper Refin. Co. LLC | 10/18/2021 | JA014084–109 | | 228 |
| Sinclair Casper Refin. Co. LLC | 10/19/2021 | JA014110–126 | | 227 |
| Sinclair Casper Refin. Co. LLC | 5/24/2022 | JA014195–199 | | 10 |
| Sinclair Casper Refin. Co. LLC | 2/28/2022 | JA004842–51 | | 95 |
| Sinclair Wyo. Refin. Co. LLC | 8/17/2021 | JA014215–74 | | 290 |
| Sinclair Wyo. Refin. Co. LLC | 10/19/2021 | JA014725–300 | | 227 |
| Sinclair Wyo. Refin. Co. LLC | 10/19/2021 | JA014301–17 | | 227 |
| Sinclair Wyo. Refin. Co. LLC | 5/24/2022 | JA014385–89 | | 10 |
| Sinclair Wyo. Refin. Co. LLC | 10/19/2021 | JA014390–657 | | 227 |
| Superior Refin. Co. LLC | - | - | | - |
| The San Antonio Refinery LLC | 6/16/2021 | JA005204–06 | | 352 |
| The San Antonio Refinery LLC | 8/6/2021 | JA009144–70 | | 301 |
| The San Antonio Refinery LLC | 9/17/2021 | JA009171–272 | | 259 |
| The San Antonio Refinery LLC | 11/3/2021 | JA009273–83 | | 212 |

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| The San Antonio Refinery LLC | 12/2/2021 | JA009284–91 | | 183 |
| The San Antonio Refinery LLC | 2/3/2022 | JA009292–320 | | 120 |
| The San Antonio Refinery LLC | 3/17/2022 | JA014676 | | 78 |
| The San Antonio Refinery LLC | 3/25/2022 | JA014677–80 | | 70 |
| The San Antonio Refinery LLC | 3/28/2022 | JA014681–85 | | 67 |
| United Refin. Co. | 2/7/2022 | JA014886–91 | | 116 |
| U.S. Oil & Refin. Co. | 7/26/2021 | JA014686–99 | | 312 |
| U.S. Oil & Refin. Co. | 9/17/2021 | JA014700–72 | | 259 |
| U.S. Oil & Refin. Co. | 9/24/2021 | JA014773–854 | | 252 |
| U.S. Oil & Refin. Co. | 11/2/2021 | JA014855–71 | | 213 |
| U.S. Oil & Refin. Co. | 12/2/2021 | JA014872–79 | | 183 |
| Wynnewood Refin. Co., LLC | 6/14/2021 | JA008492–94 | | 354 |
| Wynnewood Refin. Co., LLC | 6/14/2021 | JA008537–39 | | 354 |
| Wynnewood Refin. Co., LLC | 7/9/2021 | JA014892–901 | | 329 |
| Wynnewood Refin. Co., LLC | 9/17/2021 | JA014902–75 | | 259 |
| Wynnewood Refin. Co., LLC | 9/24/2021 | JA014976–15058 | | 252 |
| Wynnewood Refin. Co., LLC | 11/4/2021 | JA015059–77 | | 211 |

Appendix Table 2: Petitioner Supplements to Pending SRE Petitions

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Wynnewood Refin. Co., LLC | 4/6/2022 | JA015202–04 | ███████████ | 58 |
| Wyo. Refin. Co. | 6/14/2021 | JA008652–54 | ███████████ | 354 |
| Wyo. Refin. Co. | 6/14/2021 | JA008710–12 | ███████████ | 354 |
| Wyo. Refin. Co. | 7/26/2021 | JA015205–18 | ███████████ | 312 |
| Wyo. Refin. Co. | 9/17/2021 | JA015219–91 | ███████████ | 259 |
| Wyo. Refin. Co. | 9/24/2021 | JA015292–373 | ███████████ | 252 |
| Wyo. Refin. Co. | 11/2/2021 | JA015374–90 | ███████████ | 213 |
| Wyo. Refin. Co. | 12/2/2021 | JA015391–98 | ███████████ | 183 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Alon Refin. Krotz Springs, Inc. | - | - | | - |
| Am. Refin. Grp., Inc. | 4/6/2022 | JA008925–29 | | 58 |
| Am. Refin. Grp., Inc. | 2/7/2022 | JA008930 | | 116 |
| Am. Refin. Grp., Inc. | 1/3/2022 | JA000432–731 | | 151 |
| Calumet Mont. Refin., LLC | 4/6/2022 | JA009138–42 | | 58 |
| Calumet Mont. Refin., LLC | 2/3/2022 | JA000292–93 | | 120 |
| Calumet Mont. Refin., LLC | 2/7/2022 | JA000372–76 | | 116 |
| Calumet Mont. Refin., LLC | 1/3/2022 | JA000432–731 | | 151 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Calumet Mont. Refin., LLC | 2/7/2022 | JA009143 | ███████ | 116 |
| Calumet Shreveport Refin., LLC | 4/6/2022 | JA009511–15 | ███████ | 58 |
| Calumet Shreveport Refin., LLC | 2/7/2022 | JA000432–731 | ███████ | 116 |
| Calumet Shreveport Refin., LLC | 2/4/2022 | JA000732–33 | ███████ | 119 |
| Calumet Shreveport Refin., LLC | 2/7/2022 | JA000743–44 | ███████ | 116 |
| Calumet Shreveport Refin., LLC | 2/7/2022 | JA009516 | ███████ | 116 |
| Calumet Specialty Partners, L.P. | 2/7/2022 | JA000743–44 | ███████ | 116 |
| CHS Inc. | 2/7/2022 | JA000394–408 | ███████ | 116 |
| CHS Inc. | 2/7/2022 | JA000409–14 | ███████ | 116 |
| Countrymark Refin. and Logistics, LLC | 2/7/2022 | JA009716–9824 | ███████ | 116 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Countrymark Refin. and Logistics, LLC | 4/6/2022 | JA009825–27 | ███████ | 58 |
| Countrymark Refin. and Logistics, LLC | 2/7/2022 | JA002414–2665 / JA009717–9824 | ███████ | 116 |
| Countrymark Refin. and Logistics, LLC | 4/6/2022 | JA003111–12 / JA009826–27 | ███████ | 58 |
| Cross Oil Refin. & Mktg. Inc. | 2/7/2022 | JA009857–77 | ███████ | 116 |
| Delek US Holdings, Inc. | 2/7/2022 | JA000745–56 | ███████ | 116 |
| Delek US Holdings, Inc. | 3/22/2022 | JA002921–31 | ███████ | 73 |
| Ergon Refin., Inc. | 2/7/2022 | JA010242–393 | ███████ | 116 |
| Ergon Refin., Inc. | 4/6/2022 | JA010394–98 | ███████ | 58 |
| Ergon Refin., Inc. | 2/7/2022 | JA010399 | ███████ | 116 |
| Ergon Refin., Inc. | 1/3/2022 | JA000432–731 | ███████ | 151 |
| Ergon Refin., Inc. | 2/7/2022 | JA010399 | ███████ | 116 |

App. 18

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Ergon-W.V., Inc. | 2/7/2022 | JA010590–742 | | 116 |
| Ergon-W.V., Inc. | 4/6/2022 | JA010743–47 | | 58 |
| Ergon-W.V., Inc. | 2/7/2022 | JA010748 | | 116 |
| Ergon-W.V., Inc. | 1/3/2022 | JA000432–731 | | 151 |
| Ergon-W.V., Inc. | 2/7/2022 | JA010748 | | 116 |
| HollyFrontier Refin. & Mktg. LLC | 2/7/2022 | JA000294–352 | | 116 |
| Hunt Refin. Co. | 2/7/2022 | JA010968–11192 | | 116 |
| Hunt Refin. Co. | 2/25/2022 | JA011193–200 | | 98 |
| Hunt Refin. Co. | 4/6/2022 | JA011201–205 | | 58 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Hunt Refin. Co. | 1/3/2022 | JA000432–731 | ███████ | 151 |
| Hunt Refin. Co. | 2/7/2022 | JA011207 | ███████ | 116 |
| Kern Oil & Refin. Co. | 2/7/2022 | JA011222–679 | ███████ | 116 |
| Kern Oil & Refin. Co. | 2/8/2022 | JA011360–884 | ███████ | 115 |
| Kern Oil & Refin. Co. | 2/8/2022 | JA012885–13172 | ███████ | 115 |
| Kern Oil & Refin. Co. | 2/7/2022 | JA012885–13368 | ███████ | 116 |
| Kern Oil & Refin. Co. | 2/7/2022 | JA013173–368 | ███████ | 116 |
| Kern Oil & Refin. Co. | 1/27/2022 | JA013369–72 | ███████ | 127 |
| Lion Oil Co., LLC | - | - | ███████ | - |
| Par Haw. Refin., LLC | 2/7/2022 | JA013573–665 | ███████ | 116 |
| Par Haw. Refin., LLC | 4/6/2022 | JA013666–70 | ███████ | 58 |
| Par Haw. Refin., LLC | 2/7/2022 | JA013681 | ███████ | 116 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Par Haw. Refin., LLC | 2/7/2022 | JA000377–93 | | 116 |
| Par Haw. Refin., LLC | 1/3/2022 | JA000432–731 | | 151 |
| Par Haw. Refin., LLC | 2/7/2022 | JA013681 | | 116 |
| Placid Refin. Company LLC | 2/7/2022 | JA013887–14045 | | 116 |
| Placid Refin. Company LLC | 2/7/2022 | JA014046 | | 116 |
| Placid Refin. Company LLC | 1/3/2022 | JA000432–731 | | 151 |
| San Joaquin Refin. | 4/6/2022 | JA014050–52 | | 58 |
| San Joaquin Refin. | 2/7/2022 | JA000734–42 | | 116 |
| Sinclair Casper Refin. Co. LLC | 1/3/2022 | JA000432–731 | | 151 |
| Sinclair Casper Refin. Co. LLC | 2/7/2022 | JA000767–1287 / JA014127–94 | | 116 |

App. 21

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Sinclair Casper Refin. Co. LLC | 2/7/2022 | JA014214 | | 116 |
| Sinclair Wyo. Refin. Co. LLC | 1/3/2022 | JA000432–731 | | 151 |
| Sinclair Wyo. Refin. Co. LLC | 2/7/2022 | JA000767–832 | | 116 |
| Sinclair Wyo. Refin. Co. LLC | 2/7/2022 | JA014658 | | 116 |
| Superior Refin. Co. LLC | 2/7/2022 | JA000757–66 | | 116 |
| The San Antonio Refinery LLC | 2/7/2022 | JA014659–76 | | 116 |
| The San Antonio Refinery LLC | 2/7/2022 | JA000415–31 | | 116 |
| United Refin. Co. | 2/7/2022 | JA014886–91 | | 116 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| U.S. Oil & Refin. Co. | 4/6/2022 | JA014880–84 | | 58 |
| U.S. Oil & Refin. Co. | 1/3/2022 | JA000432–731 | | 151 |
| U.S. Oil & Refin. Co. | 2/7/2022 | JA014885 | | 116 |
| Wynnewood Refin. Co., LLC | 2/7/2022 | JA015078–201 | | 116 |
| Wynnewood Refin. Co., LLC | 2/7/2022 | JA002666–920 | | 116 |
| Wynnewood Refin. Co., LLC | 4/6/2022 | JA003113–14 / JA015202–204 | | 58 |
| Wyo. Refin. Co. | 2/7/2022 | JA015399–460 | | 116 |
| Wyo. Refin. Co. | 4/2/2022 | JA015461–65 | | 62 |
| Wyo. Refin. Co. | 1/3/2022 | JA000432–731 | | 151 |

Appendix Table 3: Petitioner Comments to Proposed Denial

| Petitioner | Supplement Date | EPA Index Citation | Name on Index | Days Prior to June Denial |
|---|---|---|---|---|
| Wyo. Refin. Co. | 2/7/2022 | JA015466 | ■■■■■■■ | 116 |