## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING
COMPANY LLC, ET AL.,

          Petitioners,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

          Respondent.

No. 22-1073

(and consolidated cases)

### HUNT REFINING COMPANY'S UNOPPOSED MOTION
### FOR STAY PENDING JUDICIAL REVIEW

This case concerns Petitioner Hunt Refining Company's petition to EPA for statutory small-refinery hardship relief from the Clean Air Act's ("CAA") Renewable Fuel Standard ("RFS") for the 2019-2021 compliance years. EPA denied those hardship petitions in June 2022. Because Hunt believed that its petition for judicial review of those EPA denial decisions should be filed in the Eleventh Circuit where Hunt is located, Hunt challenged EPA's denials in that court and filed a protective petition for review in this Court. Hunt also asked the Eleventh Circuit for a stay pending judicial review because EPA's denials were likely unlawful and Hunt faced catastrophic harm—████████—without a stay. The Eleventh Circuit granted that motion, staying Hunt's RFS compliance obligations pending resolution of Hunt's petition for review. Order, *Hunt Refining Co. v. EPA*, No. 22-12535, Doc. 33 (11th Cir. Dec. 27, 2022).

The Eleventh Circuit has since determined that Hunt's challenge to EPA's denial decisions is properly venued only in this Court. No. 22-12535, Doc. 103 (Jan. 11, 2024). Because Hunt already had a petition for review on file here, the Eleventh Circuit dismissed Hunt's case in that court. *Id.* Thus, without further action by this Court, Hunt will lose the stay of its compliance obligations—a stay it has had for more than a year now—when the Eleventh Circuit's mandate issues, which is currently set for March 4, 2024. And without a stay from this Court, ████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ before this Court adjudicates Hunt's petition for judicial review.

This Court should grant Hunt's motion, just as it has for another small refinery twice before. Stay Order, No. 22-1073, Doc. 1992426 (Mar. 30, 2023); Stay Order, *Calumet Montana Refining, LLC v. EPA*, No. 23-1194, Doc. 2023350 (D.C. Cir. Oct. 23, 2023). Both of those cases concern the very same EPA reasoning at issue here. Thus, both times this Court granted stays, it was reviewing the same merits arguments that Hunt makes here and considering materially identical irreparable harm: ███████████████████████. *See* Motion to Stay, No. 22-1073, Doc. 1982976 (Jan. 24, 2023); Motion to Stay, No. 23-1194, Doc. 2016175 (Sept. 9, 2023). Both times this Court concluded that the motions "satisfied the stringent requirements for a stay pending court review." Stay Order, No. 22-1073, at 2; Stay Order, No. 23-1194, at 1. The Court should reach the same

conclusion here and maintain the status quo by preserving the stay of Hunt's 2019-2021 compliance obligations.

Moreover, Hunt is now even more likely to succeed on the merits of its challenge in this Court than when this Court and the Eleventh Circuit previously granted stays. The Fifth Circuit recently reviewed another challenge to the same EPA decision at issue here and concluded that EPA's denials are "(1) impermissibly retroactive; (2) contrary to law; and (3) counter to the record evidence." *Calumet Shreveport Refining, L.L.C. v. EPA*, 86 F.4th 1121, 1127 (5th Cir. 2023). This motion should be granted to avoid irreparable (indeed, ███████████) harm to Hunt, its employees, and the community that depends on them.

As required by Federal Rule of Appellate Procedure 18(a)(1), Hunt previously requested an administrative stay from EPA pending judicial review, and the agency did not provide an administrative stay. But EPA and Intervenors do not oppose the relief requested in this motion: a judicial stay of Hunt's 2019-2021 RFS compliance obligations pending the resolution of this case. Hunt respectfully requests that this Court rule on this unopposed motion by March 4, 2024, so that Hunt may remain fully compliant with the law while this case proceeds.

## BACKGROUND

### A.  Hunt's refinery in Tuscaloosa, Alabama.

Hunt's small refinery converts crude oil into transportation fuel. *See* Declaration of Hunt Refining Company ("Decl.") ¶18. It employs

USCA Case #23-1013    Document #2109365    Filed: 03/04/2024    Page 4 of 25

hundreds of people, pays high salaries and wages, and supports local charitable organizations. *Id*. ¶¶18-22. Hunt also provides free fuel and training to first responders. *Id*. ¶22.

## B. The RFS program.

Congress amended the CAA to establish the RFS program. The RFS program sets annual volumes of four biofuels for blending into transportation fuels (gasoline and diesel) sold in the United States. §7545(o)(2)(B)(i)(I)-(IV).[1] Congress directed EPA to promulgate regulations "to ensure that transportation fuel sold or introduced into commerce in the United States … on an annual average basis, contains at least the applicable volume of renewable fuel" set by statute. §7545(o)(2)(A)(i). DOE calculates the amount of transportation fuel projected to be sold in the next year. §7545(o)(3)(A). Based on that estimate, EPA sets a "renewable fuel obligation" for each biofuel. §7545(o)(3)(B)(ii).

"Obligated parties" meet volume targets by complying with annual Renewable Volume Obligations ("RVOs"). §7545(o)(3)(B)(ii)(I); 40 C.F.R. §§80.1406-1407. EPA imposed RVOs on refiners and importers. 40 C.F.R. §80.1406(a)(1). "Refiners" produce petroleum-based fuels from crude oil; whereas "blenders" blend biofuels into petroleum-based fuels to create gasoline and diesel products sold to consumers. Obligated parties demonstrate compliance using blending credits called RINs. 40 C.F.R. §80.1427.

---

[1] All citations to the U.S. code are to Title 42 unless otherwise noted.

RINs are created when biofuel is manufactured. *Id.* §80.1426. RINs remain "attached" to the physical volume of biofuel until blended into petroleum-based fuel, when RINs are "separated." *Id.* §§80.1428-1429. "Separated" RINs are used for compliance. *Id.* §80.1427.

"Many obligated parties"—especially small refineries—"do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." 72 Fed. Reg. 23,900, 23,904 (May 1, 2007). Obligated parties that cannot self-generate enough RINs are forced to buy RINs from others.

Congress recognized that "escalating [RFS] obligations could work special burdens on small refineries that lack the 'inherent scale advantages of large refineries.'" *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021) (quoting *Sinclair Wyoming Refining Co. v. EPA*, 887 F.3d 986, 989 (10th Cir. 2017). So Congress created a "safety valve," *id.* at 2182: "A small refinery may at any time petition the [EPA]" for an "exemption" from its RFS obligation by showing that it would suffer "disproportionate economic hardship" if required to comply with the RFS. §7545(o)(9)(B)(i); §7545(o)(9)(A)(ii)(II). "In evaluating [such] a petition," EPA must consult with DOE, and EPA

5

"shall consider" DOE's 2011 study of small-refinery RFS hardship "and other economic factors." §7545(o)(9)(B)(ii).[2]

### C. DOE repeatedly recommended, and EPA repeatedly granted, hardship relief to Hunt.

Since 2011, EPA has "relied on DOE's findings" of disproportionate economic hardship based on application of DOE's "scoring matrix." June 2022 Denial of Petitions for RFS Small Refinery Exemptions ("June Denials") at JA3145.[3] If the score "exceed[ed] an established threshold," the refinery was experiencing disproportionate economic hardship and DOE recommended relief. JA3134.

Applying the required statutory process, EPA granted Hunt's petitions for hardship relief ████████████████████. Decl. ¶¶3, 5. And before EPA denied the hardship petitions at issue here, DOE again concluded Hunt would suffer disproportionate economic hardship and recommended relief. *Id.* ¶4 & n.2. Hunt is a classic example of the type of small refinery that Congress designed the RFS hardship exemption to protect: ██████████████████████████████████████

████████████████████████████████████████

---

[2] DOE, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship ("2011 DOE Study"), Joint Appendix ("JA") 15, 44, 49.

[3] EPA published notice of the April and June Denials in the Federal Register. 87 Fed. Reg. 34873 (June 8, 2022). The full text of the April Denials can be found at JA2942 and June Denials at JA3119. Citations are to the Joint Appendix pages.

███████████████████████████████████████████
█████████████████████████████████████. *Id.* ¶2;
JA10971. Because of those challenges and others, █████████████
████████████████████.

### D.   EPA retroactively changes its approach.

#### 1.   EPA grants Hunt's 2018 hardship petition.

EPA initially granted hardship relief to over 30 small refineries, including Hunt, for the 2018 compliance year. JA2845-2846. Biofuel industry groups challenged EPA's grants, but that challenge was held in abeyance pending resolution of *HollyFrontier*.

#### 2.   EPA's reversal of Hunt's 2018 hardship exemption.

After the Supreme Court decided *HollyFrontier*, EPA requested voluntary remand of the 2018 grants. *See* JA2960, JA2932. EPA then flip-flopped and retroactively denied all 2018 hardship petitions, including Hunt's. JA2945, 2964. EPA adopted a new interpretation of the CAA, abandoned the scoring matrix DOE used for over a decade, and imposed an "economic theory" that eliminates hardship relief forever. JA3144-3145, 3151-3152.

EPA's new "economic theory" hypothesizes that "the RFS program cannot cause [disproportionate economic hardship]" on the assumption that RIN costs are equal for all obligated parties and fully passed through to customers. JA3132-3133. That theory further assumes that obligated

7

parties purchase RINs "ratably"—in real-time throughout the compliance year. JA3176.

EPA used its new theory to deny Hunt's previously granted 2018 hardship exemption.

### E.    EPA denies Hunt's 2019-2021 hardship petitions.

Less than two months later, EPA issued an identical decision denying Hunt's petitions for 2019, 2020 and 2021. JA3141; Decl. ¶4.

Hunt petitioned for hardship relief for the 2019 compliance year on October 23, 2019, for 2020 on May 19, 2020, and for 2021 on July 20, 2021. Decl. ¶5 & nn.1, 3. EPA's statutory deadlines to decide Hunt's petitions were January 21, 2020, August 17, 2020, and October 18, 2021, respectively. §7545(o)(9)(B)(iii). EPA ignored those deadlines and waited to announce 69 pending hardship decisions the same day, June 3, 2022—deciding Hunt's petitions as much as *over two years late*. Decl. ¶¶4, 6 & n. 3.

### F.    EPA's flipflop causes RIN prices to skyrocket.

The agency's extreme tardiness necessitated EPA delaying annual compliance deadlines repeatedly. *See, e.g.*, 86 Fed. Reg. 17073 (April 1, 2021). Small refineries were left in limbo for years until their hardship petitions were decided in June 2022.

EPA's actions caused RIN prices to skyrocket. On November 30, 2018—the day EPA set 2019 volumes—the price of 2019 ethanol RINs

8

was only \$0.145.[4] On December 2, 2019—the first business day after EPA was required to set 2020 volumes—the price of 2020 ethanol RINs was just \$0.205.[5] But on June 3, 2022—when EPA announced the June Denials—the prices of 2019 and 2020 ethanol RINs were both \$1.60, an increase of *over 1,200%*.[6] *See also* Decl. ¶6. 2021 and 2022 ethanol RINs are similarly expensive—\$1.63 and \$1.61, respectively.[7]

Despite knowing RIN prices had increased exponentially, EPA denied all 69 pending hardship petitions the same day. JA3122. EPA's actions increased demand for a limited supply of RINs, further increasing prices and exacerbating RIN scarcity. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Decl. ¶¶9-14.

## STANDARD OF REVIEW

The standard for a motion to stay an administrative order pending judicial review is the same as for motions for stays of district court orders. *Nken v. Holder*, 556 U.S. 418, 433-436 (2009). "[A] court considers four factors: '(1) whether the stay applicant has made a strong showing that

---

[4] OPIS End-of-Day Ethanol Assessment Report (Nov. 30, 2018).

[5] *Id.* (Dec. 2, 2019).

[6] *Id.* (June 3, 2022).

[7] OPIS End-of-Day Ethanol Assessment Report (June 3, 2022).

he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Id*. at 425-426 (citation omitted). "The first two factors of the traditional standard are the most critical." *Id*. at 434. The last two factors "merge" into a single public interest factor "when the Government is the opposing party." *Id*. at 435

## ARGUMENT

This Court should maintain the status quo and continue to stay Hunt's 2019-2021 RFS compliance obligations pending this litigation because Hunt is likely to succeed on the merits and would suffer catastrophic irreparable harm without a stay. *See* Stay Order, No. 22-1073; Stay Order, No. 23-1194. Moreover, a stay is in the public interest. Hunt will succeed on the merits because (1) EPA's "statutory interpretation" violates the language and structure of the CAA, (2) EPA's denial runs counter to the evidence before the agency and is based on a false premise, and (3) EPA applies its new approach retroactively without fair notice. *Calumet Shreveport*, 86 F.4th at 1127, 1133-1142 (holding as much). Without a stay, EPA's unlawful denial will cause Hunt to suffer devastating and irreparable harm, including, ███████████████████████. Hunt's compliance costs will also be unrecoverable by the time this case is resolved. Both are clear-cut cases of irreparable harm. Such illegal, harmful conduct does not serve the public interest—it would only harm

Hunt's employees and community, undermine American energy independence, and increase consumer prices at the pump by ██████████ ████████████████████████████████.

The Eleventh Circuit has never waivered from its conclusion more than a year ago that Hunt satisfies the criteria for a stay pending judicial review—that court found only that this case must be the one to hear Hunt's petition for review. This Court has granted stays to another small refinery in materially identical circumstances to Hunt. And EPA, the respondent here and the party that would be impacted by a stay, does not oppose a stay while this Court considers Hunt's challenge.

## I. Hunt is likely to succeed on the merits.

EPA's denial of Hunt's 2019-2021 hardship petition is contrary to law and arbitrary and capricious in multiple ways, some of which are described below and any one of which requires vacatur of EPA's decisions.

### A. EPA rewrites the statute.

In its June Denial decisions, EPA made multiple incorrect interpretations of the CAA that cannot be reconciled with the statute's plain text. "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see Murray Energy Corp. v. EPA*, 936 F.3d 597, 626 (D.C. Cir. 2019) (EPA cannot "displace the statutory determination" framework established by Congress "simply because the agency's 'preferred approach'" "better" suits its favored "policy.").

USCA Case #23-1177    Document #2012214    Filed: 09/08/2023    Page 21 of 25

**First, EPA effectively eliminated statutory hardship relief**. As the Fifth Circuit has observed, EPA's new interpretation "read[s] the exemption framework promulgated by Congress out of the statute entirely, such that no small refinery will ever qualify for one." Opinion at 8, *Calumet Shreveport Refining, LLC v. EPA*, No. 22-60266 (5th Cir. Jan. 27, 2023), Doc. 209. This violates the "elementary canon of construction that a statute should be interpreted so as not to render" any provision "inoperative." *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (citation omitted).

EPA is quite clear that it intends never to grant small refinery hardship relief again: the agency believes that "the RFS program does not advantage or disadvantage any ... parties over the others," and that "a small refinery's ability to recover its RIN costs in the price of the fuel it produces does not depend on factors such as geographic range or pricing power." JA3184. EPA has thus stated that a small refinery "should have no reasonable expectation that its [small refinery exemption] petition will be granted in the future." 87 Fed. Reg. 54,158, 54,161 n.27 (Sept. 2, 2022).

EPA cannot effectively repeal the statutory provision for small refinery hardship relief. *See Griffon v. U.S. Dep't of Health & Human Servs.*, 802 F.2d 146, 155 (5th Cir. 1986) ("The power of an [agency] to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law ... . A regulation which ... operates

USCA Case #24-1179    Document #2083014    Filed: 09/09/2024    Page 23 of 25

to create a rule out of harmony with the statute is a mere nullity." (citations omitted)); *Real v. Simon*, 510 F.2d 557, 564 (5th Cir. 1975) (same); *United States v. Shumway*, 199 F.3d 1093, 1107 (9th Cir. 1999) ("Administrative agencies lack authority effectively to repeal the statute by regulations."). EPA argued to the Supreme Court in *HollyFrontier* that Congress intended hardship exemptions to phase out, but the Court disagreed, observing that, "[i]f Congress really had wanted all exemptions to cease," it "surely [chose] an odd way to achieve it." 141 S. Ct. at 2180.

Given the CAA's plain language providing for hardship relief and the Supreme Court's recognition that Congress intended such relief to be available on an ongoing basis, it defies logic and law for EPA to decide that it will never again grant hardship relief.

**Second, EPA unlawfully redefined "disproportionate economic hardship."** EPA unlawfully redefined the key statutory standard for granting hardship exemptions.

1. Congress conditioned hardship relief on determining whether "a small refinery … would be subject to disproportionate economic hardship" after "consider[ing] the findings of the [DOE] study … and other economic factors." §7545(o)(9)(A)-(B). But here, EPA applies an altogether different inquiry: whether small refineries had "demonstrate[d] how [their] specific RFS compliance costs [we]re disproportionate compared to other refineries' RFS compliance costs." JA3138.

USCA Case #25-1005      Document #2100014      Filed: 02/11/2025      Page 24 of 25

Whether a refinery experiences "disproportionate economic hardship," §7545(o)(9)(A)-(B), is a broader, more "holistic evaluation" than whether a small refinery can prove "disproportionate RFS compliance costs." JA3139. In asking whether a small refinery "would be subject to a disproportionate economic hardship if required to comply," §7545(o)(9)(A)(ii)(II), Congress focused the inquiry on the economic *effect* that RFS compliance would have on small refineries. Compliance costs may be a *cause* of that effect, but they are not themselves the effect that EPA must assess. Rather, Congress required EPA to look beyond RFS compliance costs to the resulting economic hardship. To read the statute otherwise "would render part of subparagraph (B)(ii) a nullity." *Calumet Shreveport*, 86 F.4th at 1138.

Even if small refineries had the same RFS compliance costs as their larger competitors (an incorrect assumption), the CAA would still permit them to demonstrate that RFS compliance would cause disproportionate economic hardship due to "other economic factors," including local economic conditions or other refinery-specific circumstances. *See Sinclair Wyoming Refining*, 887 F.3d at 996-999 (EPA cannot ignore "other economic factors"). A simple example shows why: If RFS compliance costs every refinery $1 billion per year, then all refineries would face the same costs. But those costs would obviously disproportionately harm small refineries like Hunt that operate with lower margins. EPA cannot "take[ ] the holistic evaluation required by Congress and morph[ ] it into a single

question"—much less the wrong one. *Id.* at 997. But that is what EPA did. It effectively repealed the "disproportiona[lity]" standard and the statutory requirement to consider "other economic factors."

### B.    EPA's denial is arbitrary and capricious, and GAO agrees.

Even if EPA's new approach were consistent with the statute, it would still be arbitrary and capricious. EPA denied hardship relief based on its "economic theory" of "RIN passthrough" that supposedly makes it "unlikely" that any small refinery can experience disproportionate economic hardship. JA3139-3140. EPA's decision is arbitrary and capricious because it runs counter to the evidence before the agency and is based on a false premise. *Calumet Shreveport*, 86 F.4th at 1140 (concluding that EPA's findings are "so implausible" that they "could not be ascribed to a difference in view or the product of agency expertise" (citation omitted)).

1.    EPA's "RIN passthrough" hypothesis runs counter to the evidence before the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Hunt submitted voluminous evidence *proving*, based on its financial data and experience, that ███████████████████████████—contrary to EPA's core theory for the Denials. *See* JA10970, 10973-10976; JA6647-6648; JA6697-6698; JA6780-6785. And Congress' investigative branch agreed that EPA's analysis was fatally flawed. The Government Accountability Office's ("GAO") examination of the June Denials (JA3398-3475) revealed

USCA Case #23-1177    Document #2045014    Filed: 03/06/2024    Page 23 of 25

that EPA's "RIN passthrough" theory relies on an incorrect assumption: that all parties pay and receive the same price for RINs. GAO's model, using EPA's RIN market data, showed that "smaller buyers pay more, and smaller sellers receive less, when buying or selling RINs compared to larger buyers and sellers." JA3469. GAO concluded that EPA's denials rely on a "flawed assumption and an incomplete assessment" such that EPA "ma[d]e decisions on small refinery exemptions without quality information and, therefore, risk[ed] inappropriately denying valid exemption petitions." JA3411, 3415.

Following GAO's criticism, EPA's analysis of data that it had all along *confirmed* that its passthrough theory is incorrect. EPA's December 2022 RIN price analysis shows that small refineries pay more and receive less when buying or selling RINs compared to their larger competitors. JA3479, 3488. And the averages in EPA's RIN Price Analysis mask an even greater heterogeneity: some small refineries pay even more and receive even less than others. *See id.* Congress created hardship relief for exactly this reason, and EPA is relying on a demonstrably false theory about the RIN market to ignore Congress's intent.

2.    EPA's "RIN passthrough" hypothesis also relies on a false premise. EPA claims small refineries "will recover the cost of the RINs they purchase in the sales price of the petroleum fuel they sell" if they "purchase the RINs they need for compliance on a ratable basis"—that is, in real-time as they produce transportation fuel. JA3176. "Conversely,

obligated parties that choose to delay RIN purchases … may recover more or less than the price they paid for RINs in the sales price of the petroleum fuel they sell, depending on whether the RIN price on the purchase date is higher or lower than the RIN price on the date the petroleum fuel is sold." *Id.*

But purchasing RINs ratably is not required by statute or regulation, nor has it ever been a condition of small refinery hardship relief. Indeed, EPA explicitly endorsed foregoing ratable RIN purchases. JA10836 ("Obligated parties need not acquire RINs at the same time that they produce or import fuel but may, if they choose, simply purchase the required number of RINs by the end of the compliance period, once their annual production is known.").

Hunt cannot simply blend more renewable fuel into its gas and diesel, ███████████████████████████████████████████████████
███████████████████████████████████████████████████
██. Decl. ¶¶2, 16. And Hunt reasonably expected to continue receiving hardship relief for 2019-2021. *Id.* ¶5. The evidence Hunt submitted to EPA shows that █████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

17

███████████████████████████████████

██████████████

It is arbitrary and capricious for EPA to deny Hunt's hardship petitions based on the *assumption* that it is "unlikely" a small refinery "would face a disproportionate cost of compliance" when Hunt presented refinery-specific evidence proving that Hunt in fact did.

### C.    EPA's denials are unlawfully retroactive.

Even if EPA's new approach to hardship relief were somehow permissible in the future after giving adequate notice to enable Hunt to prepare, EPA's denial of Hunt's 2019-2021 hardship petitions was unlawfully retroactive. "A fundamental principle in our legal system," enshrined in the Due Process Clause, "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-258 (2012). Notice is fair if it allows regulated parties "to identify, with '*ascertainable certainty*,' the standards with which the agency expects [them] to conform." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995), *as corrected* (June 19, 1995) (emphasis added).

If an agency "wishes to use [its new] interpretation to cut off a party's right, it must give full notice of its interpretation." *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3-4 (D.C. Cir. 1987), *as amended* (July 7, 1987). Regulated parties cannot be expected "to divine the agency's interpretations in advance or else be held liable when the agency announces

18

its interpretations for the first time." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-159 (2012).

Retroactive application of a new legal standard is unlawful if a party conformed its conduct to a prior legal regime. *See, e.g.*, *Air Transport Ass'n v. CAB*, 732 F.2d 219, 227-228 (D.C. Cir. 1984); *Patel v. INS*, 638 F.2d 1199, 1203-1204 (9th Cir. 1980); *Nat. Gas Pipeline Co. v. FERC*, 590 F.2d 664, 668 (7th Cir. 1979); *Drug Package, Inc. v. NLRB*, 570 F.2d 1340, 1346-1347 (8th Cir. 1978). And "the more an agency acts like a legislator—announcing new rules of general applicability—the closer it comes to the norm of legislation and the stronger the case becomes for limiting application of the agency's decision to future conduct." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1172 (10th Cir. 2015) (Gorsuch, J.).

Here, Hunt did not receive constitutionally adequate notice that hardship relief would cease to exist, making retroactive application of EPA's new interpretation unlawful. *Calumet Shreveport*, 86 F.4th at 1135-1136 ("EPA cannot surprise petitioners by penalizing them for good-faith reliance on the agency's prior positions.") (cleaned up).

After years of EPA addressing hardship petitions the same way, Hunt reasonably expected EPA to follow the CAA and to give fair notice because it was making a massive change in its regulatory framework. Hunt ▮▮▮▮▮▮ previously received hardship relief, and it reasonably believed that would continue for 2019-2021. Decl. ¶5. But EPA

19

did not definitively announce its new approach to hardship relief until halfway through 2022. So EPA's denials "attache[d] new legal consequences to events completed before its enactment." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

EPA's proposed denials also did not provide the constitutionally required notice. Proposed actions are just that: proposals. Agencies ask for comments because proposed actions are subject to change. Hunt did not have the required "ascertainable certainty" of EPA's new approach until June 2022. *General Electric*, 53 F.3d at 1329. And as EPA has conceded in related circumstances, obligated parties cannot adequately "plan[] their compliance" unless they "understand[] their obligations for the years before and after" a "given calendar year." 87 Fed. Reg. 5696, 5699-5700 (Feb. 2, 2022). A change after 2021 was over and halfway through 2022 is certainly insufficient. The denial of Hunt's hardship petitions is unlawfully retroactive.

## II. EPA's unlawful denial will irreparably harm Hunt.

This Court already concluded that a small refinery in Hunt's position would be irreparably harmed if it were forced to comply with its 2019-2021 RFS obligations. *See* Stay Order, No. 22-1073; Stay Order, No. 23-1194. █████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

USCA Case #25-1107    Document #2112024    Filed: 05/20/2025    Page 21 of 25



. *Id*. ¶¶9-14. Absent a stay, Hunt will suffer irreparable harm. *Id*. ¶¶9, 14.

Additionally, Hunt would face massive penalties. EPA can fine out-of-compliance parties up to "$25,000 for every day of such violation." §§7545(d)(1), 7413(c). EPA adjusts that statutory penalty for inflation— the daily penalty is currently $57,617 per violation. 40 C.F.R. §19.4. Because RFS compliance is based on the calendar year, out-of-compliance parties are immediately exposed to 365 days' worth of penalties for each of the four RVOs at issue—some $84.1 million per year. In other words, Hunt could be liable for massive penalties *plus* exorbitant RIN costs.

These penalties also constitute irreparable harm. Forcing Hunt "to face ruinous penalties" without "some real opportunity to challenge [this] administrative action" violates its due process rights. *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1119 (2d Cir. 1975). And "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (citation omitted).

21

This Court should maintain the status quo and not allow Hunt to be ███████████████ before it can present its arguments to this Court.

## III. The public interest favors granting a stay.

There is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Instead, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted).

The public also has an interest in preserving small refineries. Hunt employs hundreds of people in Tuscaloosa and pays salaries and benefits far above the average in the community. Decl. ¶18. Hunt also supports its community by charitable giving, volunteer services, and supplying free fuel during emergencies. *Id.* ¶¶21-22. Hunt's value to both Tuscaloosa and the region has only increased in recent years. "The refinery is the last injection point on the Colonial Pipeline—one of the largest pipelines in the country—that runs from Houston to New Jersey. The pipeline serves most of the southern states and major hubs along the Atlantic Coast. When refineries along the Gulf Coast are forced to shut down due to hurricanes, [Hunt] is able to remain open and continue supplying the pipeline." *Id.* ¶19.

Staying Hunt's compliance obligations will not harm anyone or the environment. The biofuels in the years at issue (2019-2021) have already

been blended; a stay will not reduce production or blending by a single drop. EPA has repeatedly delayed actions and postponed deadlines under the RFS; it has no legitimate basis to now claim that staying Hunt's compliance obligations will cause any harm. Indeed, EPA and Intervenors do not oppose the relief requested in this motion.

## CONCLUSION

This Court should grant Hunt's unopposed motion to stay its RFS compliance obligations for 2019-2021 pending the resolution of this case. Hunt respectfully requests that this Court rule on this unopposed motion by March 4, 2024, so that Hunt may remain fully compliant with the law while this case proceeds.

Dated: February 6, 2024

Michael R. Huston
Karl J. Worsham
PERKINS COIE LLP
2901 N. Central Ave.,
Suite 2000
Phoenix, AZ 85012-2788
MHuston@perkinscoie.com
KWorsham@perkinscoie.com

Respectfully submitted,

*s/ Jonathan G. Hardin*

Jonathan G. Hardin
Alexandra Magill Bromer
PERKINS COIE LLP
700 13th Street, NW, Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6297
Facsimile: 202.654.6211
JHardin@perkinscoie.com
ABromer@perkinscoie.com

*Attorneys for Petitioner Hunt Refining Company*

## CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,111 words, excluding the parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used for the word count).

Dated:  February 6, 2024

      *s/ Jonathan G. Hardin*

      Jonathan G. Hardin

      PERKINS COIE LLP

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system, and that an electronic copy of the sealed Motion and supporting declaration will provided to Respondent's and Intervenors' counsel via electronic means.

Dated:  February 6, 2024

 s/ Jonathan G. Hardin 
Jonathan G. Hardin
PERKINS COIE LLP