**No. 22-1073 (and consolidated cases)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING COMPANY LLC, et al.,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

On Petition for Review of Final Agency Action
of the Environmental Protection Agency

## PETITION OF GROWTH ENERGY FOR PANEL REHEARING

DAVID M. LEHN
JAY SCHUFFENHAUER
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
dlehn@bsfllp.com

September 9, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................2

REASONS FOR GRANTING REHEARING ...........................................4

    I.    THE COURT MISAPPREHENDED EPA'S CAUSATION STANDARD, WHICH IS THE BEST READING OF THE STATUTE .............................................4

        A.  The Court Incorrectly Attributed the "Sole Cause" Standard to EPA ...............................................................................5

        B.  EPA Correctly Read the Statute to Require Not Only But-For Cause But Also Proximate Cause ............................................12

    II.  THE COURT MISAPPREHENDED THE RECORD IN HOLDING THAT THE DENIALS ARE ARBITRARY ...........................................................15

CONCLUSION ................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Fuel & Petrochemical Manufacturers v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019)................................................................9, 17

*Americans for Clean Energy v. EPA*,
    864 F.3d 691 (D.C. Cir. 2017)................................................................2

*Babbitt v. Sweet Home Chapter of Communities*,
    515 U.S. 687 (1995)................................................................7

*Blackman v. District of Columbia*,
    633 F.3d 1088 (D.C. Cir. 2011)................................................................14

*Bostock v. Clayton County, Georgia*,
    590 U.S. 644 (2020)................................................................13

*Calumet Shreveport Refining, LLC v. EPA*,
    86 F.4th 1121 (5th Cir. 2023)................................................................4

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015)................................................................4

*Hemi Group, LLC v. City of New York*,
    559 U.S. 1 (2010)................................................................7

*Hermes Consolidated, LLC v. EPA*,
    787 F.3d 568 (D.C. Cir. 2015)................................................................14

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
    594 U.S. 382 (2021)................................................................6

*In re American Home Mortgage Holdings, Inc.*,
    637 F.3d 246 (3d Cir. 2011)................................................................14

*In re OPM Data Security Breach Litigation*,
    928 F.3d 42 (D.C. Cir. 2019)................................................................7

ii

*Lexmark International, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .................................................................................13

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ..........................................................................17

*Paroline v. United States*,
   572 U.S. 434 (2014) ............................................................................7, 13

*Renewable Fuels Ass'n v. EPA*,
   948 F.3d 1206 (10th Cir. 2020) ...........................................................6, 12

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ...............................................................................14

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .................................................................................4

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) ..............................................................5

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .................................................................................7

*United States v. Bayless*,
   201 F.3d 116 (2d Cir. 2000) ..................................................................14

## STATUTES

42 U.S.C. §7545

   (d)(1) .......................................................................................................2

   (*o*)(9)(A)(ii) ..................................................................................... 12-13

   (*o*)(9)(A)(ii)(I) ........................................................................................3

   (*o*)(9)(A)(ii)(II) ......................................................................................2

   (*o*)(9)(B)(i) .............................................................................................3

## REGULATIONS

40 C.F.R. §80.1463(b) ................................................................2

## SECONDARY SOURCES

22 American Jurisprudence 2d Damages §351 (2d. 2024)......................................8

Dobbs et al., The Law of Torts §§215, 229 (2d ed. 2024)........................................8

Restatement of the Law of Torts §918(1) ............................................. 7-8

# INTRODUCTION

Various petroleum refineries petitioned EPA for exemption from their Renewable Fuel Standard ("RFS") obligations based on alleged "disproportionate economic hardship" ("DEH"). EPA denied the petitions because (1) the statute allows exemption only if the refinery's DEH is caused by its RFS compliance, and (2) RFS compliance causes no DEH because all refineries can pass through their compliance costs ("Denials").

The Court erroneously vacated the Denials. First, the Court held that the statute does not require that RFS compliance be the "sole cause" of DEH. The problem with that conclusion is EPA did not apply a "sole cause" requirement. EPA actually required that RFS compliance be the "but for" and proximate ("direct") cause of the DEH. The Court should correct its misapprehension of EPA's position and hold that EPA's interpretation is the best reading of the statute. Specifically, the Court should make clear that RFS compliance does not "impose" compliance cost, or "subject" refineries to compliance cost, to the extent that the refinery could reasonably have avoided it. Otherwise, the exemption provision would perversely reward refineries for gaming the system with strategically inefficient compliance measures and thereby undermine the RFS's purpose of increasing renewable-fuel use.

1

Second, the Court declared EPA's cost-passthrough finding arbitrary because it contradicted a prior EPA statement without explanation, and contradicted evidence indicating that refineries could not always buy RINs contemporaneously with their fuel sales. That ruling misunderstood the issues and overlooked significant contrary record evidence.

Therefore, the Court should grant rehearing.

## BACKGROUND

The RFS embodies a "market forcing policy" to increase renewable-fuel use. *Americans for Clean Energy v. EPA*, 864 F.3d 691, 696-697, 710 (D.C. Cir. 2017); *see* Op.6. Refineries and other obligated parties must comply with annual national requirements specifying the amount of renewable fuel to be introduced into the fuel supply. Op.6. To show compliance, each obligated party must retire the number of "RINs" (credits) corresponding to its proportional share of the national requirement. Op.7. Obligated parties can obtain RINs by blending renewable fuel with petroleum or by buying RINs from others in a national market. Op.7-8. An obligated party that fails to comply by the deadline faces civil penalties. 42 U.S.C. §7545(d)(1); 40 C.F.R. §80.1463(b).

Congress allowed EPA to "exempt" any "small refinery" from its RFS obligations for a given year if the refinery shows that it "would be subject to [DEH] if required to comply." §7545(*o*)(9)(A)(ii)(II); *see also*

2

§7545(*o*)(9)(A)(ii)(I), (B)(i).  In 2022, EPA denied all pending exemption petitions ("Denials").  Op.13.  The Denials were based on a legal standard and a factual finding: (1) the statute requires each petitioning refinery to "demonstrate a direct causal relationship between its RFS compliance costs and the DEH," JA2961; and (2) all small refineries can fully "pass through" (or recoup) their RIN costs because the price at which they sell their fuel in the wholesale market includes a premium equal to the cost of the RINs they buy for compliance, Op.14; JA2998-JA2999. EPA explained that "all obligated parties have the ability to match their RIN costs with the [RIN premium] they receive when they sell their fuel," by "purchasing RINs ratably," i.e., "on a systematic, regular basis."  JA2998; *cf.* Op.33 n.11 (redefining "ratably" to mean "contemporaneously").  Because small refineries can reasonably avoid any net compliance cost, EPA concluded, their RFS compliance does not cause their alleged DEH.  JA2955-JA2956.

The Court vacated the Denials.  It held that "the statute nowhere suggests that [RFS compliance] must be the sole cause of the hardship," Op.22, and that EPA had "ignored" the statutory option to carry forward a RIN deficit, which "expressly recognizes the availability of nonratable RIN purchasing."  Op.25-26. The Court also held that the Denials were arbitrary because EPA's passthrough finding contradicted a prior EPA statement without explanation and ignored

3

evidence indicating that small refineries cannot always purchase RINs contemporaneously with their fuel sales.  Op.29.

## REASONS FOR GRANTING REHEARING

### I.   THE COURT MISAPPREHENDED EPA'S CAUSATION STANDARD, WHICH IS THE BEST READING OF THE STATUTE

The Court interpreted the statute to require that RFS compliance be the DEH's "but for" cause, but not that it be the DEH's "sole cause."  Op.22-23.  EPA, however, never adopted or applied a "sole cause" requirement.  That concept was introduced by *petitioners' brief*, and none of the pages from the Denials that petitioners or the Court cited support that description.  *See* Pet'rs.' Joint Opening Br. 20, 37, ECF #2035080 (Jan. 9, 2023); Op.14 (citing JA2961).  Rather, EPA interpreted the statute to require that compliance be the DEH's but-for and *proximate* cause.[1]

---

[1]      Refineries apparently first introduced the "sole cause" concept in their reply brief in *Calumet Shreveport Refining, LLC v. EPA*, *see* Pet'rs.' Joint Reply Br. 24, No. 22-60266, ECF #326-2 (5th Cir. June 1, 2023), leading the Fifth Circuit to mistakenly adopt that characterization, 86 F.4th 1121, 1137 (5th Cir. 2023).  This Court may have also been misled by the Justice Department's brief, which did not clearly refute petitioners' "sole cause" mischaracterization and which stated (Br.77) that "EPA's analysis" contains no "proximate-cause requirement."  *See* Op.22.  That statement cannot be squared with the face of the Denials (as explained presently), and therefore the Court must disregard it, *see Council for Urological Interests v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015) ("we look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations" (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

4

EPA's actual interpretation is the best statutory reading. But-for cause ensures that refineries are not relieved of their RFS obligations for financial conditions that would exist even without those obligations. EPA granted exemptions based on such unrelated financial conditions under its *prior* approach, and the Tenth Circuit correctly faulted EPA for doing so. And proximate cause—including the doctrine of avoidable consequences—ensures that refineries cannot be exempted based on compliance costs they could reasonably have avoided. Otherwise, the exemption provision would create (in economics parlance) a "moral hazard" by rewarding refineries that *choose* to take unreasonably costly compliance measures or otherwise gamble in the RIN market and thereby would undermine the RFS. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1046 (D.C. Cir. 2017) (discussing concept of moral hazard).

### A.    The Court Incorrectly Attributed the "Sole Cause" Standard to EPA

The Court's rejection of a "sole cause" requirement is wrong because it rests on a misunderstanding of EPA's position.

1.    The Denials said: "Under the approach we adopt here, a small refinery must demonstrate a direct causal relationship between its RFS compliance costs and the DEH it alleges; assertions regarding other real but unrelated financial difficulties a small refinery may be experiencing will not satisfy this requirement."

JA2961.  This standard contains two components: but-for cause and proximate cause.

First, EPA's interpretation requires that RFS compliance be the but-for cause of the asserted DEH.  EPA stated that DEH stemming entirely from "unrelated financial difficulties" cannot qualify for exemption, JA2961, because DEH that would exist "even *without* RFS compliance costs … is not *caused* by the RFS program," JA3004.  EPA explained:  The statute "precludes an interpretation that the exemption is available to provide financial assistance to small refineries for reasons wholly unrelated to the RFS program …. It is hard to imagine that Congress intended the SRE provisions be used to provide relief from the financial distress some small refineries may otherwise face."  JA2972.

By adopting a but-for requirement, EPA corrected its "prior approach to evaluating [exemption] petitions," which "did not require a showing that DEH was caused by RFS compliance" at all and instead allowed exemptions if the refinery was "experiencing DEH for any reason, including reasons unrelated to RFS compliance."  JA2961; *see Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1253-1254 (10th Cir. 2020), *rev'd on other grounds sub nom. HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382 (2021).  The Court here endorsed the but-for requirement: "For RFS compliance to cause a hardship, the hardship would not have occurred without compliance."  Op.23.

6

Second, EPA's standard requires that RFS compliance be the DEH's "direct" cause. "Direct" cause is "proximate" cause. *See, e.g.*, *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) ("Proximate cause … requires some direct relation between the injury asserted and the injurious conduct alleged." (cleaned up)); *Babbitt v. Sweet Home Chapter of Communities*, 515 U.S. 687, 732-733 (1995) (Scalia, J., dissenting) ("'proximate' causation simply *means* 'direct' causation").

Thus, EPA adopted an intermediate standard between a pure but-for test and a sole-cause test. A "requirement of proximate cause is more restrictive than a requirement of factual [or but-for] cause alone." *Paroline v. United States*, 572 U.S. 434, 444-445 (2014). "Every event has many [but-for] causes, however … only some of them are proximate." *Id.* at 444. Yet, proximate cause is less restrictive than "sole cause" because "the proximate cause is not necessarily … the sole cause." *In re OPM Data Security Breach Litigation*, 928 F.3d 42, 67 (D.C. Cir. 2019); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm").

Proximate cause includes "the doctrine of avoidable consequences," which states: "a person injured by the tort of another is not entitled to recover damages for such harm as he could have avoided by the use of due care after the

commission of the tort." *Restatement of the Law of Torts* §918(1); *see also* 22 *American Jurisprudence 2d Damages* §351 (2d. 2024) ("harm avoidable by the injured party's acts with ordinary prudence ceases being the direct or natural consequence of the defendant's wrong since the plaintiff has opted to suffer such consequences"); Dobbs et al., *The Law of Torts* §§215, 229 (2d ed. 2024).

The doctrine of avoidable consequences ensures that a pure but-for test does not create a moral hazard. Imagine that a driver sees another car negligently swerving into her lane. Although she could reasonably avoid the collision, she *chooses not to* in hopes that, if the collision occurs, she will recover enough damages to buy a new car. If her assessment of the law were correct, the law would create a moral hazard by incentivizing dangerous or costly behavior. The law is smarter than that: although the other driver's negligence may be a *but-for* cause of the collision, the doctrine of avoidable consequences deems the negligence *not* the *proximate* cause and thereby precludes the "victim" from gaming the system to recover damages.

2.  The Denials applied EPA's intermediate standard, not a "sole cause" standard. EPA determined that the "passthrough analysis demonstrates that there is no economic hardship caused by RFS compliance costs." JA2962; *see also* JA2955-JA2956, JA2963, JA2974. Although RFS compliance might be a *but-for* cause of a refinery's actual net compliance cost, EPA found that refineries could

8

reasonably avoid that cost through passthrough.  Therefore, RFS compliance is not

the *proximate* cause of any refinery's net compliance cost and, in turn, of any

refinery's DEH.

EPA's conclusion reflects the doctrine of avoidable consequences.  If a

small refinery could obtain an exemption based on reasonably avoidable net

compliance cost, then the exemption provision would incentivize small refineries

to act as risk-free arbitragers to the RFS's detriment.  If RIN prices declined after

their fuel sales, they would keep the difference between the higher RIN premium

and the lower RIN cost as profit.  If instead RIN prices rose after their fuel sales,

they could be fully relieved of their RFS obligations via exemption, not have to

incur the cost of buying RINs at all, and thus keep the *entire* RIN premium as

profit.  Heads, they win; tails, they win more.  Consequently, as EPA recognized,

small refineries would be incentivized to make the "choice to delay RIN

procurement in hopes of receiving an [exemption], or … attempt to time the

transaction to profit from the fluctuation in the RIN market prices over time,"

JA2999.  Thus, the exemption provision would perversely undermine Congress's

market-forcing aim in creating the RFS, *supra* p.2, because exemptions

"effectively reduce[] the required volume of renewable fuel," JA1053; *see*

*American Fuel & Petrochemical Manufacturers v. EPA*, 937 F.3d 559, 571, 588

(D.C. Cir. 2019).

9

The Denials presented this rationale expressly:

> [I]n light of EPA's findings regarding RIN cost passthrough, granting SREs would mean that exempted small refineries would not only be relieved of their RFS obligations, but would also get a financial *benefit* through the sale of their petroleum fuel that includes the value of the RIN but no associated RFS compliance costs.  This windfall to small refineries does not further the goals of the RFS program, and only provides a disproportionate net benefit to small refineries ….

> [S]mall refinery commenters [argued that EPA must] provide hardship relief due to the higher cost of RFS compliance for the small refineries that chose [an impossible or unreasonably costly] compliance mechanism.  Such an approach, where the business decisions of the individual companies are made within the regulations but contrary to the purpose of the program, does not constitute DEH *caused* by the cost of compliance with the RFS program, and therefore cannot be a basis for hardship relief.  Otherwise, all small refineries could simply choose such an impossible compliance approach, and then, having made this choice, be assured of relief from the RFS obligations.  Similarly, individual business decisions made by an obligated party not to ratably accrue RINs as their obligation accrues, but instead to either purchase RINs in advance or delay RIN purchases until a later date, are business choices that companies may lawfully make.  However, … EPA may not consider these individual business choices in determining if a small refinery faces DEH due to compliance with the RFS program.

JA2972, JA2999.

The Court asserted that EPA "neglected the [statute's] directive to consider 'other economic factors,'" Op.19, or "reduced" EPA's "consideration of other economic factors" besides compliance cost "to the economic hardship of RFS compliance," Op.20.  Those criticisms reflect the Court's mistaken apprehension of EPA's causation standard.  In fact, EPA's treatment of "other factors" matches the

10

Court's prescription: "For RFS compliance to cause a hardship, the hardship would not have occurred without compliance. But that does not foreclose other factors contributing to the hardship." Op.22-23.

EPA recognized that *if RFS compliance causes the refinery to incur some net cost*, other economic factors could then be relevant to ascertaining the qualifying DEH because those other factors could contribute to the DEH by providing the conditions under which the refinery must absorb the net compliance cost: "the 'other economic factors' EPA may consider when evaluating SRE petitions must still be related to determining whether the small refinery's compliance with its RFS obligations is what caused its alleged DEH." JA2962. So, EPA "considered" "all" the "economic factors" that the refineries had raised "other" than compliance cost. JA2962-JA2963, JA2974; *see* JA3213-JA3215, JA3243-JA3261.

But because EPA found that the RFS does not cause refineries to incur any net compliance cost, it correctly concluded that any DEH to which *other* factors contribute would exist "even *without* RFS compliance" and therefore could not be *caused by* RFS compliance. JA3004. RFS compliance consists of retiring the requisite number of RINs, which is done by acquiring those RINs (and then submitting the appropriate paperwork). Op.7. Thus, RFS compliance can cause a refinery to experience DEH only through the imposition of net compliance cost;

11

once EPA found that compliance does not cause net compliance cost, it followed

directly that compliance does not cause any DEH, and any other factors

contributing to alleged DEH became irrelevant.

Allowing exemptions based on DEH stemming from other factors even if

compliance does not cause any net compliance cost would return EPA to its prior

approach, which required no causal link between RFS compliance and DEH at all.

*See* JA2961; *supra* p.6.  As the Tenth Circuit explained in correctly rejecting that

prior approach: "Macroeconomic conditions surely provide important context for

assessing individual small refinery extension petitions" (i.e., other factors may be

but-for causes of cognizable DEH that is caused by compliance), but exemptions

cannot be granted based on such conditions "alone" (i.e., on DEH not caused by

compliance).  *Renewable Fuels*, 948 F.3d at 1253-1254; *see* JA2961.

### B.     EPA Correctly Read the Statute to Require Not Only But-For Cause But Also Proximate Cause

The Court (Op.22-23) and EPA are correct that the statute requires but-for

cause, and petitioners conceded as much (Br.35-36).  However, EPA is correct that

the statute is "best" read to also require proximate cause.  JA2963.

1.     The statute "uses the phrases 'subject to [DEH] if required to comply

with' [the RFS] and [RFS] 'compliance … would impose'" DEH "to describe the

[causal] relationship" between RFS compliance and the DEH.  Op.22 (quoting

§7545(*o*)(9)(A)(ii)).  These phrases do not expressly specify the causation standard, but that hardly means the statute merely requires but-for causation.

The Supreme Court "generally presume[s]" that federal statutes require "proximate[] cause[]."  *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  Consequently, "in a variety of contexts," *id.*, the Supreme Court has "found a proximate-cause requirement built into a statute that did not expressly impose one," *Paroline*, 572 U.S. at 446.  A pure "but-for test … can be a sweeping standard" because, again, "events have multiple but-for causes." *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020).  So, "[t]h[e] venerable principle [of presuming proximate cause] reflects the reality that the … remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing."  *Lexmark*, 572 U.S. at 132 (cleaned up).

Requiring proximate cause for exemptions accords with this presumption and, as explained, ensures that the exemption provision does not create a moral hazard that undermines the RFS.  Congress may have intended exemptions to provide a safety valve when compliance costs could not be reasonably avoided (assuming those costs led to a *hardship* that was *disproportionate*).  *See* Op.8.  But Congress surely did not intend for exemptions to bestow a windfall on small refineries at the expense of achieving the RFS's fundamental goal of increasing renewable-fuel use.  In fact, this Court has said so, upholding a denial of an RFS

exemption based on "self-inflicted hardship," where the refinery lacked funds for compliance because it had made prior "discretionary" dividend payments. *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 578 (D.C. Cir. 2015); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (rejecting interpretation that "would provide a perverse incentive" to "undermine the [statute's] effectiveness"); *Blackman v. District of Columbia*, 633 F.3d 1088, 1092 (D.C. Cir. 2011) (rejecting statutory "construction [that] would provide a perverse incentive … in direct contradiction of Congress's apparent goal"); *United States v. Bayless*, 201 F.3d 116, 129 (2d Cir. 2000) (rejecting "reading of the statute [that] would create a moral hazard [and] contravene the legislature's intent"); *In re American Home Mortgage Holdings, Inc.*, 637 F.3d 246, 258 (3d Cir. 2011) (rejecting statutory "interpretation involv[ing] a moral hazard that is counter to [Congress's] policy").

2.     The Court asserted that the statute "expressly recognizes the availability of nonratable RIN purchasing" through the "RIN deficit carryover provision." Op.25-26.  EPA's position, the Court said, "effectively penalizes small refineries for purchasing RINs nonratably."  Op.26.

The Court's reasoning incorrectly converts a mechanism designed to *facilitate compliance* without penalties—deficit carryforward—into a mechanism to *avoid compliance* altogether—exemption.  Congress could not have intended the deficit-carryforward option to result in *exemption* by incentivizing RFS-defeating

14

compliance strategies.  Rather, the deficit-carryforward option coexists with proximate cause.  Proximate cause does not preclude small refineries from delaying RIN purchases; it merely preserves the proper consequences of doing so for the separate question of exemption.  If a refinery carried its RIN deficit because it could not reasonably have complied without net cost initially, then it may comply in the subsequent year without penalty or, if it *still* cannot reasonably avoid net cost, seek exemption.  But if the refinery carried the deficit even though it could reasonably have avoided net compliance cost initially, then it must comply in the subsequent year (without penalty) and cannot obtain exemption based on the fact that RIN prices have increased in the meantime.  This is a rational regime for promoting RFS compliance while allowing flexibility in unavoidable extenuating circumstances.

## II.  THE COURT MISAPPREHENDED THE RECORD IN HOLDING THAT THE DENIALS ARE ARBITRARY

A.    The Court thought EPA's passthrough finding was undercut by a study finding that 73% of the RIN price was recouped on the day of the fuel sale and 98% was recouped within two business days.  Op.33.  That objection—which petitioners never made and the Court apparently derived from a prior Circuit decision *upholding* EPA's passthrough finding, *see id.*—misapprehended the record.  What matters is how much of the RIN price can be recouped eventually,

15

not immediately.  EPA found that refineries *can* recoup their RIN costs "fully"

based "on an abundance of evidence, including economic theory and [several]

empirical studies."  JA2975, JA3079; *see* JA2976-JA2984, JA2992-JA2999;

JA3079-JA3081, JA3089.

Moreover, the study cited by the Court actually found "*complete* pass-

through," "consistent with economic theory and with efficiently operating

wholesale fuels markets."  No. 16-1052, JA536, ECF #1745095 at 548/590 (D.C.

Cir. Aug. 10, 2018) (emphasis added); *accord* Knittel et al., "The Pass-Through of

RIN Prices to Wholesale and Retail Fuels under the Renewable Fuel Standard," 4

*Journal of the Association of Environmental and Resource Economists* 1081, 1116

(Sept. 2017) (updated report), *cited at* JA3153 n.156[2]; JA14630 (updated report).

B.    The Court concluded that EPA had not shown that "ratable RIN

purchases are consistently available to small refineries" given that RIN prices are

unavailable on weekends "but fuel is still sold on those days."  Op.31.  The Court

again misunderstood the issue and the record.  The question is whether small

refineries can buy RINs at prices that, overall, do not exceed the RIN premiums

they receive through their fuel sales; contemporaneous RIN purchasing is only one

---

[2] https://scholar.harvard.edu/files/stock/files/knittel_meiselman_stock_
jaere_2017.pdf.

16

means of doing so.  *See* JA3106, JA3082.  Indeed, the prior point—that the RIN premium is eventually collected fully even if not all on the day of the fuel sale— illustrates that fuel sales and RIN purchases need not be perfectly contemporaneous to net out compliance costs.  Thus, EPA reasonably found that buying RINs "on a systematic, regular basis" would suffice to avoid net compliance cost.  JA2998.

More fundamentally, the Court overlooked a critical finding by EPA: "small refineries can enter into contracts with various RIN brokers to purchase RINs … at a price that is calculated based on the average posted market price for the month." JA3106; *see* EPA.Br.78; JA3495.  Such contracts enable every small refinery to fully recoup its RIN costs, regardless of the precise timing of its fuel sales relative to its RIN purchases (and thus regardless of what constitutes "systematic, regular" RIN purchasing).  This unrebutted finding was based on EPA's significant "technical expertise" and therefore was due an "extreme degree of deference." *American Fuel*, 937 F.3d at 574; *see Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247, 2261 (2024) ("mandat[ory deferential] judicial review of agency policymaking and factfinding").

C.    Finally, the Court concluded that, with "no explanation," EPA contradicted its prior statement that an empirically observed "lack of alignment in time between RIN generation and gasoline/diesel fuel demand rendered 'real time'

17

RIN retirement infeasible." Op.29-30 (cleaned up). But EPA *did* explain why that

prior observation does not undermine the Denials: as just discussed, small

refineries can reasonably avoid net compliance cost without buying all their RINs

simultaneously with their fuel sales.

## CONCLUSION

The Court should grant rehearing.

Respectfully submitted,

/s/ David M. Lehn
DAVID M. LEHN
JAY SCHUFFENHAUER
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727
dlehn@bsfllp.com

September 9, 2024

18

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limit of Federal Rule of Appellate Procedure 40(b) because it contains 3,900 words.

This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

/s/ David M. Lehn
DAVID M. LEHN

September 9, 2024

## CERTIFICATE OF SERVICE

I certify that on September 9, 2024, I filed a copy of this brief using the Court's case management electronic case filing system, which will automatically serve notice of the filing on registered users of that system.

<u>/s/ David M. Lehn</u>
DAVID M. LEHN

September 9, 2024

# ADDENDUM

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 16, 2024           Decided July 26, 2024
                              Reissued August 14, 2024

No. 22-1073

SINCLAIR WYOMING REFINING COMPANY LLC AND SINCLAIR
CASPER REFINING COMPANY LLC,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN COALITION FOR ETHANOL, ET AL.,
INTERVENORS

———

Consolidated with 22-1075, 22-1100, 22-1102, 22-1109,
22-1114, 22-1115, 22-1122, 22-1128, 22-1129, 22-1130,
22-1132, 22-1133, 22-1135, 22-1165, 22-1181, 22-1183,
22-1185, 22-1186, 22-1187, 22-1188, 22-1189, 22-1190,
22-1191, 22-1192, 22-1194, 22-1195, 22-1197, 22-1199,
22-1219, 22-1238, 22-1240, 22-1246

———

On Petitions for Review of Final Actions
of the Environmental Protection Agency

———

*Michael R. Huston* and *Mark W. DeLaquil* argued the causes for petitioners.  With them on the joint briefs were *Eric D. McArthur*, *Peter C. Whitfield*, *Daniel J. Feith*, *Peter A. Bruland*, *Jonathan G. Hardin*, *Alexandra M. Bromer*, *Samuel P. Hershey*, *Thomas E. Lauria*, *Andrew K. Gershenfeld*, *Jeffrey R. Holmstead*, *Brittany M. Pemberton*, and *Ian S. Shelton*.  *Eric B. Wolff* and *Karl J. Worsham* entered appearances.

*Bryan J. Harrison* and *Jeffrey Hughes*, Attorneys, U.S. Department of Justice, argued the causes for respondent.  With them on the brief was *Todd Kim*, Assistant Attorney General.

*Matthew W. Morrison* argued the cause for intervenors in support of respondent.  With him on the brief were *Cynthia Cook Robertson*, *Shelby L. Dyl*, and *David M. Lehn*.

————

No. 22-1074

SINCLAIR WYOMING REFINING COMPANY LLC,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE AND KERN OIL & REFINING
CO.,
INTERVENORS

————

Consolidated with 22-1125, 22-1126, 22-1127, 22-1179,
24-1008, 24-1010

————

On Petitions for Review of Final Actions
of the Environmental Protection Agency

————

*David Lehn* argued the cause and filed the briefs for petitioner Growth Energy.

*Jeffrey R. Holmstead* and *Samuel P. Hershey* argued the causes for petitioners Sinclair Wyoming Refining Company, LLC and Wynnewood Refining Company, LLC. With them on the briefs were *Brittany M. Pemberton*, *Thomas E. Lauria*,

4

and *Andrew K. Gershenfeld*. *Lucius B. Lau* and *Taylor R. Pullins* entered appearances.

*Benjamin Grillot*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Todd Kim*, Assistant Attorney General.

*Daniel J. Feith* argued the cause for intervenors for respondent. With him on the brief were *Eric D. McArthur*, *Peter C. Whitfield*, *Jonathan G. Hardin*, *Michael R. Huston*, *LeAnn Johnson Koch*, *Alexandra Magill Bromer*, *Karl J. Worsham*, *Ian S. Shelton*, *Robert A. Long, Jr.*, *Kevin King*, *Thomas Brugato*, *Daniel G. Randolph*, *Robert J. Meyers*, *Elizabeth B. Dawson*, *Richard S. Moskowitz*, and *Tyler Kubik*. *Ryan C. Morris*, *John P. Wagner*, and *Eric B. Wolff* entered appearances.

Before: PILLARD, RAO and PAN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: The Clean Air Act's ("CAA") Renewable Fuel Standard ("RFS") program requires oil refineries to introduce renewable fuels, such as ethanol, into the nation's energy supply. Refineries meet their obligations under the RFS program by blending renewable fuels into fossil fuels that are sold at gas stations or by purchasing certain credits that indicate their compliance. Small refineries that would be "subject to a disproportionate economic hardship if required to comply" can petition the Environmental Protection Agency ("EPA") for exemptions from the RFS program's requirements.

In 2022, EPA denied all pending RFS-exemption petitions filed by small refineries (the "Denial Actions"). EPA

5

determined that the only costs relevant to showing economic hardship in support of an exemption petition were those caused by compliance with the RFS program, and that refineries fully and efficiently pass such costs on to their customers. EPA thus concluded that small refineries do not face any economic hardship imposed by compliance with the RFS program. Because the agency's rationale for denying the pending exemption petitions was a departure from its prior practice, and the denials came years after the relevant compliance years had ended, EPA eased the burden on certain small refineries by providing them with an alternative means of meeting their RFS obligations (the "Alternative Compliance Actions"). Specifically, EPA excused the small refineries from buying and submitting compliance credits for certain years.

Several small refineries now challenge the Denial Actions as contrary to law and arbitrary and capricious. Growth Energy, a trade association whose members are ethanol producers, challenges the Alternative Compliance Actions as unauthorized by law. And two refineries—Sinclair Wyoming Refining Company and Wynnewood Refining Company— argue that the April Alternative Compliance Action stopped short of providing them with adequate relief.

We conclude that EPA's rationale for denying all pending exemption requests was contrary to law and arbitrary and capricious. We therefore vacate the Denial Actions except with respect to two refineries—Company A and Company B— which EPA correctly determined were ineligible for exemptions on other grounds unaffected by vacatur of the Denial Actions.[1]  We dismiss Growth Energy's petition

---

[1]  We refer to those two refineries as "Company A" and "Company B" because their identities are shielded by a protective

6

because Growth Energy has failed to demonstrate that it has standing to challenge the Alternative Compliance Actions. We deny on the merits Sinclair's petition challenging the April Alternative Compliance Action, and we dismiss Wynnewood's petition because it does not challenge a final agency action.

**I.**

**A.**

In 2005 and 2007, Congress amended the Clean Air Act to establish the RFS program, which aims to "increase the production of clean renewable fuels." Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007). "To move the United States towards greater reliance on clean energy, the Clean Air Act's [RFS program] calls for annual increases in the amount of renewable fuel introduced into the U.S. fuel supply." *Growth Energy v. EPA*, 5 F.4th 1, 7 (D.C. Cir. 2021) (per curiam).

To achieve the goals of the RFS program, Congress requires refineries and other obligated parties to meet "'applicable volume[s]'—mandatory and annually increasing quantities of renewable fuels that must be 'introduced into commerce in the United States' each year—and tasks [EPA] with 'ensur[ing]' that those annual targets are met." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019) (per curiam) (alterations in original) (quoting 42 U.S.C. § 7545(o)(2)(A)(i)). Congress dictated the applicable volumes through 2022 for three types of renewable fuel, and for a fourth type—biomass-based diesel—it dictated applicable volumes

---

order. *See Sinclair Wyo. Refin. Co. LLC v. EPA*, No. 22-1073, Doc. 1987069 (D.C. Cir. Feb. 22, 2023).

7

through 2012. *See* 42 U.S.C. § 7545(o)(2)(B)(i)(IV). During those initial years, Congress required EPA to convert the applicable volumes into industry standards. *Id.* § 7545(o)(3)(B). For ensuing compliance years, Congress did not dictate applicable volumes but instead required EPA to do so. *Id.* § 7545(o)(2)(B)(ii). Generally, EPA's RFS industry standards take the form of a percentage calculated by dividing the applicable volume of each renewable fuel by the agency's estimate of the total volume of fuel the nation will consume— *e.g.*, if the applicable volume for a given year is 15 billion gallons of renewable fuel, and EPA estimates that the nation will consume 100 billion gallons of fuel that year, the standard will be 15 percent. *See Wynnewood Refin. Co., LLC v. EPA*, 77 F.4th 767, 773 (D.C. Cir. 2023).

EPA measures industry compliance with the annual renewable-fuel requirements by using credits called RINs, short for "Renewable Identification Numbers." *Id.* at 774 (noting that RINs "serve as the currency of the RFS Program"); *see* 40 C.F.R. § 80.1427(a). Refineries must obtain RINs and then submit or "retire" them to EPA to show that they have done their part to meet the RFS standard in each compliance year. *See Wynnewood Refin. Co.*, 77 F.4th at 774. RINs are assigned to each "batch" of renewable fuel that is produced or imported for use in the United States. 40 C.F.R. § 80.1426(a), (e). When the renewable fuel is blended with conventional transportation fuel (*e.g.*, gasoline or diesel), the RINs are "separated" from their assigned batch and "may be traded in the market" to other obligated parties in need of RINs "or used to demonstrate compliance" with the RFS program. *Wynnewood Refin. Co.*, 77 F.4th at 774; *see* 40 C.F.R. §§ 80.1426(e), 80.1429(b).

8

Excess RINs that are neither used nor traded by the refinery that generated them can be "banked," *i.e.*, saved "for use in the next compliance year." *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 699 (D.C. Cir. 2017) (cleaned up). Banked RINs "are known in the industry as 'carryover' RINs." *Id.* Carryover RINs may be used only in the subsequent compliance year, and otherwise "will expire." *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 913 (D.C. Cir. 2014) (citing 40 C.F.R. § 80.1427(a)(6)). Small refineries that are unable to blend renewable fuel must purchase RINs to comply with the RFS program, 42 U.S.C. § 7545(o)(5)(D), or they must apply for an exemption from the requirements of the program based on disproportionate economic hardship, *id.* § 7545(o)(9).

**B.**

When Congress created the RFS program, it recognized that the program "could work special burdens on small refineries." *HollyFrontier Cheyenne Refin. LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 386 (2021). Congress therefore provided three categories of exemptions for small refineries, *i.e.*, refineries that produce, on average, fewer than 75,000 barrels of fuel a day. *See* 42 U.S.C. § 7545(o)(1)(K).

First, Congress provided a blanket exemption for all small refineries until calendar year 2011. *See id.* § 7545(o)(9)(A)(i) ("The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.").

Second, recognizing that hardship could continue past 2011, Congress directed the Department of Energy ("DOE") to conduct a study "to determine whether compliance with the [RFS program] would impose a disproportionate economic hardship on small refineries." *Id.* § 7545(o)(9)(A)(ii)(I). If

9

DOE determined that a small refinery "would be subject to a disproportionate economic hardship if required to comply with" the RFS program, EPA was required to extend the exemption for any such refinery for at least two years. *Id*. § 7545(o)(9)(A)(ii)(II).

Third, and most relevant here, Congress provided that "[a] small refinery may at any time petition" EPA "for an extension" of its exemption from RFS obligations "for the reason of disproportionate economic hardship." *See id*. § 7545(o)(9)(B)(i).  EPA is tasked with "evaluating [such] petition[s]," and in doing so must "consult[] with the Secretary of Energy" and "consider the findings" of DOE's hardship report, as well as "other economic factors." *Id*. § 7545(o)(9)(B)(ii).  Significantly, relief under this provision must take the form of an "extension" of Congress's initial blanket exemption; the statute does not provide a mechanism for EPA to grant hardship exemptions to small refineries that did not receive the initial exemption.  *See id*.; *see also HollyFrontier*, 594 U.S. at 397.[2]

---

[2]    In relevant part, the text of 42 U.S.C. § 7545(o)(9)(B) reads as follows:

(B) Petitions based on disproportionate economic hardship

(i) Extension of exemption

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

(ii) Evaluation of petitions

10

DOE's first small-refinery study in 2009 found that, in a liquid and competitive RIN market, compliance with the RFS program would not impose disproportionate economic hardship.  But in 2011, DOE issued a second study, which found that small refineries "have particular obstacles that could make compliance more costly than those of large integrated companies."  DOE, Small Refinery Exemption Study at 3 (2011) (J.A. 15).[3]  In particular, the 2011 DOE Study concluded that small refineries may lack sufficient access to capital to purchase RINs.  It also determined that small refineries may experience economic hardship for reasons beyond the cost of RINs, noting that small refineries often (1) sell to local or niche markets that are less accepting of renewable fuel; (2) sell diesel fuel, which is harder to blend with renewables; and (3) may be subject to state regulations that require refineries to sell unblended fuel.  Moreover, the 2011 DOE Study considered economic hardship that was unrelated to the RFS program, such as "shutdown[s] due to [] accident[s] and subsequent loss[es] of revenue."  *Id.* at 36 (J.A. 48).

The 2011 DOE Study also included a scoring matrix that could be used to assess which small refineries would face disproportionate economic hardship.  For over a decade after the issuance of the 2011 DOE Study—until the Denial Actions

_____

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

[3]    All "J.A." cites are to the joint appendix in the 22-1073 case unless otherwise noted.

11

at issue here—EPA relied on DOE's findings and applied DOE's scoring matrix to determine whether to grant hardship exemptions.  During that period, EPA nearly always granted hardship relief when DOE's scoring matrix recommended it.[4]

Meanwhile, in 2015, EPA released an assessment of RIN market dynamics (the "Burkholder Study").  In that study, EPA concluded that the price of gasoline and diesel includes the cost of acquiring RINs, which means that refineries pass through the price of acquiring RINs to their consumers when they sell fuel (the "RIN cost passthrough theory").  Nevertheless, EPA did not immediately incorporate the findings of the Burkholder Study into its assessment of hardship petitions.  Instead, EPA continued to follow DOE's matrix, which takes into consideration factors such as access to capital and unique market demand for non-renewable fuel.

### C.

In *Renewable Fuels Association v. EPA* ("*RFA*"), 948 F.3d 1206 (10th Cir. 2020), the Tenth Circuit reviewed EPA's interpretation of the RFS provisions of the Clean Air Act and the agency's decision to grant certain hardship exemptions for the 2016 and 2017 compliance years.  *See id.* at 1214.  The

---

[4]     The scoring matrix relies on indices that tracked "two broad components" of disproportionate economic hardship: a "high cost of compliance relative to the industry average," and "significant impairment of [] refinery operations" caused by the cost of compliance.  J.A. 15.  The two indices incorporate information relevant to disproportionate economic hardship that go beyond the costs of compliance with the RFS program.  *Id.*

12

Tenth Circuit concluded that EPA erred in three relevant respects.

First, the Tenth Circuit held that any refineries that had not received continuous exemptions from compliance since the beginning of the RFS program were ineligible for an "extension" under the statute. *Id.* at 1244-49.

Second, the court determined that EPA's practice of considering "hardships beyond those caused by RFS compliance" in granting exemptions was contrary to law. *Id.* at 1253-54. It noted that the statutory language allowed refineries to petition for exemptions based on "disproportionate economic hardship if *required to comply with RFS obligations*," making clear that "renewable fuels compliance must be the cause of any disproportionate hardship." *Id.* at 1253 (cleaned up) (emphasis added). Accordingly, the court concluded, EPA erred by granting "extensions of exemptions based at least in part on hardships not caused by RFS compliance." *Id.* at 1254.

Third, the court held that EPA had not adequately accounted for its own theory that all costs of complying with the RFS program could be passed on to consumers. The Tenth Circuit noted that the upshot of the RIN cost passthrough theory was that although refineries were "directly paying for the RINs they buy on the market," they were "passing that cost along in the form of higher wholesale gasoline and diesel prices." *Id.* at 1256 (cleaned up). EPA's analysis of economic hardship in support of the 2016 and 2017 exemptions was flawed, according to the court, because the agency "did not analyze the possibility of RIN cost recoupment." *Id.*

13

The Supreme Court partially reversed the Tenth Circuit's holding. *See HollyFrontier*, 594 U.S. 382. The Court held that a small refinery may receive an "extension" of an exemption even if it had not been continuously exempted from complying with the requirements of the RFS program. *See id.* at 399-400. The Court did not address the Tenth Circuit's alternative holdings regarding the scope of the hardships that may be considered in granting an RFS exemption, or the effect of the RIN cost passthrough theory.

Nevertheless, on remand from the Supreme Court, the Tenth Circuit vacated its entire decision. *See RFA v. EPA*, No. 18-9533, 2021 WL 8269239 (10th Cir. July 27, 2021).

**D.**

In the aftermath of the Supreme Court's *HollyFrontier* decision and the vacatur of the Tenth Circuit's decision in *RFA v. EPA*, EPA informed the small refineries with pending hardship-exemption petitions that it was considering denying *all* the pending petitions, which spanned compliance years 2016 to 2021. Then, in April 2022, EPA denied 36 petitions for compliance year 2018, including 31 petitions it had initially granted. EPA, April 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022) (J.A. 2943-3016) ("April Denial"). In June 2022, EPA issued a materially identical decision denying all remaining pending hardship petitions. EPA, June 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022) (J.A. 3120-94) ("June Denial"). The Denial Actions broke from EPA's prior approach in several ways, influenced by the reasoning of the Tenth Circuit's opinion in *RFA v. EPA*.

14

First, "primarily informed by the *RFA* opinion," EPA reinterpreted the relevant statutory language to require refineries to demonstrate that they experienced disproportionate economic hardship caused solely by compliance with the RFS program. *See* April Denial at 17 (J.A. 2961).

Second, and relatedly, EPA applied the RIN cost passthrough theory to conclude that RFS compliance would not impose any economic hardship on any refinery. Relying on the Burkholder Study and other market data, EPA found that RIN markets are efficient and liquid, and that the price of fuel on any given day accounts for that day's RIN prices. Thus, refineries can purchase RINs ratably—that is, contemporaneously with the sale of their fuel—and pass through the RIN costs to consumers in the price of the fuel.

Based on those assumptions, EPA concluded that "no small refinery experiences [disproportionate economic hardship] as a result of compliance with the RFS program." *Id.* at 18 (J.A. 2962). Accordingly, it denied all the pending small-refinery hardship-exemption petitions.

EPA also relied on alternative grounds in denying the hardship petitions filed by two refineries—Company A and Company B. EPA determined that those two refineries were ineligible for relief because they had not received the initial blanket exemption and therefore could not be granted an "extension" of relief under the terms of the statute. *See id.* at 22 (J.A. 2966) ("[T]he language of the statute indicates that, without having received the [initial blanket exemption,] there is nothing for a small refinery to petition EPA to extend temporally" such that "if a small refinery did not receive the

15

original statutory blanket exemption, it is ineligible to have EPA extend the duration of that exemption.").

### E.

EPA recognized that the Denial Actions would pose special difficulties for the small refineries whose hardship petitions for certain years initially were granted by the agency before the Tenth Circuit's decision in *RFA*, but later were denied in light of the Tenth Circuit's intervening adverse decision. Thus, EPA provided alternative ways for small refineries in that predicament to comply with their RFS obligations.

In conjunction with the April Denials, EPA provided alternative RFS compliance options to the 31 small refineries that previously had received exemptions for the 2018 compliance year. EPA, April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries (2022) (J.A. (22-1074) 1-24) ("April Compliance Action"). EPA determined that those 31 small refineries no longer held RINs necessary to comply with their 2018 RFS obligations, and that requiring them to seek new RINs would lead to a drawdown of the carryover RIN bank that would threaten the integrity of the RFS program. Thus, under the April Compliance Action, the 31 small refineries that originally received an exemption from their 2018 compliance obligations were required to submit annual compliance reports but were not required to retire any additional RINs to meet their reinstated 2018 RFS obligations.

EPA acknowledged that the June Denial, which denied all remaining hardship petitions filed by small refineries, affected three refineries whose 2016 and 2017 exemption petitions

16

previously had been granted.  Thus, EPA offered those small refineries the same alternative means of compliance that had been provided in the April Compliance Action.  EPA, June 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries (2022) (J.A. (22-1074) 358-85) ("June Compliance Action").  We refer to the June and April Compliance Actions together as the Alternative Compliance Actions.

**F.**

Numerous refineries subject to the Denial Actions filed petitions for review in this court.  Those petitions were consolidated and are now before us.   Fifteen of those petitioners also filed petitions for review in other circuits where their refineries are located—the Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits.  The other circuits, except for the Fifth Circuit, concluded that all the cases challenging the Denial Actions belonged in the D.C. Circuit:  They thus either transferred those petitions for review to this court or dismissed them.  The Fifth Circuit, however, held otherwise and reached a decision on the merits.  *See Calumet Shreveport Refin., LLC v. EPA*, 86 F.4th 1121 (5th Cir. 2023).  In *Calumet*, the Fifth Circuit held, in relevant part, that (1) EPA's interpretation of the exemption provision to require economic hardship caused solely by RFS-program costs was "foreclosed by the statute's text"; and (2) the RIN cost passthrough theory was "contrary to the evidence" before the agency because it was "implausible" that "all refineries can completely pass on their RIN costs."  *Id.* at 1138, 1140.

Related petitions were filed to challenge the Alternative Compliance Actions.  First, Growth Energy, a trade association whose members are ethanol producers, asserts that the

17

Alternative Compliance Actions are unlawful because EPA lacked statutory authority to absolve refineries from purchasing RINs to meet their obligations under the RFS program. Second, two refineries—Sinclair and Wynnewood—challenge the April Compliance Action as not extending far enough.

**II.**

The petitioners argue the Denial Actions are contrary to law because EPA's interpretation unlawfully narrows the RFS program's small refinery hardship exemption. We agree.

**A.**

The CAA authorized an initial exemption from RFS obligations for all small refineries. 42 U.S.C. § 7545(o)(9)(A)(i). A two-year extension of that blanket exemption was available for small refineries "subject[ed] to a disproportionate economic hardship if required to comply with" the RFS program. *Id.* § 7545(o)(9)(A)(ii)(II); *see also id.* § 7545(o)(9)(A)(ii)(I) (instructing the Secretary of Energy to determine when RFS compliance "would impose a disproportionate economic hardship on small refineries"). After that extension, small refineries could "at any time" petition EPA for further extensions of the hardship exemption "for the reason of disproportionate economic hardship." *Id.* § 7545(o)(9)(B)(i). When deciding those petitions, EPA must consider the 2011 DOE Study and "other economic factors." *Id.* § 7545(o)(9)(B)(ii).

In the Denial Actions, EPA interpreted the CAA to require a refinery "have disproportionate RFS compliance costs and actual economic hardship due to those disproportionate RFS compliance costs" to qualify for a hardship exemption. April

18

Denial at 18 (J.A. 2962). In other words, an exemption could be granted *only if* a small refinery's RFS compliance costs were disproportionate. EPA further reasoned that because small refineries comply with the RFS program by generating or purchasing and then retiring RINs, the only compliance cost is the cost of generating or purchasing RINs. Thus, EPA concluded, for a petitioner to qualify for an exemption extension, it must experience a hardship from disproportionate RIN costs alone.

EPA also limited "the 'other economic factors' EPA may consider when evaluating [exemption] petitions" to factors "related to determining whether the small refinery's compliance with its RFS obligations is what caused its alleged" disproportionate economic hardship. *Id.* (J.A. 2962). As we describe at length in the background section and in the next part, under EPA's passthrough theory, refineries pass the cost of purchasing RINs through to end purchasers. EPA relied on this theory to conclude that refineries cannot experience disproportionate RFS compliance costs, so no economic hardship can result. *Id.* at 29 (J.A. 2973).

Based on its interpretation of the CAA and in conjunction with its economic theory, EPA denied all of the pending hardship petitions for failing to show disproportionate economic hardship from RFS compliance. *Id.* at 1 (J.A. 2945).

**B.**

EPA's definition of disproportionate economic hardship is inconsistent with the plain meaning of the hardship exemption

19

and contradicts other provisions in the CAA.[5]  The Denial
Actions exclusively focused on compliance costs instead of
economic hardship, neglected the CAA's directive to consider
"other economic factors," and introduced an overly strict
causation requirement.

First, while Congress conditioned the exemption on a
showing of "economic hardship," EPA essentially considered
compliance costs as the only qualifying economic hardship.  *Id.*
at 28 (J.A. 2972).  The natural meaning of "hardship,"
however, encompasses more than compliance costs.  A
hardship is a "[p]rivation; suffering or adversity."  BLACK'S
LAW DICTIONARY (11th ed. 2019); *see also Sinclair Wyo.
Refin. Co. v. EPA*, 887 F.3d 986, 996-97 (10th Cir. 2017)
(defining hardship as "something that 'makes one's life hard or
difficult'" (citation omitted)).  A cost is a far narrower concept,
"[t]he amount paid or charged for something; price or
expenditure."  BLACK'S LAW DICTIONARY (11th ed. 2019).
Costs can certainly impose a hardship, but the economic
hardship imposed by a regulatory action can extend beyond
costs.

Many considerations, from geographic to refinery-specific
factors, could result in the same compliance costs affecting
refineries differently.  The Supreme Court in *HollyFrontier*
explained that the CAA's authorization to petition "at any
time" recognized "the possibility that small refineries might
apply for exemptions in different years in light of market
fluctuations and changing hardship conditions," factors that
extend beyond compliance costs.  *HollyFrontier*, 594 U.S. at

---

[5]     Our analysis and conclusion that the Denial Actions are contrary
to law is consistent with the Fifth Circuit's decision in *Calumet
Shreveport Refining*, 86 F.4th at 1137-40.

20

393.  We previously affirmed EPA's broad discretion to consider a range of factors when deciding hardship petitions. *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 574-75 (D.C. Cir. 2015).

But regulatory discretion and flexibility do not permit EPA to restrict the meaning of "economic hardship" in a manner inconsistent with the CAA.  While EPA may consider a variety of economic factors when deciding what a hardship is, it cannot reduce the broad statutory term "economic hardship" to *only* one factor.  *See Sinclair Wyo. Refin. Co.*, 887 F.3d at 996 (holding EPA could not consider only the long-term viability of the refinery when determining whether it faced an economic hardship).  EPA's interpretation of the CAA unduly narrowed "economic hardship" to include only compliance costs.[6]

Second, a blinkered focus on compliance costs runs afoul of the statutory directive that EPA consider "other economic factors," in addition to economic hardship, when deciding whether to extend a hardship petition.  42 U.S.C. § 7545(o)(9)(B)(ii).  In the Denial Actions, EPA limited "other economic factors" to "determining whether the small refinery's compliance with its RFS obligations is what caused its alleged" disproportionate economic hardship.  April Denial at 18 (J.A. 2962).  This misses the mark.

The consideration of "other economic factors" cannot be reduced to the economic hardship of RFS compliance because EPA must "consider the findings of the [2011 DOE Study] *and*

---

[6]  We conclude EPA's interpretation was contrary to law.  However, we have no occasion to otherwise determine the meaning of "disproportionate economic hardship," which Congress did not define in the CAA.  *See* 42 U.S.C. § 7545(o)(1).

21

other economic factors."   42 U.S.C. § 7545(o)(9)(B)(ii) (emphasis added).  The 2011 DOE Study is the component that calls for "determin[ing] whether compliance with the requirements of [the RFS program] would impose a disproportionate economic hardship on small refineries."  *Id.* § 7545(o)(9)(A)(ii)(I).  In the CAA, Congress instructs EPA to consider "other economic factors" *in addition to* considering economic hardship from RFS compliance.

EPA's definition is overly narrow because it fails to account for EPA's obligation to consider "other economic factors" beyond those in the DOE Study.  "Congress was aware the RFS Program might disproportionately impact small refineries because they lack the inherent scale advantages of large refineries."  *Sinclair Wyo. Refin. Co.*, 887 F.3d at 989.  EPA's Denial Actions specifically excluded numerous factors and did not explain what "other economic factors" it will consider.  April Denial at 60 (J.A. 3004).  EPA's analysis suggests that there are no permissible factors outside of RFS compliance costs—an interpretation that reads "other economic factors" out of the statute.

Relying on our decision in *Hermes*, EPA argued the CAA's silence on the definition of "disproportionate economic hardship" and its failure to identify particular "other economic factors" to be considered gives EPA "substantial discretion" to implement the RFS exemptions.  April Denial at 17 (J.A. 2961) (quoting *Hermes*, 787 F.3d at 575).  But that discretion obtains only "[a]s long as EPA consults with DOE and considers the 2011 Study and 'other economic factors.'"  *Hermes*, 787 F.3d at 575.  EPA enjoys no discretion to refuse to consider "other economic factors."

22

Third, EPA's approach overreads the requirement that a refinery's hardship be caused by RFS compliance. EPA reasoned that hardships unrelated to RFS compliance could not be considered when granting an exemption and that reliance on other factors was beyond EPA's statutory authority. April Denial at 26-28 (J.A. 2970-72). EPA maintains that its interpretation is informed by the Tenth Circuit's decision in *RFA v. EPA*, which held that "hardships caused by overall economic conditions are different from hardships caused by compliance with statutory renewable fuel obligations." 948 F.3d at 1253. In consideration of that ruling, EPA says it "determined that disproportionate economic hardship must be caused *only* by RFS compliance to allow EPA to grant an exemption petition." Resp. Br. 43 (emphasis added). But that holding is neither law in this circuit nor in the Tenth Circuit, where it has since been vacated. *See RFA v. EPA*, 2021 WL 8269239; *see also HollyFrontier*, 594 U.S. at 399-400 (reversing *RFA v. EPA*, 948 F.3d 1206).

EPA's interpretation of the small refinery hardship exemption imposes a limitation that goes beyond the plain meaning of the statute. While the necessary economic hardship must be caused by RFS compliance, the statute nowhere suggests that this must be the sole cause of the hardship. To describe the relationship between RFS compliance and economic hardship, the CAA uses the phrases "subject to . . . if required to comply with" and "compliance . . . would impose."[7] Courts have found similar terms—including "based

---

[7]    This causal language describes the requirements for granting an initial hardship exemption extension. 42 U.S.C. § 7545(o)(9)(A)(ii)(I), (II). Although the language is not repeated in the provision for subsequent extensions, the same requirement that RFS compliance "impose" the hardship necessarily applies to any

23

on," "by reason of," and "results from"—to require simple but-for causation. *See Burrage v. United States*, 571 U.S. 204, 213-14 (2014) (collecting cases). A "but-for cause" is "[t]he cause without which the event could not have occurred." BLACK'S LAW DICTIONARY (11th ed. 2019). For RFS compliance to cause a hardship, the hardship would not have occurred without compliance. But that does not foreclose other factors contributing to the hardship.

Moreover, Congress required sole causation elsewhere in the CAA but did not impose that requirement for the small refinery hardship exemption. The CAA uses the word "solely" when describing the required causation standard in other parts of the statute.[8] "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Although these provisions of the CAA were enacted at different times than the small refinery hardship exemption, the principle is the same. We "may not narrow a

---

subsequent extension precisely because it is an *extension* of the initial exemption. *Id.* § 7545(o)(9)(B)(i); *see also HollyFrontier*, 594 U.S. at 393-94.

[8]    *See, e.g.*, 42 U.S.C. § 7545(t)(8) (discussing amenability to "an enforcement action or penalties under subsection (d) solely arising from the blending of compliant reformulated gasolines"); *id.* § 7407(e)(3) ("No compliance date extension . . . shall cease to be effective by reason of the regional limitation . . . if the violation of such limitation is due solely to a redesignation of a region under this subsection."); *id.* § 7412(b)(3)(A) ("The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.").

24

provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

EPA argues the statute need not include "magic words, such as 'solely,'" to impose a strict causation standard. But "'sole' and but-for cause are very different." *Ponce v. Billington*, 679 F.3d 840, 845 (D.C. Cir. 2012). In the Title VII context, for example, the Supreme Court and our court have explained "the statutory phrase 'because of,'" a but-for causation requirement, "does not mean '*solely* because of.'" *Porter v. Natsios*, 414 F.3d 13, 18 (D.C. Cir. 2005) (citation omitted). Nothing in EPA's argument justifies reading "imposed" to mean "solely imposed."

Although EPA has a measure of flexibility when implementing the RFS program and its exemptions, EPA's interpretation in the Denial Actions goes beyond its statutory discretion and conflicts with the plain meaning of the CAA.[9]

## C.

EPA also erred by concluding that nonratable RIN purchases could not be considered a "disproportionate economic hardship" because they are not caused by RFS compliance.

In the Denial Actions, EPA explained that part of the requirement to consider "other economic factors" includes

---

[9]    EPA primarily argues that its interpretation is the best reading of the statute. In the alternative, however, EPA maintains its construction is reasonable under *Chevron*. We need not consider this alternative argument in light of the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, which overrules *Chevron*. *See* 144 S. Ct. 2244 (2024).

25

considering economic theories that affect hardships imposed by RFS compliance. One of those theories is EPA's theory of RIN cost passthrough. April Denial at 29 (J.A. 2973). According to EPA, the market price of unblended gasoline and diesel increases to reflect the price of RINs, allowing refineries to pass the RIN cost through to fuel purchasers and to recover the entire cost of acquiring RINs by selling at the market price. *Id.* at 37 (J.A. 2981). Because refineries *could* pass on their compliance costs, EPA treats the decision to purchase RINs nonratably, along with any attendant costs, as a "business choice." It follows that the cost of purchasing RINs nonratably "cannot be a basis for hardship relief" because that cost "does not constitute [disproportionate economic hardship] *caused* by the cost of compliance with the RFS program." *Id.* at 55 (J.A. 2999).

EPA's refusal to consider the costs of nonratable RIN purchases ignores the compliance flexibility the CAA provides. The CAA conditions the hardship exemption, and subsequent extensions, only on RFS compliance being a cause of the hardship. *See* 42 U.S.C. § 7545(o)(9)(A)(ii). The CAA is silent on the required timing of RIN purchases, except to require refineries to meet their RFS volume targets annually. *See id.* § 7545(o)(2)(A)(i). Whenever RINs are purchased, their costs are "impose[d]" by RFS compliance because refineries purchase RINs only to comply with the RFS program.

Insofar as the CAA addresses the timing of RIN purchases, it expressly recognizes the availability of nonratable RIN purchasing. The RIN deficit carryover provision permits refineries that are "unable to generate or purchase sufficient credits to meet the [RFS] requirements . . . to carry forward a renewable fuel deficit" under certain conditions. *Id.*

26

§ 7545(o)(5)(D). The refineries may then satisfy those RFS requirements through RIN purchases over the next year. The RIN deficit carryover provision is no mere afterthought. Carryover RINs and RIN deficits are of "critical importance," providing essential "flexibility and liquidity" in the renewable fuel market. *Ams. for Clean Energy*, 864 F.3d at 714-15. And these carryover RIN deficits are necessarily satisfied by purchasing RINs nonratably. EPA's interpretation effectively penalizes small refineries for purchasing RINs nonratably, despite Congress's provision of a RIN deficit carryover mechanism that specifically contemplates nonratable RIN purchases.

EPA's policy justification for excluding nonratable RIN purchases as a ground for economic hardship is unmoored from the CAA. To begin with, the agency acknowledged that nonratable purchases are lawful. April Denial at 55 (J.A. 2999). Nonetheless, EPA insisted that purchasing RINs nonratably is "contrary to the purpose of the program" because the RFS program exists to "'ensure that gasoline sold . . . in the United States . . . contains the applicable volume of renewable fuel.'" *Id.* (J.A. 2999) (quoting 42 U.S.C. § 7545(o)(2)(A)(i)). But the RFS program requires refineries to meet *annual* requirements, not to purchase RINs ratably. Refineries must retire RINs annually, regardless of when they purchase them.

EPA also argues its new interpretation satisfies Congress's intention to make the hardship exemption "temporary." But the term "temporary" applies only to the initial two-year extension of the exemption. 42 U.S.C. § 7545(o)(9)(A) (titled "Temporary exemption"). The continuing extension of the hardship exemption proceeds from subparagraph (B), which nowhere purports to be "temporary." To the contrary, it provides a mechanism for the *ongoing renewal* of exemptions.

27

*See id.* § 7545(o)(9)(B)(i) (permitting hardship petitions "at any time"). Moreover, the Supreme Court has already rejected policy arguments for "taper[ing] down" the number of refineries receiving hardship exemptions as inconsistent with the statutory text. *HollyFrontier*, 594 U.S. at 399 (cleaned up). The CAA and Supreme Court precedent make clear that EPA cannot sunset the small refinery exemption by regulatory fiat.

\* \* \*

A statutory exemption cannot swallow the rule, but neither can we read a statute's purposes so broadly as to render the exemptions superfluous. The RFS program reflects a carefully crafted legislative bargain to promote renewable fuels, but also to provide an exemption mechanism for small refineries. EPA enjoys some flexibility with respect to implementing the program, but it cannot rewrite the balance established by Congress. EPA's interpretation cannot be squared with the CAA. Accordingly, we hold the Denial Actions are contrary to law.

## III.

Petitioners next argue that EPA's Denial Actions are arbitrary and capricious. We again agree.

We must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). Under this standard, an agency must engage in reasoned decision making. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015). That means that the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (cleaned

28

up).  Agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Moreover, if an agency changes positions, it must "display awareness that it *is* changing position."  *Fox Television*, 556 U.S. at 515 (emphasis in original).  Thus, an agency "may not, for example, depart from a prior policy *sub silentio*."  *Id.*

In the Denial Actions, EPA concluded that small refineries do not face disproportionate economic hardship because they bear no costs of complying with the RFS program.  That is so, in EPA's view, because (1) RIN markets are efficient and liquid, and the price of fuel on any given day accounts for that day's RIN prices; (2) small refineries may purchase RINs "ratably," or contemporaneously with their fuel sales; and (3) small refineries therefore can pass through the cost of RINs to their customers.  April Denial at 55 (J.A. 2999); *see id.* at B-63 (J.A. 3106) ("[T]he very concept of ratable RIN purchases means that the acquisition of the RIN is approximately concurrent with the sale of the fuel.").

EPA also determined that small refineries that cannot blend fuel and must purchase RINs do not face disproportionate compliance costs compared to refineries that generate RINs because RIN-generating refineries must discount their fuel prices by the full value of the RINs that they sell.  Under EPA's theory, there is no advantage to generating RINs by blending fuel as opposed to buying RINs from others—either way, fuel prices will adjust to account for the

29

value of the RINs that are contemporaneously bought or sold. *Cf. Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 650 (D.C. Cir. 2019) (noting that EPA's theory assumes that refineries that "offer finished fuel without attached RINs . . . must discount their blended fuel by roughly the value of the RINs that they detached" in order to ensure that their fuel is offered "at a competitive price" (emphasis omitted)).

Petitioners dispute EPA's central premise.  They argue that they cannot always purchase RINs ratably, and that fact fatally undermines EPA's analysis.  *See* April Denial at B-63 (J.A. 3106) (arguing that small refineries cannot "acquire RINs ratably due to a lack of capital, an inability to afford the RINs, or specific limitations in their ability to buy RINs in the proper lot sizes without facing a much steeper cost to acquire the RINs"); *id.* at B-39 (J.A. 3082) (arguing that ratable RIN purchases are impossible on weekends).  According to petitioners, EPA's misunderstanding of the dynamics and features of the RIN market render its denial of their hardship petitions arbitrary and capricious.  We agree with petitioners for three reasons.

First, EPA's position on the ready availability of contemporaneous RIN purchases is the precise opposite of its prior stance on this point, and the agency offers no explanation for its change in view.  *See Fox Television*, 556 U.S. at 515 (noting that an agency "may not . . . depart from a prior policy *sub silentio*").  By way of background, on October 11, 2018, the President directed EPA to "address RIN price manipulation claims and increase transparency in the RIN market."  Modifications to Fuel Regulations to Provide Flexibility for E15; Modifications to RFS RIN Market Regulations, 84 Fed. Reg. 10,584, 10,608 (proposed Mar. 21, 2019).  In response, EPA considered a proposal to require refineries to retire RINs

30

in real time (*i.e.*, ratably) rather than yearly. *See id.* at 10,616 (noting that EPA "considered a provision that would require RIN retirement for every batch of gasoline or diesel immediately or shortly after it is produced or imported"). But EPA declined even to seek comment on that proposal. It stated that it did not "believe a practical implementation framework for [real-time RIN retirement] exist[ed]." *Id.* EPA reasoned that "[i]t would be virtually impossible for the market to instantaneously meet such tight demand for RINs" by refineries and other regulated parties because "[t]he generation of RINs and the production and import of transportation fuel are not time aligned over the course of the year." *Id.* In other words, because RIN generation "is not consistent throughout the year," there were "many months" where "the demand for RINs exceeded the generation of new RINs." *Id.* In EPA's view, this "lack of alignment in time between RIN generation and gasoline/diesel fuel demand render[ed] 'real time' RIN retirement infeasible." *Id.* Although EPA's 2019 action addressed the timing of RIN retirements, which is not at issue here, EPA's 2019 reasoning regarding RIN purchases is germane to our review.

EPA's Denial Actions represent a sharp departure from its prior conclusion. Despite previously finding that real-time RIN retirement was "infeasible" and "virtually impossible" based in part on the impracticability of ratably acquiring the needed RINs, *id.*, EPA here concluded that small refineries may purchase RINs ratably and *should* do so to avoid economic hardship, *see* April Denial at 54 (J.A. 2998) ("Obligated parties that choose to purchase the RINs they need for compliance on a ratable basis . . . will recover the cost of the RINs they purchase in the sales price of the petroleum fuel they sell."). EPA made no attempt to explain its about-face on this critical assumption, and that failure of explanation alone renders

31

EPA's Denial Actions arbitrary and capricious. *See Fox Television*, 556 U.S. at 515.[10]

Second, the record evidence did not adequately support EPA's assumption that ratable RIN purchases are consistently available to small refineries. *See State Farm*, 463 U.S. at 43 (noting that an agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view"). Specifically, EPA failed to sufficiently account for weekend fuel sales. RIN price quotes are "not available for weekends and major holidays," but fuel is still sold on those days—indeed, 28 percent of all fuel transactions occur on Saturday and Sunday. April Denial at B-39 (J.A. 3082). A refinery selling fuel on weekends thus cannot purchase RINs ratably—it must purchase RINs preemptively based on Friday's prices, or belatedly based on Monday's prices. This reality undercuts EPA's passthrough theory—if the market price of RINs decreases over the weekend, weekend fuel prices presumably will take account of the lower price and also will drop. Accordingly, a refinery that purchased RINs on Friday will suffer an economic loss because

---

[10]    EPA asserts that arguments regarding its change in position were never raised before the agency. EPA is incorrect: Several commenters argued before the agency that EPA's new position was inconsistent with its prior rejection of a real-time RIN retirement requirement. *See* Par Pacific, Comments on "Proposed RFS Small Refinery Exemption Decision" at 13 & n.63 (Feb. 7, 2022) (J.A. 390 & n.63); Delek US Holdings, Comments on "Proposed RFS Small Refinery Exemption Decision" at 2 & n.3 (Dec. 14, 2021) (J.A. 747 & n.3); Wynnewood Refining, Comments on "Proposed RFS Small Refinery Exemption Decision" at 27 & n.147 (Feb. 7, 2022) (J.A. 2692 & n.147).

32

it will be unable to pass through the full price of its RINs. *Accord Calumet Shreveport Refin.*, 86 F.4th at 1141 (noting that refineries are at least sometimes "unable to purchase RINs ratably").

EPA acknowledged that RIN price quotes are unavailable on weekends but countered that such unavailability was not "fundamentally problematic for refineries wishing to acquire RINs ratably with their fuel production and sales." April Denial at B-39 (J.A. 3082). EPA reasoned that the refineries "can buy a volume of RINs at Friday's RIN price but at a volume that reflects Friday, Saturday, and Sunday's sales volumes." *Id.* (J.A. 3082). EPA believed that this solution was sufficient because "Friday's RIN price information is the information that the market has when it finds the appropriate fuel pricing on Saturday and Sunday." *Id.* (J.A. 3082). In other words, EPA assumed that weekend fuel prices would reflect Friday's RIN prices. But EPA provided no studies or data to support that conclusion. Indeed, the chief study on which EPA relied in support of its RIN cost passthrough theory did not examine any data for weekends. *See* Christopher R. Knittel et al., The Pass-Through of RIN Prices to Wholesale and Retail Fuels under the Renewable Fuel Standard: Analysis of Post-March 2015 Data at 15 (Nov. 23, 2016) (J.A. 14644) (noting that "[t]he data are for U.S. business days"). Thus, EPA's determination that refineries can efficiently pass through RIN costs on weekends amounts to "sheer speculation." *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

In addition, EPA ignores the fact that small refineries may not have the necessary working capital to pre-purchase RINs to account not only for Friday's fuel sales but also Saturday's and Sunday's. One of the core tenets of the RIN cost passthrough theory is that small refineries will never be economically

33

burdened by the RFS program because they can use the proceeds from their fuel sales to purchase RINs. That principle does not work if the small refineries are expected to purchase RINs in advance of their corresponding fuel sales.

Third, EPA failed to support its assumption that RIN prices are immediately passed through to the refineries' customers. *See State Farm*, 463 U.S. at 43 (noting that an agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency"). EPA relied on the Knittel study, which concluded that RIN prices *generally* are passed through from refineries to their customers. *See Alon Refin. Krotz Springs, Inc.*, 936 F.3d at 649 (explaining the Knittel study's findings that "RIN cost[s] generally [are] included in the sale prices of obligated fuels" (cleaned up)). That study did not find that the cost passthrough is immediate: It stated that "73% of a change in RIN price was passed through in the form of higher petroleum prices in the same day [and] 98% within two business days." *Id.* (citing the Knittel study).

The evidence of a lag in price adjustment undercuts EPA's assumption that a refinery can *assure* RIN cost passthrough by purchasing RINs ratably. If a refinery is unable to pass through the entire cost of its RINs when it makes its fuel sales, the refinery may suffer economic losses that could cause hardship. EPA's failure to support the central premise of its economic theory renders the Denial Actions arbitrary and capricious. *See Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 589.[11]

---

[11]   EPA suggests that "ratably" may mean only purchasing "on a systematic, regular basis" rather than "contemporaneously." *See* April Denial at 54 (J.A. 2998). This definition does not change our

34

For each of the foregoing reasons, EPA's Denial Actions are arbitrary and capricious.[12]

**IV.**

EPA denied two refineries' hardship petitions for an independent reason: EPA concluded that, in addition to failing to demonstrate disproportionate economic hardship, neither refinery met threshold eligibility requirements to receive the small-refinery hardship exemption. *See* April Denial at 21-23 (J.A. 2965-67). The companies—Company A and Company B—challenge EPA's ineligibility determination as contrary to law and arbitrary and capricious. Company A also contends that, even if the ineligibility criteria are lawful, EPA's application of them to its refinery was impermissibly retroactive.

Some context is helpful to understand these challenges. Between 2007 and 2014, EPA promulgated various regulations

---

conclusion. EPA has not offered any coherent definition of what time frame constitutes "regular" purchasing, leaving us to "guess as to what" the agency intended to say, and that renders the Denial Actions arbitrary and capricious. *See Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994). Further, EPA has not explained how regular, non-contemporaneous RIN purchases would ameliorate the problems with passing through RIN costs discussed above.

[12]    Petitioners have also argued that the Denial Actions were impermissibly retroactive because they reasonably relied on EPA's prior approach to adjudicating hardship petitions. Because we conclude that EPA's approach to adjudicating hardship petitions in the Denial Actions was contrary to law and arbitrary and capricious, we need not, and do not, address whether it was also impermissibly retroactive.

35

implementing the initial blanket exemption from the RFS program and the later individualized extensions of that exemption. In 2007 and 2010, EPA promulgated regulations under the initial blanket exemption. *See* Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900 (May 1, 2007); Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program, 75 Fed. Reg. 14,670 (Mar. 26, 2010). Under those regulations, a refinery would qualify for the blanket exemption if its average crude oil throughput was below 75,000 barrels in either 2004 or 2006. *See* 40 C.F.R. §§ 80.1101(g), 80.1141(b)(2)(i) (2007); 40 C.F.R. §§ 80.1401, 80.1441(b)(1)(i) (2010). (EPA did not use 2005 data because "some refineries' production may have been affected by Hurricanes Katrina and Rita." *See* 72 Fed. Reg. at 23,925.) A refinery that failed to qualify based on its 2004 and 2006 production would not be eligible for the initial blanket exemption, even if its production fell below the threshold amount in later years. EPA also required that, to obtain the initial blanket exemption, a small refinery submit a "verification letter" containing information enabling EPA to confirm that the refinery qualified for the exemption. *See* 40 C.F.R. § 80.1141(b)(2) (2007) (now codified at § 80.1441(b)(1)). If EPA found "false or inaccurate information" in the verification letter, it would "void" the exemption. *Id.* § 80.1141(c).

The regulations implementing the statutory provision for individual refineries to apply for extensions authorized a refiner to petition "at any time . . . for an extension of its small refinery exemption." *Id.* § 80.1141(e)(1)(i) (2007) (now codified at § 80.1441(e)(2)). EPA decided in 2014 to measure refinery output based on the year for which the exemption is sought and the immediately preceding year. *See* Regulation of Fuels and Fuel Additives: RFS Pathways II, and Technical

36

Amendments to the RFS Standards and E15 Misfueling
Mitigation Requirements, 79 Fed. Reg. 42,128, 42,152 (July
18, 2014) (codified at 40 C.F.R. § 80.1441(e)(2)(iii)).  The
output of a small refinery seeking an exemption for the year
2020, for example, must be below the small-refinery threshold
in both 2020 and 2019.

Through 2016, EPA understood that, under the statute and
its regulations, "only small refineries that previously had
received the initial exemption . . . qualif[ied] for an extension
of that exemption."  Petition for Review at 4-5, *Dakota Prairie
Refin., LLC v. EPA*, No. 16-2692 (8th Cir. June 13, 2016)
(attaching a copy of EPA's denial of a refinery hardship
petition on the ground that the refinery had not received the
initial blanket exemption); *see also RFA*, 948 F.3d at 1247.
Around 2017, however, the agency experimented with a
different approach.  It started to grant hardship petitions,
including Company A's, even when the refinery "did not
receive the initial, statutory small refinery exemption."  EPA,
Grant of Request for Extension of Small Refinery Temporary
Exemption under the Renewable Fuel Standard Program for
[Company A's refinery] at 1.  In doing so, EPA recognized that
it "[p]reviously . . . regarded as eligible for hardship relief only
those refineries that received the initial statutory exemption."
*Id.* at 1 n.1.  But it did not explain how a refinery that did not
receive the initial exemption could receive an "extension" of
that exemption.  Instead, EPA defended its new approach on
policy grounds, observing that it would allow a refinery "to
seek hardship relief without regard to the refinery's operations
from over a decade ago."  *Id.*  Under that approach, EPA
initially granted Company A's and Company B's 2018
hardship petitions.  *See* EPA, Decision on 2018 Small Refinery
Exemption Petitions (Aug. 9, 2019) (J.A. 3518-19) ("August
2019 Decision").

37

Those exemptions were quickly challenged in court. Representatives of the renewable fuels industry challenged some of the 2017 hardship exemptions in the Tenth Circuit in 2018. *See* Petition for Review, *Renewable Fuels Ass'n v. EPA*, No. 18-9533 (10th Cir. May 29, 2018). And they challenged the 2018 exemptions, including Company A's and Company B's, in this court in 2019. *See* Petition for Review, *Renewable Fuels Ass'n v. EPA*, No. 19-1220 (D.C. Cir. Oct. 22, 2019). The Tenth Circuit acted first and faulted EPA for failing to heed the statute's "extension" terminology. *RFA*, 948 F.3d at 1243-49. It held that a small refinery could receive an extension of the exemption only if it had applied for and received an exemption for every preceding year of the RFS program. *See id.* at 1245. Otherwise, that court reasoned, there would be no exemption to "extend." *Id.*

The Supreme Court granted certiorari and charted a middle path in *HollyFrontier*, 594 U.S. 382. The Court rejected as unduly rigid the Tenth Circuit's reading of the statute to require unbroken continuity, holding that "small refineries whose exemptions have lapsed in one year may still seek an 'extension' in a following year." *Id.* at 390. The Court embraced EPA's pre-2017 position that hardship relief was available "only to small refineries in existence in 2008 and not to new ones" as sufficient to give meaning to the term "extension," since only refineries that received the initial blanket exemption could petition for an "extension" of that exemption. *Id.* at 397; *see also id.* at 398 (explaining that there is nothing "odd about the fact that Congress chose only to protect existing small refineries rather than new entrants" since Congress often "chooses to protect existing market participants from shifts in the law while applying new restrictions fully to future entrants").

38

In light of the Supreme Court's decision to review the Tenth Circuit's continuity holding, our Circuit held the challenges to the 2018 exemptions in abeyance. *See Renewable Fuels Ass'n v. EPA*, No. 19-1220 (D.C. Cir. Feb. 17, 2021), Doc. 1885774. After the Supreme Court issued its opinion in *HollyFrontier*, we granted EPA's request for a voluntary remand of the exemptions. *See Renewable Fuels Ass'n v. EPA*, No. 19-1220 (D.C. Cir. Dec. 8, 2021), Doc. 1925942.

In the Denial Actions, EPA largely reverted to its original approach to eligibility consistent with its existing regulations and the *HollyFrontier* decision. *See* April Denial at 21-22 (J.A. 2965-66). As relevant here, EPA clarified that, to receive an extension of the initial blanket exemption, a small refinery must have qualified for the initial blanket exemption based on its average throughput in either 2004 or 2006; it need not have continuously received extensions. *Id.* at 22 (J.A. 2966). EPA also reiterated the requirement that a small refinery must have sought and received the initial exemption, meaning it must have submitted a verification letter to EPA. *Id.* (J.A. 2966).

Applying that approach, EPA determined that neither Company A nor Company B was eligible for an extension because, among other reasons, neither had submitted the requisite verification letter to EPA to claim the initial exemption. EPA accordingly concluded that neither was eligible to petition for an extension of that exemption. It therefore denied Company A's and Company B's remanded 2018 hardship petitions. *See id.* at 22-23 (J.A. 2966-67). And it denied the companies' pending 2019 and 2020 petitions. *See* June Denial at 23-24 (J.A. 3144-45).

39

The companies challenge EPA's ineligibility determination on various grounds. None is persuasive.

First, the companies contend that EPA's approach in the Denial Actions contradicts its regulations. In their view, 40 C.F.R. § 80.1441(b)(1) does not "purport to condition the initial exemption on a verification letter." Reply Br. 46. Rather, the companies suggest, any refinery meeting the statutory eligibility criteria automatically received the initial blanket exemption, regardless of whether it claimed it by submitting the verification letter. We disagree. From the outset, EPA regulations used the verification letter to confirm that a refinery qualified for and intended to use the exemption. That is why the regulations specified that, "[i]f EPA finds that a refiner provided false or inaccurate information regarding a refinery's crude throughput . . . in its small refinery verification letter, the exemption will be void as of the effective date of these regulations." 40 C.F.R. § 80.1141(c). If a small refinery can lose the initial exemption by filing a faulty verification letter, the exemption is not automatically applied. EPA permissibly required qualifying refineries to claim the exemption by submission of the letter.

Second, Company A argues that, if the regulations mean what EPA's Denial Actions say they do—*i.e.*, that to have received the initial blanket exemption, a small refinery must have submitted a verification letter—the regulations so interpreted are contrary to the statute and must be set aside. (Although Company B initially suggested the regulations should be set aside, it retreated from that argument in the reply brief.) In Company A's view, a small refinery automatically qualified for the initial blanket exemption if its crude oil throughput was below 75,000 barrels per day on average in any year before 2011. It contends that, to the extent the regulations

40

add the requirement of a verification letter attesting to the same, they are contrary to law.

For starters, the verification-letter rule is not new. EPA promulgated it in 2007, raising the question whether Company A's statutory challenge is timely. The CAA mandates that a challenge to EPA's regulations be filed within 60 days of the date of the regulation's promulgation, unless the challenge "is based solely on grounds arising after such sixtieth day," in which case it must "be filed within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1). The challenge concededly was not raised during the initial sixty-day window; Company A instead invoked the after-arising exception, which enables a party to rely on an intervening legal development to bring a claim that it "could not have raised" during the initial sixty-day window. *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 473 (D.C. Cir. 2013); *see also Sierra Club de Puerto Rico v. EPA*, 815 F.3d 22, 26-28 (D.C. Cir. 2016).

Here, Company A (or, technically, the previous owner of its relevant refinery) could have raised a timely challenge to the verification-letter requirement. If it thought its refinery qualified as small, Company A would have had standing to challenge the regulations at that time, seeking to benefit from the exemption without submitting a verification letter. Assuming Company A could have brought an after-arising claim within sixty days of when its claim ripened (an issue on which we take no position), that was, at the latest, in 2008, when its average throughput first fell below 75,000 barrels. *See* Company A, Comments on "Proposed RFS Small Refinery Exemption Decision" at 5 & n.25 (Feb. 7, 2022).

Company A, however, chose not to bring a claim and instead complied with the renewable fuel requirements in 2008,

41

2009, and 2010. Because the company would have had standing to challenge the verification-letter requirement as contrary to the Act within sixty days after first qualifying as a small refinery, it cannot now bring such a challenge. It is well established that "'the mere application of a regulation,' without anything more" is not after-arising grounds triggering the section 7607(b)(1) exception. *Sierra Club de Puerto Rico*, 815 F.3d at 27 (quoting *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 458 (D.C. Cir. 2013)).

Company A contends that a timely challenge to the verification-letter requirement "would have been speculative" in 2008 because EPA had not yet spelled out that receipt of the initial blanket exemption was a prerequisite to later obtaining an individualized hardship exemption. Reply Br. 49 (quoting *Sierra Club de Puerto Rico*, 815 F.3d at 27). But Company A does not challenge EPA's determination that a refinery seeking an extension must show that it received the initial exemption. Indeed, in light of the plain meaning of the statutory reference to "extension," as acknowledged in *HollyFrontier*, any such challenge would be futile. Instead, Company A seeks to challenge the verification-letter requirement itself. And, as explained, Company A had every opportunity to bring that challenge back in 2008. It therefore cannot do so now.

Third, Company B argues that EPA's reasoning is arbitrary and capricious because EPA failed to explain its change in policy. Company B points to the fact that, before the April Denial, EPA briefly granted Company B's 2018 hardship petition. *See* August 2019 Decision (J.A. 3518-19). But EPA acknowledged that its approach in the April Denial was a change from the approach it took in granting an unusually high number of exemptions for 2018, including Company B's. No more was needed. When it initially granted the 2018

42

exemptions, EPA did not mention the RFS program's express limitation of the hardship exemption to small refineries that had received—and so were in a position to seek an "extension" of—the initial blanket exemption. *See* 42 U.S.C. § 7545(o)(9)(B)(i). Nor had EPA grappled with that requirement when it changed its approach in 2017. In the April Denial, EPA acknowledged and reasonably explained that it withdrew individual exemptions granted to refineries that did not receive the blanket exemption, including Company B, in accordance with its longstanding (if briefly disregarded) regulation and to be "consistent with the Supreme Court's holding in *HollyFrontier*." April Denial at 21 (J.A. 2965). Under the circumstances, that explanation suffices.

Company B also argues that EPA's reasoning is arbitrary and capricious on its own terms. In support of the Company B denial, EPA cited the Supreme Court's statement in *HollyFrontier* that hardship relief is available only to those "small refineries in existence in 2008." *See id.* at 22 & n.105 (J.A. 2966) (quoting 141 S. Ct. at 2181). Company B contends that reasoning does not apply to it because Company B was in existence in 2008.

EPA reasonably explained, however, that although Company B existed in 2008, it was "in the same situation as a new [post-2008] refinery" ineligible for hardship relief. EPA, Company B - June 2022 Denial Action (June 3, 2022). That was because, before 2017, the company generated crude oil as a byproduct and sold it to a local refiner, and so the company did not incur renewable fuel obligations. It was only when that local refiner stopped purchasing Company B's crude oil around 2017—long after the RFS program was in place—that Company B began refining the crude oil on its own and incurring renewable fuel obligations under the RFS program.

43

EPA explained that, before changing its operations in 2017 to refine its own crude oil, Company B, like a new refinery, "had the ability to consider whether [it] believe[d] the establishment of the RFS program and its requirements [would] cause economic hardship before beginning operations." *Id.*

Company B objects that EPA's analysis was nonetheless arbitrary and capricious because, unlike a new refinery that could "assess the markets" and the concomitant costs before entering them, Company B did not voluntarily enter the transportation fuel market; it did so "only as a last resort—to ensure that its byproducts were not waste that could harm the environment."  Pet. Br. 98.  Even accounting for those considerations, EPA's explanation as to why it deemed Company B ineligible was reasonable.  If it was not profitable for Company B to start refining crude oil in 2017, it could have stayed out of the refining business. *See* Company B Denial.  In that sense, then, the company did voluntarily opt into the RFS program like a new refinery.

Finally, Company A argues that, even if EPA's ineligibility determination were permissible, the agency should not have applied it "retroactively" after the years from which Company A sought compliance relief had passed.  EPA announced its intention to deny the hardship petitions in December 2021—after the end of the compliance years at issue for Company A's refinery (2018, 2019, and 2020). *See* EPA, Proposed RFS Small Refinery Exemption Decision (December 2021) (J.A. 224).  If it had known the refinery was ineligible for an exemption, Company A asserts, it could have "adjust[ed] [its] compliance strateg[y] []or ma[de] [an] informed decision[] about how much crude oil to process in those years."  Reply Br. 40.  Therefore, the company concludes, EPA should have withheld the effect of the denials by, for example, extending

44

the Alternative Compliance Actions to cover not only 2018 but also 2019 and 2020.[13]

We disagree.  "The general principle is that when as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it."  *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc).  There is an exception for cases in which applying a new rule to preexisting conduct would "work a 'manifest injustice.'"  *Id.* (quoting *Thorpe v. Housing Auth. of City of Durham*, 393 U.S. 268, 282 (1969)).  We have employed various tests to evaluate whether the application of a new agency rule to parties to an administrative adjudication will work a manifest injustice.  *See United Food & Com. Workers Int'l Union, AFL-CIO, Local 150-A v. NLRB*, 1 F.3d 24, 34-35 (D.C. Cir. 1993) (reviewing the tests).  "Although our multi-factor tests have been stated in terms of a balancing of co-equal factors, each includes one that, in practice, has been given primary importance; namely, the critical question of whether the challenged decision 'creates a new rule, either by overruling past precedents relied upon by the parties or because it was an issue of first impression.'"  *Id.* at 34 (quoting *District Lodge 64 v. NLRB*, 949 F.2d 441, 447 (D.C. Cir. 1991)).  Characterizing the Denial Actions as imposing a new eligibility rule, Company A argues that EPA

---

[13]    As explained, *supra* n.12, we do not reach the challenges to the retroactive application of EPA's approach to adjudicating hardship petitions because we hold that approach is contrary to law and arbitrary and capricious.  By contrast, since we hold that EPA's eligibility approach is lawful, we must consider Company A's argument that it must not be applied retroactively.

45

should have "withheld" the economic consequences of those Actions by granting additional compliance relief.

Company A's argument fails because, for purposes of applying a new ruling to prior conduct, not all precedent is created equal. The mere fact that an agency "modif[ies] existing law" is not enough to justify withholding its new ruling's effect on parties to the agency adjudication. *See District Lodge 64*, 949 F.2d at 447. The overruled precedent must have been "clear [and] consistent" during the period of the alleged reliance. *Id.* If it did not "rise to the level of a well established practice," then reliance on that precedent is likely unreasonable. *Clark-Cowlitz*, 826 F.2d at 1083 (internal quotation marks omitted). For, in the end, our approach "focuses on the reliance of the parties before the tribunal." *Sanitary Truck Drivers & Helpers Loc. 350 v. NLRB*, 45 F.4th 38, 45 (D.C. Cir. 2022).

Here, EPA's approach to eligibility was not "settled" during the period of Company A's asserted reliance. *See Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006). As mentioned, "[t]hrough at least the first quarter of 2016, the EPA itself limited 'extensions' to only those small refineries that qualified for the original blanket exemption." *RFA*, 948 F.3d at 1247. For example, EPA denied a hardship petition in 2016 on the ground that the petitioning refinery did not exist in 2006 and therefore "could not have received the initial blanket exemption." *See* April Denial at 20 (J.A. 2964). In 2017, EPA granted some extensions to refineries that had not qualified for the original exemption before reasserting the receipt-of-initial-exemption requirement in 2022. *See id.* (J.A. 2964). That history confirms that EPA's approach in the Denial Actions "is not the sort of radical transformation whose retroactive

46

application is likely to be unfair." *District Lodge 64*, 949 F.2d at 448.

EPA's decision to apply the Denial Actions' eligibility approach to Company A is further supported by the strength of EPA's reasons in support of that approach. "[A]dministrative agencies have greater discretion to impose their rulings retroactively when they do so in response to judicial review, that is, when the purpose of retroactive application is to rectify legal mistakes identified by a federal court." *Verizon*, 269 F.3d at 1111. That is the case here. The renewable fuel producers' challenge in the Tenth Circuit culminated in the Supreme Court's acknowledgment that the RFS program forecloses hardship relief for small refineries that did not receive the initial blanket exemption. *HollyFrontier*, 141 S. Ct. at 2181. Thus, as EPA recognized, the eligibility approach articulated in the Denial Actions comported with its own rules and was "consistent with the Supreme Court's holding in *HollyFrontier*." April Denial at 21 (J.A. 2965). Because the Denial Actions' updated eligibility requirement was adopted to align the RFS program with the statutory text and clear implications of the Supreme Court's ruling in *HollyFrontier*, EPA's decision to apply that approach retroactively was reasonable.

47

\* \* \*

In sum, we conclude that EPA's denials of Company A's and Company B's hardship petitions were lawful and reasonable. We therefore deny their petitions for review.

**V.**

Finally, we turn to the three petitions challenging the Alternative Compliance Actions, consolidated under No. 22-1074. The Compliance Actions apply to the 31 small refineries that initially received small refinery exemptions for 2016, 2017, or 2018 but whose exemptions were vacated and later denied in the Denial Actions. The Compliance Actions allow these refineries to satisfy their RIN obligations "without retiring any additional RINs." April Compliance Action at 1 (J.A. (22-1074) 4); June Compliance Action at 2 (J.A. (22-1074) 362). The first petition, from Growth Energy, challenges EPA's authority to issue the Compliance Actions. The other two petitions, from small refineries seeking hardship exemptions, argue that the April Compliance Action did not extend relief far enough with respect to their 2018 RIN obligations.[14]

**A.**

We first address Growth Energy's petition. Growth Energy is an association of renewable fuels producers that primarily produce conventional ethanol. Growth Energy challenges EPA's legal authority to issue the Alternative Compliance Actions. Explaining that Congress created several specific mechanisms for waiving RFS obligations, Growth

---

[14]    The refineries do not challenge the June Compliance Action.

48

Energy argues that this scheme precludes EPA from relieving refineries from their RFS obligations through other regulatory actions. *See* 42 U.S.C. § 7545(o)(7)(A) (general waiver); *id.* § 7545(o)(7)(D) (cellulosic waiver); *id.* § 7545(o)(9) (small refinery hardship exemption). Growth Energy maintains that, when no statutory waiver or exemption applies, the CAA requires EPA to "ensure[]" the renewable fuel volume requirements are met. *Id.* § 7545(o)(3)(B)(i).

We do not reach the merits of this petition, however, because Growth Energy has failed to meet its burden of establishing standing.

**1.**

To establish associational standing, an organization must show that "(1) 'its members would otherwise have standing to sue in their own right;' (2) 'the interests it seeks to protect are germane to the organization's purpose;' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014). Members have standing to sue in their own right if they can "show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The petitioner bears the burden of establishing standing. *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).

49

Because Growth Energy is not the object of the challenged Alternative Compliance Actions, standing is "substantially more difficult" to establish. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quoting, *inter alia*, *Warth v. Seldin*, 422 U.S. 490, 505 (1975)).  A court cannot redress an injury "that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  A petitioner must provide reason to believe a government regulation will "significantly affect[]" the decisions of the third party. *Branton v. FCC*, 993 F.2d 906, 912 (D.C. Cir. 1993).  "Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient." *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004).  "[T]he petitioners carry the burden of adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Chamber of Commerce*, 642 F.3d at 201 (cleaned up).  Growth Energy may meet its burden by "citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Ohio v. EPA*, 98 F.4th 288, 300 (D.C. Cir. 2024) (cleaned up).

**2.**

Growth Energy's theory of standing turns on the relationship between RFS obligations and the demand for renewable fuels from refineries regulated by the RFS program. In its opening brief, Growth Energy states that the Compliance Actions reduce the net demand for its members' products and that the "destruction of demand" constitutes an injury in fact. Growth Energy Br. 15.  To support its standing, Growth Energy submits a single declaration from its CEO that lists the

50

organization's members and their share of the renewable fuels market. The CEO avers that three-quarters of the renewable fuel used for RFS compliance is ethanol, and Growth Energy's members produce 57 percent of all ethanol. Moreover, the CEO asserts that the Compliance Actions will "substantially reduce the future demand for Growth Energy's members' renewable-fuel products" by reducing the renewable fuel obligations for 31 small refineries. Decl. of Emily Skor at 4. Even when replying to Intervenors' challenge to standing, Growth Energy offers no additional analysis and attaches only another declaration from its CEO simply reiterating that the Compliance Actions will reduce demand and harm its members. *Cf. Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (explaining that affidavits in support of standing generally should be made in "the petitioner's opening brief—and not . . . in reply to the brief of the respondent agency").

Such sparse and conclusory claims about competitive injuries are insufficient to establish standing. *See Ohio*, 98 F.4th at 303 (holding plaintiffs failed to "cite any record evidence or to file additional affidavits or other evidence sufficient to support" their standing (cleaned up)). Growth Energy relies on the market share of its members, but market share alone does not demonstrate that EPA's Compliance Actions will cause these ethanol producers (or any others) a present or future economic injury. While Growth Energy has alleged that some future reduction in demand for renewable fuels is possible, nothing in the briefing or record suggests that a reduction in overall market demand is "certainly impending" as a result of the Compliance Actions. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

The dynamics of the RIN market are not so clear that we can assume without further information or analysis that

51

waiving some RIN obligations for 2018 will reduce 2024 demand for Growth Energy's members' renewable fuels. The Compliance Actions here cover only 31 small refineries, and Growth Energy has offered no evidence about how a waiver of RFS obligations for those refineries will change the overall market demand for renewable fuels.[15]    That market includes many actors beyond the 31 small refineries.

Growth Energy also maintains that courts have "routinely" found Growth Energy had standing in other cases challenging EPA actions, which, it implies, supports standing here. But Growth Energy's past demonstration of standing to challenge different EPA actions does not diminish its burden to establish standing in this case. *Cf. TransUnion*, 141 S. Ct. at 2208 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press."). Moreover, the previous cases Growth Energy cites for this proposition do not opine on Growth Energy's standing. But they resolve other parties' standing based on more detailed evidence than Growth Energy has provided here. For example, in *Growth Energy*, environmental petitioners challenged an EPA rule increasing the annual fuel target for biofuels. 5 F.4th at 28. Relying on a report and declaration explaining how increasing the volume of required biofuels would increase demand for the feedstocks that create those biofuels, we held that environmental petitioners would experience injury. *Id.*; *see also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015 (D.C.

---

[15]    By contrast, the Tenth Circuit found a similar biofuels coalition had standing to challenge EPA's grant of a hardship exemption when the coalition included an affidavit from an economist who modeled how the actual demand for renewable fuels would be affected by RFS exemptions. *RFA*, 948 F.3d at 1232-33 (10th Cir. 2020), *vacated*, No. 18-9533, 2021 WL 8269239 (10th Cir. July 27, 2021).

52

Cir. 2016) (holding that "economic actors suffer constitutional injury in fact when agencies . . . allow increased competition" (cleaned up)).  In contrast to those earlier cases, Growth Energy submitted no evidence whatsoever about how vacating these Compliance Actions would affect the overall demand for renewable fuels.

With respect to Article III standing, past performance is no guarantee of future results.  Growth Energy failed to establish its members have standing to challenge the Alternative Compliance Actions.  Accordingly, we dismiss Growth Energy's petition for review.

**B.**

Next, we turn to the two small refineries' challenges. Sinclair Wyoming Refining Company ("Sinclair") and Wynnewood Refining Company ("Wynnewood"), along with 34 other small refineries, applied for hardship exemptions in 2018.  In March 2019, while waiting for EPA to decide their petitions, both Wynnewood and Sinclair retired RINs to satisfy their 2018 RFS obligations.

In August 2019, applying its longstanding approach of granting exemption petitions based on the DOE matrix, EPA granted 31 of the 2018 hardship petitions, including Wynnewood's.  *See* August 2019 Decision (J.A. 3518-19). EPA contemporaneously returned the RINs of the refineries for which it granted exemptions.

EPA denied the remaining five petitions, including Sinclair's, based on the DOE matrix.  *Id.* (J.A. 3518-19).  In Sinclair's view, its denial resulted from a clerical error: EPA failed to convey a necessary document to DOE, which resulted

53

in a lower DOE matrix score.  In January 2021, EPA reversed its decision and granted Sinclair's 2018 small refinery exemption.  EPA, Decision on the Small Refinery Exemption Petitions from the Sinclair Wyoming Refinery for 2018 and 2019 and the Sinclair Casper Refinery for 2019 (2021) (J.A. (22-1074) 630-32, 782).  It did not, however, return the RINs Sinclair had already retired for the 2018 compliance year.

Not satisfied with EPA's actions, both refineries sought redress, first with EPA and then in petitions for review.  Wynnewood requested EPA reissue its RINs, rather than merely returning them, to remedy the value the RINs lost while awaiting EPA's delayed decision on its hardship petition.  Letter from Wynnewood to EPA, Re: Petition for Hardship Relief Under EPA's Renewable Fuel Standard at 2 (Sept. 20, 2019) (J.A. (22-1074) 670).  Some of Wynnewood's RINs had been 2017 carryovers, so they had expired by the time EPA returned them.  The remaining RINs—from 2018—had depreciated in value since Wynnewood retired them.  When EPA declined, Wynnewood petitioned for review in the Tenth Circuit.[16]  Sinclair requested EPA return the RINs it had retired before receiving its exemption.  When EPA declined, Sinclair petitioned the Tenth Circuit for review.

While Wynnewood's and Sinclair's cases were pending, the Supreme Court decided *HollyFrontier*, 594 U.S. 382.  In response, EPA moved—unopposed—to remand both refineries' pending cases.  We remanded Wynnewood's case for EPA to reassess along with the rest of the 2018 petitions affected by *HollyFrontier*.  The Tenth Circuit vacated and

---

[16]     The case was transferred to this circuit by consent of both parties after we granted a motion to consolidate Wynnewood's case with Sinclair's case challenging the 2018 denials.

54

remanded Sinclair's exemption. Thus, at the time of the 2022 Denial Actions, Wynnewood's exemption had been remanded but not vacated, and Sinclair's exemption had been vacated and remanded. That brings us to the present action.

EPA denied both Sinclair's and Wynnewood's 2018 hardship petitions in the April Denial. To mitigate the hardship of revoking previously granted exemptions, EPA issued the April Compliance Action. The Compliance Action authorized Wynnewood to show compliance through alternative methods, but it was silent on Wynnewood's request for RIN reissuance. The Compliance Action explicitly excluded Sinclair, along with the four other refineries whose hardship petitions EPA initially denied, from all alternative relief, effectively denying Sinclair's petition for alternative compliance and RIN reissuance. April Compliance Action at 1 n.5 (J.A. (22-1074) 4 n.5).

Both refineries petitioned for review of the April Compliance Action.

## 1.

Sinclair argues EPA's April Compliance Action was arbitrary and capricious because EPA excluded Sinclair without explaining why it was treated differently from similarly situated refineries. It is "black letter administrative law" that "like cases must receive like treatment." *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (cleaned up). Sinclair argues EPA failed to provide an adequate explanation for treating Sinclair differently because EPA simply noted in a conclusory footnote that five refineries were excluded from the alternative compliance relief and made no specific mention of Sinclair. Sinclair also argues it is

55

fundamentally the same as the 31 refineries that received relief, so the reason EPA gave for treating it differently is flawed. We disagree.

While EPA certainly could have provided more detail, we conclude that the agency adequately explained its exclusion of Sinclair from the April Compliance Action.  EPA set forth that its purpose in issuing the Compliance Action was to address the "virtually insurmountable obstacles" to small refineries whose hardship exemptions EPA had initially granted and that now needed to purchase RINs to meet their newly reimposed 2018 obligations.  April Compliance Action at 1 (J.A. (22-1074) 4).  EPA detailed its concern about the practical effects of asking previously exempted refineries to resubmit RINs.  *Id.* at 10-14 (J.A. (22-1074) 13-17).  It concluded that "because of the passage of time between when [the refineries] received their original [exemption] grants and the [April] Denial, they either no longer hold the RINs they once acquired to demonstrate compliance or they do not hold RINs in sufficient amounts to meet their combined RFS obligations."  *Id.* at 7 (J.A. (22-1074) 10).  EPA also explained its concern about "the impacts . . . on the RFS program as a whole" that a sudden increase in demand for RINs would cause.  *Id.* at 9 (J.A. (22-1074) 12).

Relying on this reasoning, EPA explained it was excluding refineries whose hardship petitions it originally denied (in August 2019) because they neither faced challenges in meeting new obligations nor contributed to an increase in new demand for RINs.  *Id.* at 1 n.5 (J.A. (22-1074) 4 n.5).  Sinclair is one of those refineries.  Its hardship petition was initially denied, it retired its RINs, and EPA never returned them.  We recognize that EPA later granted Sinclair a small refinery exemption in January 2021, but Sinclair's RINs were never returned, and the

56

Tenth Circuit vacated Sinclair's exemption after *HollyFrontier*. At the time of the Denial Action, therefore, Sinclair no longer had an exemption.

It was not unreasonable for EPA to conclude that Sinclair is not similarly situated to the 31 small refineries whose exemptions were granted in August 2019 and their RINs returned. After the April Denial, those refineries would have been obliged to purchase and submit new RINs. By contrast, Sinclair's RINs were never returned, and so after the April Denial, it was not obliged to purchase or submit RINs. EPA's explanation of its discretionary relief was sufficient. EPA made clear the criteria for inclusion in the April Compliance Action, and Sinclair did not meet them. On its own terms, the Compliance Action was not arbitrary and capricious.[17]

Sinclair also argues there is no real difference between Sinclair and a refinery that initially received the 2018 exemption because Sinclair *should* have received that exemption. The only reason EPA denied its initial petition, Sinclair argues, was that EPA failed to transmit a document to DOE. If EPA had properly handled the paperwork, Sinclair would have received an exemption. Thus, Sinclair argues, it was essentially the same as the other refineries.

EPA contests whether Sinclair would have received a 2018 exemption even without the error. But we need not decide whether Sinclair should have received the initial exemption. EPA reasonably distinguished refineries based on whether they *received* an exemption, not whether they *should have* received

---

[17]    Because Growth Energy failed to demonstrate standing, we do not reach the question of whether the Compliance Action was within EPA's authority under the CAA.

57

an exemption.  The difference matters. EPA returned RINs to those refineries that received the August 2019 exemption. Requiring them to resubmit RINs now poses the harms to the RIN market that EPA described at length in the April Compliance Action.  By contrast, refineries that did not receive the exemption, regardless of eligibility, did not have their RINs returned.  This is the case for Sinclair.  Even when Sinclair received a belated exemption in January 2021, EPA did not return Sinclair's RINs.

Although Sinclair's small refinery exemption petition took an unusual path, the bottom line is that Sinclair retired RINs, EPA never returned them, and on remand Sinclair's exemption had been vacated.  EPA reasonably concluded that Sinclair differed from the 31 refineries that received relief in the April Compliance Action.  Accordingly, we deny Sinclair's petition for review.[18]

**2.**

While Sinclair was entirely excluded from the April Compliance Action, Wynnewood received compliance relief. Its claim is thus narrower than Sinclair's: Wynnewood argues the April Compliance Action was arbitrary and capricious because EPA did not reissue Wynnewood's RINs in the Compliance Action.  We do not reach the merits of this claim,

---

[18]    Sinclair's other arguments are similarly unavailing.  First, Sinclair argues EPA ignored an important aspect of the problem when explaining why Sinclair was not entitled to relief under the April Compliance Action.  For the reasons above, we conclude EPA's explanation was sufficient. Second, Sinclair argues we should instruct EPA not only to return its RINs but also to reissue them. We need not reach this issue, however, because EPA did not err in denying Sinclair alternative compliance relief.

58

however, because EPA did not deny Wynnewood's request for RIN reissuance in the April Compliance Action—rather, EPA was silent on Wynnewood's request.

The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The problem for Wynnewood is that there has been no agency action, finding, or conclusion on Wynnewood's request for RIN reissuance. EPA did not rule on Wynnewood's request for RIN reissuance in the Compliance Action, which is silent on the matter. As explained above, the Compliance Action was tailored to remedy the effects of asking previously exempted refineries to resubmit RINs for years long since passed. By contrast, reissuing RINs is about the value of the RINs, not their availability. That type of relief was simply not addressed in the Compliance Action. Nor does Wynnewood point to any other action taken by EPA that addressed the RIN reissuance request.

Because the Compliance Action does not resolve Wynnewood's request for RIN reissuance, we cannot review the Compliance Action for its treatment of Wynnewood's claim. Accordingly, we dismiss Wynnewood's petition for review.[19]

---

[19]    We note that nothing in this decision forecloses Wynnewood's ability to seek review down the road. Wynnewood may again request EPA to reissue its RINs, as it did when EPA first returned the RINs in 2019. If EPA denies that request, Wynnewood could petition for review of that action. If EPA fails to act, Wynnewood could petition the court to compel a response.

59

\* \* \*

In sum, with respect to the petitions in No. 22-1074, we dismiss Growth Energy's petition for lack of standing; we deny Sinclair's petition because EPA's decision was adequately explained; and we dismiss Wynnewood's petition because there was no agency action with respect to its claim.

## VI.

For the foregoing reasons, we deny the petitions of Company A and Company B but otherwise grant the petitions for review in No. 22-1073, vacate the Denial Actions, and remand to EPA for further proceedings.  In No. 22-1074, we dismiss Growth Energy's and Wynnewood's petitions and deny Sinclair's petition.

*So ordered.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Intervenor Growth Energy hereby certifies the following as to parties, rulings, and related cases.

## PARTIES AND AMICI

### A. Petitioners

Review of April 2022 Denial of Petitions

- Sinclair Wyoming Refining Company LLC, and Sinclair Casper Refining Company LLC, No. 22-1073

- HF Sinclair Refining & Marketing LLC; HF Sinclair Cheyenne Refining LLC; HF Sinclair Woods Cross Refining, LLC, No. 22-1075

- Delek US Holdings, Inc., No. 22-1100

- Cenovus Energy Inc., and Superior Refining Company LLC, No. 22-1102

- CHS, Inc., No. 22-1109

- Cross Oil Refining & Marketing, Inc., No. 22-1114

- United Refining Company, No. 22-1115

- Kern Oil & Refining Co., No. 22-1122

- Wynnewood Refining Company, LLC, No. 22-1124

- American Refining Group, Inc., Nos. 22-1128 and 22-1199

- Calumet Montana Refining, LLC, and Calumet Shreveport Refining, LLC, No. 22-1129

- Countrymark Refining and Logistics, LLC, Nos. 22-1130 and 22-1165

- Ergon Refining, Inc., No. 22-1131

- Hunt Refining Company, No. 22-1132

- Par Hawaii Refining, LLC; U.S. Oil & Refining Company; and Wyoming Refining Company, Nos. 22-1133 and 22-1219

- Placid Refining Company LLC, No. 22-1134

- San Joaquin Refining Co., Inc., No. 22-1135

Review of June 2022 Denial of Petitions

- Wynnewood Refining Company, LLC, No. 22-1178

- Delek US Holdings, Inc.; Lion Oil Company, LLC; Alon Refining Krotz Springs, Inc.; and Delek Refining, Ltd., No. 22-1181

- Sinclair Wyoming Refining Company LLC; and Sinclair Casper Refining Company LLC, No. 22-1183

- CHS, Inc., No. 22-1185

- HF Sinclair Refining & Marketing LLC; HF Sinclair Cheyenne Refining LLC; HF Sinclair Woods Cross Refining, LLC, No. 22-1186

- Kern Oil & Refining Co., No. 22-1187

- Cross Oil Refining & Marketing, Inc., No. 22-1188

- United Refining Company, No. 22-1189

- American Refining Group, Inc., Nos. 22-1190 and 22-1246

- Calumet Montana Refining, LLC, and Calumet Shreveport Refining, LLC, No. 22-1191

- Countrymark Refining and Logistics, LLC, Nos. 22-1192 and 22-1238

- Ergon Refining, Inc., and Ergon-West Virginia, Inc., No. 22- 1193

- Hunt Refining Company, No. 22-1194

- Par Hawaii Refining, LLC; U.S. Oil & Refining Company; and Wyoming Refining Company, Nos. 22-1195 and 22-1240

- Placid Refining Company LLC, No. 22-1196

- San Joaquin Refining Co., Inc., No. 22-1197

- The San Antonio Refinery LLC, No. 22-1198

## B. Respondents

U.S. Environmental Protection Agency

## C. Intervenors

American Coalition for Ethanol; Growth Energy; National Corn Growers Association; National Farmers Union; Renewable Fuels Association.

## D. Amici

There are no amici.

## RULINGS UNDER REVIEW

The rulings under review are EPA's final actions titled *June 2022 Denial of Petitions for RFS Small Refinery Exemptions*, noticed at 87 Fed. Reg. 34,873 (June

8, 2022), and *April 2022 Denial of Petitions for RFS Small Refinery Exemptions*, noticed at 87 Fed. Reg. 24,300 (Apr. 25, 2022).

## RELATED CASES

Growth Energy is aware of the following currently pending case involving challenges to related EPA actions: *Sinclair Wyoming Refining Company LLC v. EPA*, No. 22-1074 (D.C. Cir.).

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Growth Energy provides the following corporate disclosure statement:

Growth Energy is a non-profit trade association within the meaning of Circuit Rule 26.1(b).  Its members are ethanol producers and supporters of the ethanol industry.  It operates to promote the general commercial, legislative, and other common interests of its members.  It does not have a parent company, and no publicly held company has a 10% or greater ownership interest in it.


/s/ David M. Lehn
DAVID M. LEHN